1    Douglas V. Drury, Esq.
     MUELLER & DRURY, P.C.
2    8110 East Cactus Road, Ste. 100
3    Scottsdale, AZ  85260-5110
     mdlaw@muellerdrury.com
4    (480) 368-5511
     State Bar No. 011461
5    Attorney for Defendant Cara M. Christ,
6    Director of the Arizona Department of Health Services,
     in her official capacity
7

## IN THE UNITED STATES DISTRICT COURT

8

## FOR THE DISTRICT OF ARIZONA

9

10    Planned Parenthood Arizona, Inc.; Eric    )    Case No.: 2:15-CV-01022-SPL
     Reuss, M.D., M.P.H.; Paul A. Isaacson,    )
11    M.D., Desert Star Family Planning, LLC;    )
     DeShawn Taylor, M.D.,    )
12                   Plaintiffs,    )    **DEFENDANT CARA M. CHRIST'S**
     )    **RESPONSE TO PLAINTIFFS'**
13    v.                             )    **MOTION FOR TEMPORARY**
     )    **RESTRAINING ORDER AND/OR**
14                                     )    **PRELIMINARY INJUNCTION AND**
     Mark Brnovich, Arizona Attorney General, )    **MEMORANDUM OF POINTS AND**
15    in his official capacity; Cara M. Christ, )    **AUTHORITIES**
     Director of the Arizona Department of )
16    Health Services, in her official capacity; )
17    Patricia E. McSorley, Executive Director )
     of the Arizona Medical Board, in her )
18    official capacity; Richard T. Perry, M.D. )
     Medical Board Chair, in his official )
19    capacity; James Gillard M.D., Medical )
20    Board Vice Chair, in his official capacity; )
     Jodi A. Bain, Medical Board Member, in )
21    her official capacity; Marc D. Berg, M.D., )
     Medical Board Member, in his official )
22    capacity; Donna Brister, Medical Board )
23    Member, in her official capacity; R. )
     Screven Farmer, M.D., Medical Board )
24    Member, in his official capacity; Gary R. )
     Figge, M.D. Medical Board Member, in his )
25    official capacity; Robert E. Fromm, M.D., )
     Medical Board Member, in his official )

capacity; Paul S. Gerding, Medical Board )
Member, in his official capacity; Lois )
Krahn, M.D. Medical Board Member, in )
her official capacity; Edward G. Paul, )
M.D. Medical Board Member, in his )
official capacity; Wanda J. Salter, Medical )
Board Member, in her official capacity; )
Jenna Jones, Executive Director of the )
Arizona Board of Osteopathic Examiners )
in Medicine and Surgery, in her official )
capacity; Scott Steingard, D.O., Board of )
Osteopathic Examiners in Medicine and )
Surgery President, in his official capacity; )
Douglas Cunningham, D.O.; Board of )
Osteopathic Examiners in Medicine and )
Surgery Vice President, in his official )
capacity; Gary Erbstoesser, D.O., Board of )
Osteopathic Examiners in Medicine and )
Surgery Member, in his official capacity; )
Jerry G. Landau, Board of Osteopathic )
Examiners in Medicine and Surgery )
Member, in his official capacity; Martin B. )
Reiss, D.O. Board of Osteopathic )
Examiners in Medicine and Surgery )
Member, in his official capacity; Lew )
Riggs, Board of Osteopathic Examiners in )
Medicine and Surgery Member, in his )
official capacity; Vas Sabeeh, D.O., Board )
of Osteopathic Examiners in Medicine and )
Surgery Member, in his official capacity, )
)
)
Defendants. )

Defendant Cara M. Christ, Director of Arizona Department of Health Services in her official capacity only, hereby responds to Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction and respectfully requests that the Motion be denied. This Response is supported by the attached Memorandum of Points and authorities and Declarations of Dr. George Delgado (Exhibit "A"), Dr. Mary

1

Davenport (Exhibit "B"), Dr. Grattan Brown (Exhibit "C"), Andrea Minichini (Exhibit "D") and Candy Campana (Exhibit "E").

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      Introduction.**

Plaintiffs build their Motion on two faulty foundations (one factual, one legal); neither of which satisfy the high threshold needed to grant the requested injunctive relief.  First, they target a standard medical practice, using the hormone progesterone to help sustain pregnancy (an accepted off-label purpose), and attempt to demonize it and its practitioners.  Their oft-repeated claim that there is "no evidence" to support the practice is false.  Second, on their First Amendment claim, they ask this court to review the statutory language at issue under a heightened scrutiny standard despite the Supreme Court's clear mandate in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992) and its progeny to review the statute under an undue burden standard.

**II.      Statement of Facts**

The Arizona Legislature passed and the Arizona Governor signed SB1318 (hereinafter the "Act") which, except for those portions stayed by the Court's June 16, 2015 Temporary Restraining Order (Dkt. 32), went into effect July 2, 2015.[1]  Among other provisions, the bill amended Arizona's informed consent statute A.R.S. §36-2153 adding disclosure requirements to A.R.S. §36-2153(A)(2)(h),(i) regarding reversal of the effects of medication abortion and making a change to A.R.S. §36-2153(C)(8) to require additional content on the Arizona Department of Health Services website regarding that procedure (see attached Exhibit "F", statute and legislative history).

---

[1] For scheduling reasons, the parties agreed to temporarily stay a portion of the statute pending a ruling on Motion.  (Dkt. 30).

Plaintiffs challenge the following additions to the informed consent statute requiring that they inform abortion patients that;

> (h) IT MAY BE POSSIBLE TO REVERSE THE EFFECTS OF A MEDICATION ABORTION IF THE WOMAN CHANGES HER MIND BUT THAT TIME IS OF THE ESSENCE.
> (i) INFORMATION ON AND ASSISTANCE WITH REVERSING THE EFFECTS OF A MEDICATION ABORTION IS AVAILABLE ON THE DEPARTMENT OF HEALTH SERVICES' WEBSITE.

### A.    Plaintiffs' Factual Claims.

Plaintiffs claim that there is no credible medical evidence to support the statutory requirements; that the requirements are irrelevant to patients that do not want to have a medication abortion; and that doctors are forced, against their First Amendment rights, to steer patients toward an experimental practice. Dkt. 1 ¶2. Plaintiffs also claim that the Act "requires that women seeking an abortion receive false, misleading, and/or irrelevant information in violation of their Fourteenth Amendment rights *Id.* ¶3. In doing so, Plaintiffs make a surprising error in treating progesterone supplementation as if it was a new, experimental drug rather than the time-tested treatment that it is.

### B.    Abortion Pill Reversal ("APR").

#### 1. Introduction.

APR came about because abortion patients who had second thoughts about proceeding with abortion after taking mifepristone began to call doctors seeking assistance in preserving their pregnancies. The doctors began to use progesterone supplementation as a viable option to preserve the pregnancies. Plaintiffs focus narrowly on Dr. George Delgado, an MD Board Certified in Family Medicine and a Fellow of the American Academy of Family Practice based in San Diego, California.

However, the first known instance of APR occurred in 2007 by Dr. Matthew Harrison.[2] To downplay the increasingly widespread use of the reversal process, Plaintiffs claim that a "small number of physicians" have "experimented" with the practice. Dkt. 1 ¶41. The Abortion Pill Reversal (APR) program is widespread, with a current network of 309 physicians worldwide, including in Arizona. Declaration of Dr. George Delgado (hereinafter "Delgado") ¶4.   Dr. Allan Sawyer, a well-known and well-respected OB/GYN in Arizona, has successfully performed the abortion pill reversal procedure. (Exhibit F).   Plaintiffs seem to imply that APR arises solely out of a case series as reflected in an article by Dr. Delgado.  As set forth herein, it is based on much more evidence, including the time-proven efficacy of progesterone, other studies, and now several years of successful implementation of APR.

From a medical and scientific standpoint, the practice of APR is remarkably modest, especially in light of Plaintiffs' wildly inaccurate claims of ethical breaches. APR: (1) takes an FDA approved hormone (progesterone) that is proven safe for pregnant women at the recommended doses and gives it to pregnant women; (2) uses progesterone which is known to aid in the prevention of fetal demise and uses it to aid in the prevention of fetal demise; and (3) for women have taken an anti-progesterone (mifepristone) for abortion and changed their mind about the abortion, reverses the effects of mifepristone by supplementing progesterone as quickly as possible following the ingestion of the mifepristone.  This process uses a previously established treatment Davenport ¶3, Delgado ¶5.  In essence, this innovation is only one of timing – moving quickly using a standard practice of supplementing progesterone in women who wish to continue their pregnancies after taking mifepristone.  (See §II(B)(4) below).

---

[2] Priests for Life Educational Resources
http://www.priestsforlife.org/columns/columns2007/07-07-16-ru486-reversal.htm

4

The American Association of ProLife Obstetricians and Gynecologists, a 2500 member organization, supports offering APR to women who regret initiating the abortion pill process, after providing appropriate informed consent. Davenport ¶3.

### 2. Progesterone in the Pregnancy Process.

Progesterone is a hormone that the ovaries produce to help the uterus prepare for pregnancy and help maintain the pregnancy once it begins. Progesterone levels increase two to three times during the first several weeks of pregnancy.  Davenport ¶31.

Women with low progesterone may be at higher risk for miscarriage. Progesterone is a well-accepted therapy for women with recurrent miscarriage. It prepares the endometria for implantation, thickens the uterine lining to ensure a successful pregnancy, increases arterial blood and glycogen in the uterine lining to ensure the right nutrients for the baby; thickens the cervix and creates a mucus plug to prevent bacteria entering the uterus.  The fact that progesterone sustains pregnancy and helps prevents fetal demise at all gestation periods, from the first through the end of the third trimesters, is not medically controversial.[3]  See also, Davenport ¶¶24-28.

Because progesterone is an endogenous hormone made by the human body, therapeutic use within the ranges normally produced by a woman and fetus during pregnancy is safe.  Providing pregnant women progesterone is not a new medication or treatment.  Progesterone is widely used by physicians treating infertility and is provided

---

[3] See, for example, S.S. Hassan, *Vaginal Progesterone Reduces the Rate of Preterm Birth in Women with a Sonographic Short Cervix: a multicenter, randomized, double-blind, placebo controlled trial*. Ultrasound Obstet Gynecol. July, 2011; 38(1): 18–31 (E-published June 15, 2011); E. Cetingoz, *Progesterone Effects on Preterm Birth in High-risk Pregnancies: a randomized placebo-controlled trial.*, Arch Gynecol Obstet. March, 2011; 283(3): 423-9. (E-published January 22, 2010) (finding statistically significant reduction of the rate of pre-term labor and pre-term delivery in high-risk groups due to the prophylactic administration of progesterone.)

to older women, women who have had previous miscarriages and other women at risk for pregnancy loss.   Delgado ¶9, Davenport ¶¶25-28.   Treating patients with progesterone to help promote pregnancy is a long-standing and safe medical practice, not "junk science" as Plaintiffs claim.

Once a woman changes her mind about getting an abortion after taking mifepristone, she ceases to be an abortion patient and becomes a woman at risk for pregnancy loss.   Although the risk to her pregnancy from the lack of progesterone effect is drug-induced, she has much in common with miscarriage and infertility patients who suffer from inadequate progesterone production due to other causes. Davenport ¶24.

In order to demonize as unethical the many doctors who supplement progesterone to reverse the effects of mifepristone, Plaintiffs talk about progesterone as if it were something alien and experimental. It is already present in women before they become pregnant and naturally increases in women during pregnancy.   Mifepristone's purpose as the first drug in the medication abortion protocol is to suppress progesterone. See §II(B)(3) below.   By adding progesterone in APR, doctors are supplementing the blocked progesterone.[4]   Plaintiffs take something routine, providing additional progesterone to pregnant women with suppressed progesterone and falsely equate it with unauthorized "human experimentation."

This is not a new hormone treatment, it has been occurring for decades.   It is not a new idea that progesterone will help protect against fetal demise; it is well-proven that it does.  This is not a new purpose; administering progesterone to pregnant women with inhibited progesterone is standard practice.   Women who have taken mifepristone and

---

[4] There is not a specific regimen for this process; each doctor who has volunteered to be available for APR consultations uses their medical judgment on the best way to supplement progesterone for their patients.

change their mind about aborting are pregnant women with suppressed progesterone. To equate supplementing progesterone with testing new, unproven drugs on humans without Institutional Review Board approval is absurd.

### 3.    Medication Abortion.

Medication abortion terminates the pregnancy through a process.  In the first step, mifepristone (RU-486)[5] is administered orally which blocks the progesterone receptors, acting as an anti-progesterone, blocking the progesterone receptor on the uterine lining and diminishing progesterone secretion of the corpus luteum of the ovary. If not counteracted, it causes the embryo to detach, die and be expelled. The FDA-approved protocol requires that, two days after taking mifepristone, the woman is to have an appointment for administration of the second drug, misoprostol, if necessary, to complete the abortion by inducing the contractions necessary to expel the remaining pregnancy tissue.  Davenport ¶6.  Some abortion providers also use an off-label protocol in which the woman receives only one 200 mg mifepristone tablet and is given misoprostol to take on her own after two days have passed.  Davenport ¶7.

Mifepristone alone often causes fetal demise and has effects up to 72 hours after it is taken.  However, as Plaintiffs admit, the fetus can survive the administration of mifepristone alone.[6]

---

[5] Mifepristone is widely used; approximately two million babies have been aborted in the United States using it.  (Boonstra, Guttmacher Policy Review, "Medication Abortion Restrictions Burden Women and Providers," Winter 2013, Volume 16, Number 1; indicating 1.52 million mifepristone abortions from 2000-2011; extrapolated based on the annual rate to 2015).

[6] Plaintiffs inaccurately claim that "up to 46% of women would have continuing pregnancies after taking mifepristone alone." (Dkt. 3-1 at 8, ¶14). The single study Plaintiffs rely on for the 46% figure (Zheng) is an outlier and is seriously flawed.   The study determined fetal survival based on inaccurate criteria and had other testing anomalies.  The reliance on faulty criteria explains why Zheng's reported rate of mifepristone "failure" is more than double the rate of comparable studies that used ultrasound to determine if the embryo were still alive at the end of the treatment period.

### 4.   Why APR Works.

APR seeks to reverse the effects of mifepristone through administration of progesterone after the mifepristone and before the woman takes misoprostol.  The rationale behind the treatment is simple; a woman who has taken the anti-progesterone mifepristone and changes her mind needs her progesterone supplemented, just as would any pregnant woman at risk for pregnancy loss.  Supplemental progesterone competitively inhibits the mifepristone to prevent the induced abortion. Davenport ¶¶3, 22-23, Delgado ¶12. After mifepristone inhibits progesterone, a woman who changes her mind about abortion needs the progesterone supplemented as soon as possible. Delgado ¶14.

Despite Plaintiffs' mantra of "no evidence," evidence exists in support of APR. This includes evidence-based practice as well as studies dealing with the reversal potential of progesterone both as to mifepristone and as to other progesterone inhibitors. Davenport ¶¶23-24, Delgado ¶12.

The fetal survival rate when using APR is 55-60%.[7] Delgado ¶13. Based on the most relevant aggregated studies, the fetal survival rate when the mother takes mifepristone alone without APR is approximately 15%-17.5%. Davenport ¶¶13-20. Étienne-Émile Baulieu who developed RU-486 found a 10% survival rate when administered to women 4-7 weeks pregnant and 15% at 8-10 weeks. Davenport ¶11.[8]

Plaintiffs overcompensate by making radical, medically unsupported claims about this common use of progesterone in APR.  The hormone is already present in the

---

(See Davenport, ¶11-20 and Section II(A)(4) below).  Numerous studies using proper methodology show fetal survival rates ranging from 12.4-22.6% following the administration of mifepristone alone.
[7] Based on more than 114 live births reported by physicians using APR, and 75 current ongoing pregnancies. Delgado ¶13.
[8] Dr. Baulieu also considered the effects of mifepristone reversible. Davenport ¶23.

woman's body before, during and after she takes mifepristone.  The APR process involves, in total, administering progesterone to a woman with inhibited progesterone and is being used as a supplement to the naturally occurring progesterone in a pregnant woman's body to help prevent fetal demise.  There is nothing "radical" about APR.

While progesterone supplementation to reverse the effects of mifepristone is an off-label use of an FDA approved hormone, it is being used for a proven evidence-based purpose; to supplement progesterone in pregnant women who need it. Progesterone supplementation to reverse the effects of mifepristone is equivalent to its therapeutic use since the 1970's to counter infertility and recurrent miscarriage. It is also analogous to the common use of progesterone to counteract drugs used in infertility treatments that adversely inhibit the effects of progesterone.  This accepted use of progesterone already demonstrates that the effects of drugs which negatively impact progesterone during pregnancy can be reversed.  Davenport ¶24.

Off-label use of FDA approved drugs is legal and widely prevalent in the United States.

> "Once a drug has been approved by the FDA for one purpose, a physician can prescribe that drug for any purpose. The practice of prescribing a drug for a purpose other than that for which it is approved is known as "off-label" use. Off-label use is legal and does not necessarily mean that the drug is being used inappropriately. In fact, many physicians prescribe a drug off label because they believe it is the best treatment for a specific condition *even though it has not yet been formally tested for use in that condition*. Informed Consent for Off-Label Use of Prescription Medications, American Medical Association Journal of Ethics, Vol.14, No.7, July, 2012.  (Emphasis added, citations omitted).

Surprisingly, Plaintiffs fail to analyze the supplementation of progesterone as the legal, time-tested practice that it is; instead choosing to mischaracterize it as unethical medical experimentation.  They acknowledge that APR involves an off-label use of progesterone (Dkt 3 at 9, n.6), but then fail to deal with the implications of that admission – an off label use of an approved substance is legal and entirely different

from experimenting on people with a new substance.   This undermines the entire edifice of their argument.  The cited AMA article does not indicate that an institutional review board is needed for off-label uses; it doesn't even mention IRB's and explicitly acknowledges that off-label use is appropriate even when there has not been testing. It does state that there is an ethical issue implicated in off label use. Patients should be given informed consent; a practice that is followed in APR. Delgado ¶6.

Off-label use is not inherently unethical, particularly when there is an extensive body of evidence for the safe and efficacious utilization of a particular medication.  The ethical use of off-label medication is judged by its goals and circumstances. (Brown ¶7).  If a physician knows that an off-label use will very effectively address a serious, life-threatening condition without disproportionate burdens, especially in the absence of "on-label" approaches, then that knowledge may at times even imply an obligation on his part to provide it. (Brown ¶9).

The off-label use of progesterone to reverse the effects of mifepristone is just such a life-saving situation.  Mifepristone acts to disrupt the natural biological functioning of the woman's body and fatally disrupt the natural development of the embryo.  Because the drug blocks progesterone, which is needed to build and maintain the uterine wall during pregnancy, the embryo cannot implant, receive nutrition, and continue to develop.  The off-label use of progesterone to build and maintain the uterine wall during pregnancy is therefore a sensible use as a reagent for mifepristone. Moreover, the fact that progesterone is a substance naturally found in a woman's body should diminish off-label safety concerns. (Brown ¶11).

The proponents of APR recommend this therapy to individual physicians for emergency off-label use for life saving therapeutic reasons as is consistent with the FDA guidelines on off-label use. Davenport ¶42.

## C.   APR Poses No Significant Health Risks.

Although progesterone had a warning label for a time, it eventually was recognized to be free of birth defect risk and the warning label removed by the FDA in 1999.  Davenport ¶34. The American Society for Reproductive Medicine ("ARSM"), the premier professional group specialized in treating women with fertility and miscarriage issues, finds progesterone safe to use in pregnancy:

> The weight of available evidence suggests that progesterone supplementation in early pregnancy poses *no significant risk to mother or fetus*....Controlled studies show no increase in congenital anomalies, including genital abnormalities in male and female infants, resulting from maternal exposure to [progesterone]...during early pregnancy. (Emphasis added) (ASRM Bulletin November, 2008 Volume 90, Issue 5, Supplement, Pages S150–S153).

This directly contradicts Plaintiffs' declaration from Dr. Schreiber regarding progesterone risk of birth defects which are obsolete according to more recent research. Furthermore, her statement that progesterone poses a risk for cholestatic jaundice and hypertension is not relevant to use of progesterone in early pregnancy.  Davenport ¶37.

Both mifepristone and progesterone independently have been determined to not cause birth defects. There is no reason to believe that child of a woman who uses both drugs together would be at risk for birth defects. Progesterone is a substance produced at high levels in normal pregnancy. The fact that thousands of babies have been born who have survived mifepristone without an increase in birth defects demonstrates that the interactions of mifepristone and progesterone are not harmful.  Davenport ¶38.

Progesterone supplementation during pregnancy is safe at the dosages at issue herein. Davenport ¶¶3, 32-41; Delgado ¶¶9-10.   There is no evidence that the administration of progesterone under these circumstances presents additional risk to the mother or fetus, contrary to Plaintiffs' allegations. Davenport ¶¶ 31-39; Delgado ¶¶10-11.

11

Ultimately, Plaintiffs provide no evidence that APR is unsafe or any plausible theory as to why it would be. Their focus is too narrow, ignoring the vast body of evidence showing the safety and efficacy of progesterone supplementation. The ultimate medical questions here are time-tested; supplementing progesterone protects against fetal death. Mifepristone works as an anti-progesterone and therefore, when a woman changes her mind after the administration of mifepristone, her progesterone needs to be supplemented.

## III.   Argument

### A.   Introduction.

Plaintiffs' First and Fourteenth Amendment claims are viewed under a rational basis/undue burden analysis. "Where it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn." *Gonzales v. Carhart*, 550 U.S. 124, 158 (2007). In the informed consent context, this means that the regulation must be true, non-misleading and relevant. *Casey*, 505 U.S. at 882.

### B.   The Undue Burden Test is the Proper Standard of Review for Plaintiffs' First and Fourteenth Amendment Claims.

The Supreme Court has rejected use of strict scrutiny in the abortion context. In *Casey*, it provided guidance to lower courts in determining the constitutionality of abortion regulations, including informed consent regulations that impact doctors' First Amendment rights. It reaffirmed Roe's "essential" holdings that a woman has a "right" to "choose to have an abortion" (before viability) without "undue interference from the State," and that the State has a legitimate interest from the outset of pregnancy in protecting the health of the woman and the life of the unborn child. *Id.* at 846.

The State is not prohibited from taking steps to ensure that a woman's choice is thoughtful and informed. *Id.* at 872. From the outset of pregnancy, the State can show concern for maternal health and the life of the unborn child and act to further those interests in protecting life. *Id.* at 853, 869. Protecting that interest in life is the aim of the Act. After explicitly rejecting strict scrutiny, *Casey* articulated the "undue burden" standard: only where a regulation imposes an undue burden on a woman's ability to choose abortion does the State overreach. *Id.* at 874.

> A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.

*Id.* at 877. The Act at issue has neither a purpose nor effect of placing such a substantial obstacle; it merely provides additional information for the mother about her health care options.

In the context of an informed consent regulation, a regulation "must be calculated to inform the woman's free choice, not hinder it." *Id.* at 877. "In short, requiring that the woman be informed of the availability of information relating to fetal development and the *assistance available should she decide to carry the pregnancy to full term* is a reasonable measure to ensure an informed choice, one which might cause the woman to choose childbirth over abortion"—and it does not amount to an undue burden. *Id.* at 883 (emphasis added). Plaintiffs complain that disclosing APR may lead to women changing their mind either to have or not have an abortion. However,

> … as we have stated, under the undue burden standard a State is permitted to enact persuasive measures which favor childbirth over abortion, even if those measures do not further a health interest.

*Id.* at 886.

The fact that the regulation impacts doctors who are required to give informed consent does not change the analysis. "[A] State may regulate the medical profession in

order to promote respect for life, so long as the State does not act irrationally or impose an undue burden on a woman's right to abortion." *Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 912 (9th Cir. 2014).

The *Casey* plaintiffs asserted a "First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State." *Id*. at 884.  Having determined that "a requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion is, for constitutional purposes, no different from a requirement that a doctor give certain specific information about any medical procedure," the Court applied the undue burden standard and disposed of the plaintiffs' First Amendment claims. *Id*.  The Court held that the status of the physician-patient relationship is "derivative" of the woman's position (and rights). *Id*. at 884.

The Court's intent is clear from its discussion of *Wooley v. Maynard*, 430 U.S. 705 (1977), and *Whalen v. Roe*, 429 U.S. 589 (1977).  "To be sure, the physicians' First Amendment rights not to speak are implicated…but only as part of the practice of medicine, subject to reasonable licensing and regulation." *Id*. (citing *Whalen*, 429 U.S. at 603).  The Court then determined, using the undue burden standard, that the informed consent requirement at issue was reasonable, and specifically found "no [First Amendment] constitutional infirmity" in the requirement under that standard. *Id*.

The Court's subsequent declaration in *Gonzales*, 550 U.S. at 159 that states have a significant role to play in regulating the medical profession underscores the Court's holdings that the State, as a licensing and regulating authority, plays a part in physician speech and action.  The "government may use its voice and its regulatory authority to show its profound respect for the life within the woman." *Id*. at 157.  The "law need

14

1  not give abortion doctors unfettered choice in the course of their medical practice...."

2  *Id*. at 163.

3      Following the Supreme Court's lead, the Fifth and Eighth circuits have found

4  informed consent laws in the abortion context to be within the State's general power to

5  regulate the medical profession (and not in violation of the First Amendment) using the

6  undue burden standard. *See Texas Medical Providers Performing Abortions Services v.*

7  *Lakey*, 667 F.3d 570, 580 (5th Cir. 2012); *Planned Parenthood Minn. v. Rounds*, 686

8  F.3d 889 (8th Cir. 2012) ("*Rounds II*").

9      In *Lakey*, the Fifth Circuit denied a First Amendment challenge to an informed

10  consent statute requiring physicians to display an ultrasound image to a woman seeking

11  an abortion and to describe the results of the ultrasound, including "the dimensions of

12  the embryo or fetus," "the presence of external members and internal organs," and the

13  opportunity to hear the fetus's heartbeat. 667 F.3d at 578-82. The *Lakey* court looked to

14  the Supreme Court's recognition in *Gonzales* that "[i]n a decision so fraught with

15  emotional consequence some doctors may prefer not to disclose all relevant

16  information, and [t]he State [has an] interest in ensuring that there is a dialogue that

17  better informs...expectant mothers." *Id.* at 576 (quoting *Gonzales*, 550 U.S. at 157-59.)

18      The *Lakey* court found that such informed consent laws are, one, "part of the

19  State's reasonable regulation of medical practice and do not fall under the rubric of

20  compelling ideological speech that triggers First Amendment strict scrutiny;" two, that

21  "relevant informed consent may entail not only the physical and psychological risks to

22  the expectant mother facing this difficult moral decision, but also the State's legitimate

23  interests in protecting the potential life within her" and three "the possibility that such

24  information might cause the woman to choose childbirth over abortion does not render

25  the provisions unconstitutional." *Id.* at 576 (citations and quotations omitted)

In *Rounds II*, the Eighth Circuit denied a First Amendment challenge to an informed consent law that required both oral and written disclosures that a known risk of abortion is an "[i]ncreased risk of suicide ideation and suicide."  With respect to First Amendment concerns, the court found that "while the State cannot compel an individual simply to speak the State's ideological message, it can use its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion, even if that information might also encourage the patient to choose childbirth over abortion." 686 F.3d at 893.

Plaintiffs rely on *Stuart v. Camnitz*, 774 F.3d 238, 248 (4th Cir. 2014) to claim that heightened scrutiny should be applied to their First Amendment claim.  However, the *Camnitz* court failed to follow *Casey*; making a series of errors.  First, it erred in applying heightened scrutiny, finding that the State's "avowed intent" was "to discourage abortion or at the very least cause the woman to reconsider her decision" and that the regulation "compel[s] speech" that is "ideological in intent and in kind." *Id.* at 242, 245.  However, this is precisely the type of informed consent that *Casey* considered and expressly allowed.

Despite the fact that *Camnitz* involved a "display and describe" informed consent statute similar to *Lakey* and *Rounds*, both which were upheld under a rational basis review under *Casey*, the Fourth Circuit rejected rational basis review.  The *Camnitz* court held instead that, because the statute compels speech and advances the State's preference for childbirth over abortion, the "heightened intermediate scrutiny standard used in certain commercial speech cases" applies. *Id.* at 248.

The *Camnitz* court then went on to find that the statute failed such scrutiny because it "impos[es] additional burdens" than "traditional informed consent" requirements and because "[t]hough the information conveyed may be strictly factual,

the context surrounding the delivery of it promotes the viewpoint the state wishes to encourage." *Id.* at 251-53. In the court's view, the statute improperly compelled the delivery of ideological information in a manner "intended to convey not the risks and benefits of the medical procedure to the patient's own health, but rather the full weight of the State's moral condemnation." *Id.* at 255.

The same "moral condemnation" criticism leveled by the *Camnitz* court could be leveled against the compelled disclosures is *Casey*. There, the Court recognized that the compelled speech reflected a "preference for childbirth over abortion" yet declined to apply heightened scrutiny. *Casey*, 505 U.S. at 883.

The court also erred by finding that the statute failed intermediate scrutiny because the statute "promotes the viewpoint the State wishes to encourage." *Camnitz*, 774 F.3d at 253. *Casey* expressly held that that a State can impose an informed consent requirement to "further[ ] the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." 505 U.S. at 882. *Casey* emphasizes that "[w]hat is at stake is the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so." 505 U.S. at 877. The State is not precluded from legislating in furtherance of its legitimate interests in requiring the disclosure of truthful and relevant information because "[t]he law need not give abortion doctors unfettered choice in the course of their medical practice." *Gonzales*, 550 U.S. at 163.

*Camnitz* also improperly relied on *Pickup v. Brown*, 740 F.3d 1208 (9th Cir.2013) where the court expressly relied on *Casey* and therefore could not have been rejecting the undue burden standard:

> At the midpoint of the continuum, within the confines of a professional relationship, First Amendment protection of a professional's speech is somewhat diminished. For example, in *Planned Parenthood of Southeastern Pennsylvania*

*v. Casey* [...] the plurality upheld a requirement that doctors disclose truthful, non-misleading information to patients about certain risks of abortion.

*Id.* at 1228.

The *Pickup* court's "sliding scale" language was used in the context of ratifying/acknowledging the *Casey* holding that there is a lower protection of free speech in the professional setting, even regarding compelled speech.   Also, the discussion of "quack" medicine in *Pickup* dealt with the State's right to regulate doctors even in light of First Amendment claims, thus undermining rather than bolstering Plaintiffs' First Amendment claim.  *Id.* at 1228.

Here, the Act is an informed consent regulation having an incidental impact on speech.

> Within the confines of a professional relationship, First Amendment protection is diminished" and "when a physician speaks to a patient in the course of medical treatment, his opinions are normally regulated on the theory that they are inseparable from the practice of medicine. *Id.* at 1228-29 (quotations and citations omitted).

Therefore,  the compelled speech under the Act is analyzed under the undue burden standard. Regulations which serve a rational purpose and do not place a substantial obstacle in the way of a woman's decision are constitutional.

### C.    The State Has Wide Discretion to Regulate Abortion Where There is Medical Disagreement or Uncertainty.

In *Gonzales*, the Court considered the constitutionality, not of a regulation of a pre-viability abortion procedure, but a complete ban of a particular pre-viability procedure (i.e., partial-birth abortion).   550 U.S. at 156.[9]  Noting that there were

---

[9] Although *Gonzales* dealt with a later-term partial-birth abortion prohibition, the role of informed consent in a woman's decision-making process played an integral role in that decision. The State has "an interest in ensuring so grave a choice is well informed" and that "[t]he State's interest in respect for life is advanced by the dialogue that better informs the political and legal systems, the medical profession, expectant mothers, and

documented medical disagreements over whether the partial-birth abortion ban would impose significant health risks to women, the Court determined that the relevant question was whether the ban could stand when such medical uncertainty persists. *Id.* at 162-63.   Citing numerous cases, the Court concluded that state and federal legislatures have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Id.* at 163. See also *Lakey*, 667 F.3d at 579:

> Appellees' position seems to assume that the facts of *Casey* represent a constitutional ceiling for regulation of informed consent to abortion, not a set of principles to be applied to the States' legislative decisions. On this broad level, however, the Court has admonished that federal courts are not the repository for regulation of the practice of medicine. *See Gonzales,* 550 U.S. at 157–58.

In *Mazurek v. Armstrong*, 520 U.S. 968, 973 (1997), the Court upheld a restriction limiting the performance of abortions to licensed physicians despite the contention that "all health evidence contradicts the claim that there is any health basis for the law."   The Court noted that "[s]tates [have] broad latitude to decide that particular functions may be performed only by licensed professionals, even if an objective assessment might suggest that those same tasks could be performed by others."

Plaintiffs strongly condemn APR by mischaracterizing it.   However, the evidence supports that many of the long-standing uses of progesterone to aid in fertility and preservation of fetal life are accepted off-label, time-tested, evidence-based practice and legal.   Davenport ¶¶8, 24-28. This includes using progesterone to counteract the effects of progesterone suppression from mifepristone and in vitro fertilization treatments.   Davenport ¶24.   Even if Plaintiffs' concerns had merit, at best there is

society as a whole of the consequences that follow from a decision to elect a late-term abortion." *Id.* at 159, 160.

1    disagreement in the medical community regarding the efficacy of the procedure.  This

2    Court should not act as "the repository for regulation of the practice of medicine" and,

3    therefore, should not prevent notification of this legal use of progesterone to women it

4    may help.

5        **D.    The Act Meets the Rational Basis and Undue Burden Tests.[10]**

6        The State's legitimate and substantial interest in preserving and promoting fetal

7    life is central to *Casey's* conclusion. "[A] fetus is a living organism while within the

8    womb, whether or not it is viable outside the womb. *Gonzales*, 550 U.S. at 147.  The

9    Act at issue deals directly with a medical practice where this substantial interest is

10   implicated; where a mother changes her mind and wants to attempt to keep her baby.[11]

11       Plaintiffs improperly attempt to shift the burden to Defendants to prove the

12   efficaciousness of APR.  However, it is Plaintiffs' burden to prove the Act is untruthful,

13   misleading or irrelevant.  "Planned Parenthood cannot succeed on the merits of its

14   claim that §7(1)(b) violates a physician's right not to speak unless it can show that the

15   disclosure is either untruthful, misleading or not relevant to the patient's decision to

16   have an abortion." *Planned Parenthood Minnesota v. Rounds*, 530 F.3d 724, 735 (8th

17   Cir. 2008) ("*Rounds I*"). Further, they must do so conclusively.  Where there is medical

18   or scientific uncertainty, state legislatures are free to act. "[M]edical uncertainty over

19   whether the Act's prohibition creates significant health risks provides a sufficient basis

20   to conclude […] that the Act does not impose an undue burden." *Gonzales*, 550 U.S. at

21   163-164. The Ninth Circuit has set forth the low threshold the State must meet in

22   regulating physician's speech under a rational basis test:

23   _____

24   [10] Unlike in other contexts, in the informed consent context, there is overlap between
     the two tests.  Here, whether the Act has a rational basis is akin to asking whether the
25   information required to be disclosed is true, non-misleading and relevant.

Plaintiffs argue that the legislature acted irrationally … because there is a lack of scientifically credible proof of harm.  But, under rational basis review, "[w]e ask only whether there are plausible reasons for [the legislature's] action, and if there are, our inquiry is at an end."

*Pickup*, 740 F.3d at 1232 (9th Cir.) (quoting *Romero–Ochoa v. Holder*, 712 F.3d 1328, 1331 (9th Cir. 2013).[12]

Mifepristone is an anti-progesterone.  Some women change their minds about abortion following mifepristone but before the abortion is complete and carry a child to term. Supplementing progesterone in pregnant women is safe, common and efficacious. Evidence exists that the effects of mifepristone are reversible.  This amply provides the "plausible reasons" for the Arizona Legislature's action and the inquiry should be at an end.

Plaintiffs launch several attacks on the Act, claiming that (1) it is not "truthful" because it is not medically proven; (2) it is misleading because the abortion is complete after administration of the second drug and (3) it is not relevant in certain situations because the information must be provided even when non-mifepristone medications are used or medication abortion is not available.

### 1. The Act is Truthful.

The Act provides that patients should be informed that "it may be possible to reverse the effects of a medication abortion…"  This statement is true.  The progesterone use at issue is legal and long-standing as an aid in preserving pregnancy. Controlled studies and evidence-based practice show that the effects of mifepristone

---

[11] The Declarations of Andrea Minichini and Candy Campana provide two such examples. (Minichinni ¶¶1-11, Campana ¶¶3-11).
[12] *Pickup* reviewed legislation which subjected state-licensed "mental health providers" to professional discipline for engaging in "sexual orientation change efforts" with clients who are minors. The *Pickup* court ultimately treated the speech as conduct and concluded "that the First Amendment does not prevent a state from regulating treatment even when that treatment is performed through speech alone." *Id.* at 1230.

can be reversed.  Plaintiffs ignore the actual wording of the Act in their attempt to impose a requirement that Arizona prove APR is effective, ignoring the warning of *Rounds* that a statute must be carefully read and reviewed according to its terms.

The statute in *Rounds* required informed consent to include "a description of all known medical risks of the procedure and statistically significant risk factors to which the pregnant woman would be subjected, including...[i]ncreased risk of suicide ideation and suicide."  Planned Parenthood and ACOG argued that the statute required conclusive proof of a causal link between abortion and suicide.

The court held that a statute requiring an informed consent disclosure of an increased risk of suicide did not require proof of such causal link.  "Even if the language...reasonably could be construed to require a disclosure of a causal link," the court would adopt the construction that would preserve the statute, i.e. that no causal link need be proven. *Rounds II*, 696 F.3d at 897.

Similarly, A.R.S. §36-2153(A)(2)(h) requires no conclusive proof of the efficacy of APR, stating that "it may be possible to reverse the effects" of a medication abortion if a woman changes her mind but that "time is of the essence."  Even more so than in *Rounds*, the wording of the Act makes clear the legislature is not asserting a medical certainty, but instead providing additional information that may be useful to the woman's decision.

The "effects" of medication abortion mentioned subject to "reversal" in the Act are the effects caused by the suppression of progesterone which endanger the pregnancy.  Progesterone is already proven to reverse medically induced effects in pregnant women. Davenport ¶24.

Physicians who provide abortions should be capable of reviewing the research in the field, understanding the difference between relative risk and proof of causation, and

1    explaining it correctly to their patients. *Id.* at 904-05 (holding that the subject matter of
2    the biological disclosure "should be clear in context to a physician"). In the end, "[t]he
3    point of informed consent laws is to allow the patient to evaluate her condition and
4    render her best decision under difficult circumstances. Denying her up-to-date medical
5    information is more of an abuse to her ability to decide than providing the
6    information." *Lakey*, 667 F.3d at 579.

7        Plaintiffs attempt to differentiate the requirement from other similar (and
8    Supreme Court-affirmed) informed consent requirements by claiming that it would
9    "radically expand" the informed consent requirement in the state. Dkt. 1 at ¶18.[13]

10       Although Defendants are not required to prove that APR works, there is
11   evidence that it does work. Dr. Delgado has now compiled over 114 successful
12   instances of live birth and 75 ongoing pregnancies after administration of APR.

13       In addition, early animal experiments in the development of abortion drugs
14   utilized the concept of blocking progesterone and its reversibility. Dr. Davenport's
15   review of these studies indicates that the study by Csapo developed an effective anti-
16   progesterone abortion serum for rats. He demonstrated that abortions would be
17   prevented if rats were given progesterone three hours after the abortifacient preparation,
18   although not as late as six hours (Csapo, 1976, 1977). Davenport ¶23. The Yamabe
19   study (2009), demonstrated the reversibility of mifepristone abortion in rats. Two
20   groups of pregnant rats were injected with mifepristone; one of these groups was also

---

22   [13] Plaintiffs claim that the "goal of informed consent is to provide each of Plaintiffs'
23   patients with the information necessary to enable her to make the right decision for
     herself" and that the Plaintiffs advise patients "not to start an abortion, medication or
     surgical, unless and until she is firm in her decision to terminate the pregnancy." (Dkt.
24   1 at ¶¶30-31). This ignores the fact that women can and do change their minds after
     starting the medication abortion process, and devalues and questions the later decisions
25   of those women who did indeed change their minds. It also ignores the scores of

injected with progesterone. The rats were examined at 1-4 days after the injections. At 4 days, 66.7% of the rats in the mifepristone-only group had aborted. However, the pregnancies of 100% of the rats who were also given progesterone survived. Davenport ¶23. The progesterone supplement prevented fetal loss. These animal experiments give further credibility to the validity of the concept of progesterone reversal of mifepristone abortion in humans. Davenport ¶23.

By focusing narrowly on APR which is geared only toward the (fast) timing of administering progesterone, Plaintiffs ignore this body of evidence, both through studies and evidence-based practices, that giving additional progesterone to pregnant women who wish to remain pregnant assists in maintaining fetal life. Plaintiffs agree that if a mother stops the process after taking Mifepristone, a live birth may occur. There is no reason to withhold information that replacing the progesterone lost to mifepristone may improve the changes of carrying a pregnancy to term.

Prior to this Act, if a woman changed her mind after the first pill, she may have received no information or bad information about her options.[14] Women are entitled to know the undisputed fact that the abortion is not necessarily complete and that there is potential to proceed with the pregnancy if they so desire. This is a life and death situation; it is highly relevant to give the mother information that she could still proceed to a live birth.

---

women who later regretted their abortions who did not have the ability or opportunity to reverse the process. (Campana ¶6, Minichini ¶¶6-7)

[14] See Declaration of Candy Campana who changed her mind after taking mifepristone and was told by employees of Plaintiff Planned Parenthood of AZ that there was nothing she could do and she needed to complete the abortion by taking the second pill. She instead searched on her own, discovered APR, underwent treatment and is currently 33 weeks pregnant (Campana ¶6). Plaintiffs admit that a fetus may survive mifepristone, but it appears that this may not be communicated to patients who ask.

Plaintiffs contend that they do not wish to be required to endorse APR, but there is no such requirement in the statutory language. In fact, nothing in the statute prevents them from openly opposing it. They may disagree with many items in the informed consent statute; they do not endorse them by following the law and telling people that there is information on the State website.

In addition, providing this information, even to women contemplating a surgical abortion, could impact a patient's decision about what kind of procedure she wishes to have. Plaintiffs argue that a woman may start the abortion process and then back out because of this information. Such argument denies the patient her agency; she has the right to this information and should be trusted to make her own decision.

Given the language of the statute, the fact that the State is not required to prove a causal nexus, the State's broad discretion in acting in the face of medical uncertainty, the safe and effective use of progesterone in pregnancy, the relevant studies, the success of APR and Plaintiffs failure to establish that the Act is untrue; the Act meets the truthfulness prong.

### 2. The Wording of the Act is Non-misleading.

Plaintiffs argue that other non-mifepristone drug protocols terminate the fetus and therefore the statutory requirements are misleading. A.R.S. §36-449.01 defines "Medication abortion" as "the use of any medication, drug or other substance that is intended to cause or induce an abortion." As a result, the term includes, by statutory definition, the initial stage of administering mifepristone intended to "induce" an abortion by blocking progesterone. The proposed language of the Act is correct; the effects of the administration of the drug mifepristone, may be reversed. *Rounds* requires that we look carefully at the wording of the statute. Here, the statute was crafted so as not to provide confusing information or give false hope. The Act advises

a mother that the process "may" be reversed and that "time is of the essence."  This broadly conveys that a possibility exists that, in some circumstances, a live birth may yet result.  It provides sufficient information so that, if the mother is interested in doing so, she can get further information from a medical provider; information including the limitations and circumstances about whether her fetus remains viable and possible treatments available to her. Trying to cover all eventualities in an informed consent requirement, as Plaintiffs seem to suggest, would itself cause confusion.  Better to leave the additional explanations to the treating physicians or the physicians disclosed through the informed consent process. See *Rounds II*, 686 F.3d at 904-05.

Plaintiffs further complain that "once an abortion has occurred, whether by medication abortion or by any other means, a woman is no longer pregnant, which cannot be reversed." Dkt. 1 ¶37.  That is, of course, true, if a medication abortion is completed.  However, the information is required prior to the commencement of the procedure and the claim ignores the reality that mifepristone does not always work by itself to terminate pregnancy.  A woman can be mid-medication abortion and change her mind.  A "medication abortion" by definition, is a process, not a completed act. See http://www.plannedparenthood.org/learn/abortion/the-abortion-pill  (describing a "medication abortion" as a "three step process.")  As a result, the language of the Act is not inaccurate or misleading.  The effects of a medication abortion may indeed be reversible in its early stages.  It is not necessary that the Act specify the exact window of time in which the process may be reversed.  Instead, the Act states that "time is of the essence" which, rather than being confusing, communicates a sense of urgency that any attempt to reverse the effects must take place early in the process.

In addition, Plaintiffs argue that the Act is misleading because it could cause confusion among women who are not seeking a medication abortion or are not eligible

for one.  However, physicians have the ability to explain the situation to their patients. If a woman does not wish to seek a medication abortion, this information will either be discarded by her or used to re-evaluate her position.  If she is not eligible for a medication abortion, the physician can explain that this is required informed consent language but that she is not eligible for this type of abortion.

Plaintiffs further argue that the Act is misleading because there is no proof APR exists.  Dkt. 1 ¶49.  This argument fails for the same reason its "truthfulness" argument fails.  The Act is not misleading.

### 3. The Act is Relevant.

Plaintiffs next complain that the Act requires them to give the notice to every patient, including those having a surgical abortion.  The notice given at the beginning of the process is part of the information required to be given to each patient who may not have made up their mind on surgical or medication abortion; this provides additional information which could aid the patient in her decision.  As noted above, if she is beyond the time where this information is applicable, the physician can indicate that to her.  To the extent the Court finds any relevance issue, the Act should be construed to address those issues and preserve the Act.  See Section (F) below.

Therefore, the Act is truthful, non-misleading and provides relevant information. It does not require or prevent doctors from performing any procedure.  It is therefore much less intrusive than the regulation at issue in *Gonzales*.  There is no evidence that the Act's requirements could lead to any additional health risks.  The procedure here is reasonable and designed to do what is medically necessary – where a fetus may remain

viable, progesterone is needed to offset the anti-progesterone previously given.  The Act meets the undue burden test.[15]

**E.     Plaintiffs are not entitled to a Preliminary Injunction or Temporary Restraining Order.**

Plaintiffs bear the burden of establishing their right to a preliminary injunction by showing that they are (1) likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008).

Plaintiffs cannot clear the first hurdle.  For the reasons previously set forth herein, Plaintiffs will not succeed on the merits.  The Act has a rational basis and meets the undue burden test.  Similar to *Rounds*,

> Planned Parenthood's evidence at the preliminary injunction stage does not establish a likelihood of proving that, with the definition incorporated, the disclosure required by [the Act] is anything but truthful, non-misleading and relevant to the patient's decision to have an abortion, and thus "part of the practice of medicine, subject to reasonable licensing and regulation by the State."

---

[15] Even if an intermediate scrutiny standard were applied to the First Amendment claim, the Act passes constitutional muster.  The Act at issue herein makes no moral condemnation and is value neutral; it simply imparts information.  Therefore, it would survive even under *Camnitz*' flawed analysis. Under an intermediate standard of scrutiny, the State must demonstrate "at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest. *Camnitz*, 774 F.3d at 250.

The *Camnitz* regulation required a physician to "perform an ultrasound using a sonogram" and "display and describe the image" of the fetus to the patient "in detail," even if the patient "averts her eyes or refuses to hear" (*id*. at 242-43) while the patient is "half-naked or disrobed on her back on an examination table, with an ultrasound probe either on her belly or inserted into her vagina" (*id*. at 255).

In contrast, the Act here only requires that a physician "give a woman certain information as part of obtaining her consent to an abortion" which "for constitutional purposes, [is] no different from a requirement that a doctor give certain specific information about any medical procedure." *Casey*, 505 U.S. at 884.  The Act does not convey an ideological message.

*Rounds I*, 530 F.3d at 738.

The plaintiff must always show that irreparable harm is "likely," not merely "possible." *Winter*, 555 U.S. at 21-22. Requiring physicians to provide information that the effects of medication abortion (inhibiting progesterone) can be reversed by supplementing progesterone is not harmful. It is accurate and necessary information to provide to women who change their mind regarding abortion after taking mifepristone and prior to taking misoprostol.

Further, the balance of the equities lies in favor of the Act. Prior to this Act, women who changed their mind about abortion might not receive any information (since patients go home after taking the mifepristone) or might have received bad information about whether they had any options to maintain their pregnancies. The information required by the Act provides them access to willing, licensed physicians who can counsel them as to whether it is possible to reverse the effects of mifepristone given their present situations. Providing women with more information is more favorable than keeping the information from them and is in the public interest.

### F.   If any Portion of the Act requires Irrelevant Disclosure, Relief Must be Narrow.

"Every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Gonzales,* 550 U.S. at 153. In *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 328-29 (2006), the Supreme Court held that if a statute is unconstitutional in its application to certain people, the proper remedy is not to invalidate the statute, but to enter a temporary restraining order only as to the unconstitutional application.

The Supreme Court recently recognized that "in every case we must respect the role of the Legislature, and take care not to undo what it has done. A fair reading of

legislation demands a fair understanding of the legislative plan." *King v. Burwell*, 135 S. Ct. 2480, 2496 (2015). Here, the legislative plan is to give pregnant women additional information about preserving their pregnancies if they change their mind during the medication abortion process.

> Generally speaking, when confronting a constitutional flaw in a statute, [the court] will limit the solution to the problem [and] enjoin only the unconstitutional applications of a statute while leaving other applications in force…or to sever its problematic portions while leaving the remainder intact. *Ayotte*, 546 U.S. at 321 (Citations omitted).

In determining an appropriate remedy, the court will "try not to nullify more of a legislature's work than is necessary [because] a ruling of unconstitutionality frustrates the intent of the elected representatives of the people…" *Id.* at 329. "Accordingly, the normal rule is that partial, rather than facial, invalidation is the required course, [so that] a statute may be declared invalid to the extent that it reaches too far, but otherwise left intact." *Id.* Further, the court will also look to legislative intent and, "[a]fter finding an application or portion of a statute unconstitutional, [will] ask: Would the legislature have preferred what is left of its statute to no statute at all?" *Id.* at 330.

Therefore, if this court finds any aspect of the Act unconstitutional (for example, as irrelevant to women who are past the date where they would be eligible for a medication abortion or if they are having a different type of medication abortion), the court could enter a temporary restraining order saying it is unconstitutional in that application and limit it to those who are eligible for a mifepristone medication abortion.

### G.   Plaintiffs Do Not Have Standing to Raise These Issues on Behalf of Their Patients; Their Position Conflicts with the Patients' Rights to Have Information.

Plaintiffs assert that they are bringing this action, in part, on behalf of their patients. However, Plaintiffs' position in this action is adverse to their patients.

1  Plaintiffs therefore do not have third-party standing to assert the rights of their patients

2  and said claims should be dismissed.

3  　　While the Supreme Court has repeatedly held that physicians and abortion

4  clinics may assert the rights of their patients in the abortion context, *McCormack v.*

5  *Herzog*, 13-35401, 2015 WL 3429396, at *6 (9th Cir. May 29, 2015), the rationale was

6  that "it generally is appropriate to allow a physician to assert the rights of women

7  patients as against *governmental interference with the abortion decision.*" *Singleton v.*

8  *Wulff*, 428 U.S. 106, 118 (1976) (emphasis added).  This action does not conform to the

9  Court's rationale for allowing third-party standing.

10  　　Generally, "one may not claim standing . . . to vindicate the constitutional rights

11  of some third party." *Barrows v. Jackson*, 346 U.S. 249, 255 (1953).  The reasons are:

12  (1) "it may be that in fact the holders of those rights either do not wish to assert them,

13  or will be able to enjoy them regardless of whether the in-court litigant is successful or

14  not;" and, (2) "third parties themselves usually will be the best proponents of their own

15  rights[; t]he courts . . . therefore should prefer to construe legal rights only when the

16  most effective advocates of those rights are before them." *Singleton*, 428 U.S. at 113-

17  14.  Thus, for "litigants to bring actions on behalf of third parties, . . . [they] must have

18  suffered an 'injury in fact,' . . . giving [them] a 'sufficiently concrete interest' in the

19  outcome of the issue in dispute; [they] must have a close relation to the third party; and

20  there must exist some hindrance to the third party's ability to protect his or her own

21  interests." *Coal. of Clergy, Lawyers, & Professors v. Bush*, 310 F.3d 1153, 1163 (9th

22  Cir. 2002).  "Even where the relationship is close, the reasons for requiring persons to

23  assert their own rights will generally still apply." *Singleton*, 428 U.S. at 116.  And,

24  even when there are hindrances to a woman's ability to protect her own interest,

25  "th[o]se obstacles are not insurmountable.  Suit may be brought under a pseudonym, as

1    so frequently has been done.  A woman who is no longer pregnant may nonetheless

2    retain the right to litigate the point because it is "'capable of repetition yet evading

3    review.'" . . .  And it may be that a class could be assembled, whose fluid membership

4    always included some women with live claims." *Id.* at 117 (quoting *Roe v. Wade*, 410

5    U.S. 113, 124-25 (1973)).

6         Here, the patients' right to have information is adverse to the Plaintiffs' desire to

7    withhold that information from them.  Thus, even if the patients have a right not to

8    receive information from their physicians, it is entirely possible that they do not wish to

9    assert those rights in favor of receiving all possible information available to them.  *See*

10   *Singleton*, 428 U.S. at 113.  Accordingly, it would be the patients themselves who

11   would be the most appropriate litigants to advocate for their rights, should they choose

12   to assert them, in order to avoid an unnecessary constitutional adjudication.  *See id.*

13   And, there are methods for alleviating any obstacles to the patients' abilities to protect

14   their own interests.  *See id* at 117.

15        Moreover, when the courts have previously permitted physicians' to assert the

16   rights of their patients, the patients' exercise of their right to abortion was at stake.

17   *McCormack*, 2015 WL 3429396, at *6 (citing *Singleton*, 428 U.S. 106; *Planned*

18   *Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833 (1992)).  Here, S.B. 1318 does

19   not hinder women from exercising their right to obtain an abortion.  Instead it merely

20   advises women that there are physicians who can assist them if they change their mind

21   after beginning a medication abortion protocol.

22        This action is unlike others where physician or abortion clinics were permitted to

23   assert the rights of their patients.  In this case, Plaintiffs do not meet the requirements to

24   be granted third-party standing.  Accordingly, all claims raised on behalf of Plaintiffs'

25   patients should be dismissed.

**IV Conclusion.**

Abortion patients who changed their mind following ingestion of mifepristone contacted doctors to attempt to save their pregnancies.  Doctors responded by treating these patients with progesterone supplementation, a long-established evidenced-based method of preserving pregnancy in women with at-risk pregnancies.  Arizona passed SB 1318 to make the public aware of the availability of the procedure.

The APR progesterone supplementation procedure has produced positive results.  It is based on sound theory, on existing medical evidence and on peer-reviewed studies.  It is a legal and ethical off-label use of an FDA approved hormone.

Plaintiffs falsely claim that there is no evidence in support of APR.  They attack the practitioners as unethical and attack the practice by trying to paint it is something sinister, using non-medical terms such as "junk science" and "quack." Yet they fail to discuss, much less refute the underlying treatment of progesterone supplementation, instead focusing on the term "abortion reversal."  They fail to analyze the decades-long success of progesterone supplementation.  They do not mention its central role in the pregnancy process; its long-term use in analogous situations (such as reversing the progesterone suppressing effects of in vitro fertilization treatment); its non-controversial use to preserve pregnancy in a variety of circumstances.  Mifepristone's creator, the studies cited herein and practical experience all indicate that the effects of mifepristone may be reversed.

This is a life and death matter in which the State has a compelling interest. Even in the face of disputed medical evidence, Arizona may act to get this information to the public.   Therefore Defendant respectfully requests that the Court deny Plaintiffs' Motion.

Dated this 30 day of July, 2015.

                                        MUELLER & DRURY

                                        s/ Douglas V. Drury
                                        Douglas V. Drury, Esq.


A copy of the foregoing was mailed/*emailed this
30 day of _July_____, 2015 to:

Diana Salgado
Planned Parenthood Federation of America
434 W 33rd St.
New York, NY  10001
Diana.salgado@ppfa.org
Attorney for Planned Parenthood Arizona, Inc.

Alice Clapman
Helene T. Krasnoff
Planned Parenthood Federation of America
1110 Vermont Avenue NW, Stes. 300
Washington, DC 20005
alice.clapman@ppfa.org
helene.krasnoff@ppfa.org
Attorneys for Planned Parenthood Arizona, Inc.


David Brown
Hillary Schneller
Center for Reproductive Rights
199 Water Street 22nd Floor
New York, NY  10038
dbrown@reprorights.org
hschneller@reprorights.org
Attorneys for Paul A. Isaacson, M.D.

Andrew Beck
Talcott Camp
Brigitte Amiri
American Civil Liberties Union Foundation
125 Broad Street 18th Floor
New York, NY  10004
abeck@aclu.org
tcamp@aclu.org
bamiri@aclu.org
Attorneys for Eric Reuss, M.D., M.P.H.,
Desert Star Family Planning, LLC and
DeShawn Taylor, M.D.

Daniel Pochoda
Victoria Lopez
American Civil Liberties Union Foundation of Arizona
3707 N. 7th Street Ste. 235
Phoenix, AZ  85014
dpochoda@acluaz.org
vlopez@acluaz.org
Attorneys for Eric Reuss, M.D., M.P.H.
Paul A. Isaacson, M.D.; Desert Star Family Planning,
DeShawn Taylor, M.D.

By

# CERTIFICATE OF SERVICE

I hereby certify that on the _30_ day of _July_ , 2015 I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing.

_____
Douglas V. Drury