# EXHIBIT F
# STATUTE AND LEGISLATIVE HISTORY

**Arizona House of Representatives**

**Fifty-second Legislature - First Regular Session**

**House Federalism and States' Rights Committee**

Wednesday, March 11, 2015

9:00 a.m.

Link to Video1: http://azleg.granicus.com/MediaPlayer.php?view_id=22&clip_id=15544

Link to Video2: http://azleg.granicus.com/MediaPlayer.php?view_id=22&clip_id=15602

Members of the committee:

1. (R) Kelly Townsend: Chairman
2. (R) Noel W. Campbell: Vice-Chairman
3. (R) Mark Finchem
4. (R) Darin Mitchell
5. (D) Rebecca Rios
6. (R) Bob Thorpe
7. (D) Ceci Velasquez
8. (D) Bruce Wheeler

Rep. Campbell: Madame Chair, I move that SB 1318 be returned with a Due Pass recommendation. I also move that the 6 page amendment in Representative Townsend's name dated 03-04-2015 at 11:19 a.m. be adopted.

Analyst: Madame Chair, members. SB 1318 prohibits any healthcare plan offered through any healthcare exchange operating in this state from providing coverage for abortions. It offers exceptions for pregnancy which are a result of rape or incest. It also requires documentation from abortion clinics upon licensure or renewal regarding admitting privileges be submitted to the director of the AZ Department of health services. There is an amendment that I can explain at this time.

Rep. Townsend: Please do

Analyst: The 6 page amendment in the chairwoman's name, dated 3-4-2015 at 11:19 a.m. makes the following changes. It adds to the statute regarding the requirement during the 24 hour period before an abortion procedure is performed, it adds that the performing physician of a medical abortion inform the patient that it may be possible to reverse the effects of the medical abortion if she changes her mind but the amendment states that time is of the essence. It also requires that the information on reversing and assistance with reversing the effects of a medical abortion be available on the Department of Health Services website.

Senator Barto (Sponsor): Thank you Madame chair, members. For the record, Senator Nancy Barto, Senator from district 15. I sure appreciate you hearing this bill today. It's very important and it's definitely a public safety issue as well. Just a little history here... *[discussed prohibition of taxpayer funding of abortion]*. With the amendment, which is very important as well, it puts in an important consent provision for women. We've come to find out that there is an option when women have taken

CHRIST000001

RU-486 and then they've changed their mind. And there's a plan and a way for physicians to help reverse their decision if they act quickly. And so what this amendment will do is make sure that women are informed that that is a possibility if they do change their mind after taking that pill. With that, I'd be happy to answer any questions. I think it's imperative that we move on all three of these issues... *[discussed public view of taxpayer funding of abortion].* It's critical that we rectify that situation and also inform women of their opportunity to save that child within them if they do change their mind.

Rep. Campbell: The first speaker who is speaking for the bill is Mr. Allan Sawyer, who's representing himself. Is he in the house? Would you please come forward, state your name for the record and you'll be given 5 minutes.

Allan Sawyer: Thank you. Madame Chair, members of the committee: Good morning! My name is Dr. Allan Sawyer. I have been an obstetrician/gynecologist physician in Arizona since 1989, having trained at Good Samaritan Medical Center in Phoenix, and I have been in private practice in Glendale, Arizona since 1992.

Most recently I am the immediate past president of the American Association of Pro-Life Obstetricians and Gynecologists and currently I am the Chairman of Ethics at Banner Thunderbird Medical Center where I also have served on the Medical Executive Committee for the last decade.

Over my career I have delivered over 10,000 babies on three different continents and I have cared for 16,000 women in Arizona.

This morning I would like to take the opportunity to support the proposed amendment to SB 1318, which ensures that abortion providers inform women that if a woman changes her mind, it may be possible to reverse a medical abortion after the first pill is taken but time is of the essence.

I have spoken to hundreds of my patients over the last 26 years about their elective abortions, some of which have occurred within hours, some of which occurred decades ago, but the common thread between these women is the regret that they harbor after having chosen abortion.

The abortion pill RU-486 is a potent antagonist of progesterone and cortisol. The anti-progestin effects of RU-486 will result in fetal death, as progesterone is essential for fetal growth and survival. Natural micronized progesterone supplementation, either by intramuscular injections or by oral administration, can be used to overcome the anti-progesterone effects of RU-486.

Just last month a woman walked into a Glendale Planned Parenthood clinic. She was 10 weeks pregnant. She was grieving over the recent loss of her own father and thinking that this, her first pregnancy, was a bad time to be pregnant. She opted to take the abortion pill RU-486 to cause a medication abortion.

Within hours she regretted her decision, and she – the next morning – she went back to the Planned Parenthood clinic on Eugie, begging them to reverse the effect of the pill.

She was told by the Planned Parenthood staff that she had to complete the process or else she would have complications or get an infection.

CHRIST000002

While still standing in the waiting room of the Planned Parenthood clinic, she Googled on her phone "abortion pill reversal," where she  was connected to a national call center that pairs women in the midst of a medical abortion to physicians who are willing to help to save the lives of their unborn children. Within 45 minutes she was in my office where I showed her on ultrasound her 10 week fetus with a heartbeat and moving inside of her womb.

I started her on a protocol of high dose progesterone to undo the lethal effects of the RU-486. Because she had used all of her available money to pay for her abortion at Planned Parenthood, she didn't have enough money to pay for the progesterone, and so I personally paid for her medication at a local pharmacy.

She is now past her first trimester, and her baby is now out of danger and doing well, and she is due to deliver in September.

Natural micronized progesterone supplementation has been used in obstetrics and gynecology and infertility care for years. The safety of progesterone supplementation during pregnancy has been well established, and this is used routinely in high risk obstetrics such as those babies conceived by in vitro fertilization and for pregnancies at risk of preterm labor.

Administration of supplemental progesterone to women who have taken RU-486 can overcome the anti-progesterone effects of RU-486, support the early pregnancy, and effectively stop the medical abortion from occurring.

Madame Chair and members of the committee, as a board certified obstetrician/gynecologist licensed in the State of Arizona for over a quarter of a century, I testify to you today that abortion is not healthcare.

I also opine that women who have initiated a medical abortion process and who change their minds, for whatever reason, should not have their baby stolen from them because Planned Parenthood, or any abortionist, withheld life-saving facts or provided misinformation to these women.

Thank you. I'd be happy to answer any questions.

Rep. Campbell: Could you talk about the time period – this 10 weeks. We're not doctors of course. This RU-486 –  is that right? – can only be taken within the first 10 weeks?

Dr. Sawyer: It's supposed to not be given past 9 weeks.

Rep. Campbell: Okay Sir. So the longer that the woman waits to take this and then tries to reverse it, would that be – I mean, from a medical stand point – is that... Do you see where I'm going with that question?

Dr. Sawyer: So the longer a woman waits after taking RU-486, before she tries to reverse it...

Rep. Campbell: No that's not what I mean. No I mean, the longer she waits to take the pill itself and then at that point tries to reverse it, is that more likely to cause complications or not?

CHRIST000003

Dr. Sawyer: Well to me the ultimate "complication" of taking RU-486 is fetal death. The earlier that RU-486 is administered in a pregnancy, the more lethal that it is. So the later somebody is when they take it, it's actually easier for us to reverse that with progesterone.

Rep. Rios: You mentioned a story. One situation. I was wondering if there were any studies with regard to how prevalent this is, how frequently this occurs, where somebody changes their mind within that 24, 72 hour period?

Dr. Sawyer: These studies are ongoing. All of these – the network of physicians that are doing this – all those numbers are being tallied and ultimately will be published. They're not published yet but that is an ongoing – we're looking at all those numbers very closely. I don't know the number of women who have sought out abortion pill reversal after taking RU-486.

Rep. Rios: Are there any studies being done – I think to kind of follow up to Rep. Campbell – any studies that show, I think I read somewhere maybe... I'll just ask the question. Are there any studies that show once they've taken the progesterone that in fact the babies are born, is there a higher prevalence of birth defects? Are there any ethical considerations with regard to giving and risking complications?

Dr. Sawyer: I actually asked Dr. George Delgado, who is the physician in Southern California who is in charge of the website AbortionPillReversal.com, that very question last week in Washington D.C. He said that that's part of what they're looking at but so far it appears that birth defects only are at the same level of what we'd expect in the normal background population.

Rep. Rios: This use of the progesterone, is it FDA approved or just an off-label use?

Dr. Sawyer: So natural micronized progesterone is a naturally occurring substance. It's not considered a controlled substance by the FDA. There are commercially available products such as prometrium which are under FDA approval. It is an off-label usage, but physicians aren't required to practice medicine under what's only approved by FDA. We use medication off label all the time. Unfortunately in obstetrics, a lot of things are off label because it's considered unethical to do studies on pregnant women.

Rep. Townsend: To that point, would you consider cytotec off-label and what's the use of cytotec and what's the frequency of cytotec being used?

Dr. Sawyer: That's an enormous topic,

Rep. Townsend: Well, just skim over it.

Dr. Sawyer: As you know, cytotec is a category X drug and should never be used during pregnancy. We use cytotec for induction of labor and obviously, cytotec is used for abortion. But that's opening up a whole nother can of worms.

Rep. Rios: You mentioned that it's "not ethical to do studies on pregnant women"? Is that what you were saying?

CHRIST000004

Dr. Sawyer: You cannot do randomized clinical trials on pregnant women. That's considered unethical. That was established as an ethical guideline in clinical research years ago.

Rep. Rios: This isn't considered a study or an experiment?

Dr. Sawyer: This is not a clinical trial. This is looking at outcomes of pregnancies and that's the way that when you're using a drug that's not felt to be harmful during pregnancy, that's the way those studies are done.

Rep. Rios: Is this amendment, this procedure, endorsed by any professional medical groups, medical association, gynecologists?

Dr. Sawyer: As I said, I am the immediate past president of the American Association of Pro-Life Obstetricians and Gynecologists. It's certainly endorsed by them as well as the Catholic Medical Association and the Christian Medical and Dental Association. It's widely supported among pro-life physician groups.

Rep. Rios: But not generally supported by the Medical Association?

Dr. Sawyer: My professional society, the American College of OBGYN is not a pro-life group. They would not be in support of this just because of the nature of it.

Rep. Thorpe: Would you characterize this as also being an important issue as far as disclosure and really providing a mother with all available information so that they can make informed choices?

Dr. Sawyer: I absolutely agree and one of the reasons I wanted to come down here was I was appalled by what this woman was told when she was standing in the clinic. When she comes in begging to save the life of her baby, when she's changed her mind, she made a poor decision and she was given misinformation. Granted I understand that this information has not been widely published and it's not widely known, but it is going to become, and I would say over the past few weeks it has become widely known because of some things that have happened in Washington D.C.

Rep. Thorpe: *Asked question regarding ACA and taxpayer funding of abortion.*

Rep. Townsend: At what point does the FDA approve the abortion pill? How many weeks?

Dr. Sawyer: The maximum was supposed to be 9 weeks.

Rep. Townsend: Supposed to be?

Dr. Sawyer: That's what the FDA says, but those guidelines apparently aren't being followed.

Rep. Townsend: And what's the latest, to your knowledge, that Planned Parenthood is administering this pill? You said this one woman was 10 weeks. Why is Planned Parenthood giving her, if it's 9 weeks, why did Planned Parenthood give her the pill at 10 weeks? Do you have an opinion on that?

Dr. Sawyer: In her case, her last menstrual period dating and her ultrasound dating agreed exactly. She was at 10 weeks both by last menstrual period and ultrasound dating. I have no idea why she was given the abortion pill at 10 weeks.

Rep. Townsend: So we have a concern not only that they're not giving her accurate information, they're also administering medication after the approved date by the FDA, that's correct? So I see two ethical issues here – we brought up ethics earlier about possibly giving progesterone post RU-486 and potential birth defects that we may or may not know about and what are the ethics revolving around that. I see two other ethics issues – the abortion in and of itself is an ethical question, far larger than trying to save the baby's life. And two, we have an organization going outside of recommendations of the FDA, giving women a potentially dangerous drug after the recommended date. I just wanted to point out that I don't think it's an unethical issue to try and first save that child's life, and two, make that information available to her so that she can make that decision to reverse it.

Rep. Thorpe: When can the fetal heartbeat typically be detected?

Dr. Sawyer: Generally 5 weeks and 5 days.

*Video Time: 21:05*

Rep. Campbell: Is Mr. Ron Johnson here? Mr. Johnson would like to speak for the bill. He's with the Arizona Catholic Conference. Please state your name and you'll be given 5 minutes.

Ron Johnson: Madame chair, members of the committee. My name is Ron Johnson, I'm the Executive Director for the Arizona Catholic Conference. Glad to be here today to speak in favor of SB 1318.
*[Discussed the taxpayer funding of abortion prohibition from 2010]*
... We're also in support of the informed consent provision that you just heard about. Happy to answer any questions.

*Video Time: 23:40*

Brian Howard: My name is Brian Howard. I'm the president of Planned Parenthood Arizona. Madame Chair, Members of the committee, thank you for offering me this opportunity to represent Planned Parenthood's perspective on this legislation including today's amendment.

*[Talked about the other two measures of the bill]*

I really want to focus, however, on the proposed amendment today and Madame chair, I apologize for criticizing something that you're bringing forward. I'm not going to try to speak to the medicine. I know that we have one of the state's preeminent medical authorities in obstetrics and gynecology with us today and that she can do – that's her job.

I do want to speak about the idea of moral hazard with which I'm sure you're familiar. That is the idea that people take risks when they believe somebody will compensate for that risk if they conclude they made the wrong decision. You hear about this for example in people not having to think about whether

CHRIST000006

the bank they're depositing money with is sound because the FDIC's going to cover them if the bank goes under.

The focus on abortion healthcare needs to be, and remain on, counseling. Ensuring that the woman is entirely resolved in the decision that she is making. If we are required to communicate that she actually can start a process and then change her mind, a woman who is still conflicted could begin that process and risk losing a pregnancy that she ultimately would conclude that she wanted because – as Dr. Sawyer acknowledged – there is no published, widely accepted medical evidence that the therapy he is describing works. The FDA has not approved progesterone or progesterone-type products for this purpose. There is just no medical backing to make the claim. So we're communicating to women – go ahead and start! And if you change your mind, we can reverse it.

If at some point, medical evidence does demonstrate that the therapy Dr. Sawyer is describing works, Planned Parenthood's protocols are based on medical evidence and if that evidence is forthcoming, we would want to come back and talk about this. But in the absence of that, we're sending a mixed message to women and risking their pregnancies that they might ultimately conclude that they want. And that would be a tremendous mistake.

I also want to speak lastly to the patient that Dr. Sawyer describes having seen. Planned Parenthood's protocol is very clear. We follow medical evidence strictly and we only provide the medication abortion procedure on patients through 9 weeks. I can describe, speak to, how he dates pregnancies, but I know the process we go through and the standards that we strictly adhere.

Rep. Townsend: So my first question is, you're saying Planned Parenthood strictly adheres to their policies.

Brian Howard: yes, ma'am.

Rep. Townsend: Has it ever in the past happened that there's been undercover videos showing that that's not the case.

Brian Howard: There has been undercover video shot of Planned Parenthood counselors. At least here in Arizona, our staff were not found to be out of compliance with any of our policies.

Rep. Townsend: So is it reasonable to conclude that in the past we have employees or healthcare providers at Planned Parenthood, whether it's in Arizona or anywhere else, who have strayed from your policy, that that is a potential to happen. For example we are hearing testimony on record that a woman with a 10 week pregnancy came in to Dr. Sawyer's office, the credibility of your statement that you "always, 100% adhere to your policy" might be in question?

Brian Howard: I heard what Dr. Sawyer said. As I stated, I can't speak to his medical technique. What he does in his office to date pregnancies. What I can tell you is that we literally have a zero tolerance policy for failure to comply with our medical standards and guidelines. An employee who does not follow our medical standards and guidelines is no longer an employee of Planned Parenthood and that is a national

policy as well as a written and formal policy of Planned Parenthood Arizona. I can't speak to his technique or how he reached the conclusion that he did.

Rep. Thorpe: You started off by talking about bad decisions and you used the reference of a bank. I find that interesting. The FDIC kind of, they guarantee the operations of the bank. I'm not exactly sure – are we concerned about losing some interest on a deposit? Or maybe they didn't process my check correctly. I don't know if that's a good analogy. If I had more coffee in my system this morning I may even be offended by that suggestion. You mentioned a moment ago the possibility of reversing one of these abortions, that it might be risking the pregnancy. It would appear that Planned Parenthood, what they're trying to do is not only risk the pregnancy, they're trying to end the pregnancy. If a mother changes her mind, it gets back to my earlier point – full disclosure. Making sure that the mother has the information to understand the health risks of what they're doing and the health risks of any kind of medical procedure. I think that that's what is at question here. Even if the FDA hasn't approved this procedure but if it's a possibility, I think that the mother has the right to have that information. It just seems very disingenuous to me that you would stand there and suggest that you don't want to fully inform these mothers when they're making a life decision that's probably – and goes way beyond anything that they've probably ever faced during their life. Once again, suggesting that it's like deciding which bank to go to – I certainly hope that if you ever testify before us again – you're not going to be making those kinds of silly analogies because that just doesn't float with me.

Brian Howard: I apologize that the analogy did not do what I was trying to achieve which was to explain that moral hazard is a well-recognized phenomenon in decision making. When an individual believes that the consequences of their decision will be mitigated by someone or something else they will take risks that they otherwise might not take. Our concern is that by offering the illusory hope that I can reverse this process somewhere along the way, that despite being conflicted, they would go ahead and start the process. Planned Parenthood's focus is on the informed consent process and ensuring that every patient who is making this decision is doing so with all of the information that she needs to make the best decision for herself and her family.

Rep. Thorpe: In life, we take risks every day. It was a risk to jump in my car this morning and drive to the legislature. People will travel for example down to Mexico to have experimental procedures if they cancer in the hope that something will get turned around. It's beyond me that you'd be here pushing back on this. Once again, I think that full disclosure, providing the information – even if it's a risky decision – is important and in the best interest of the patient.

Rep. Wheeler: Thank you, Mr. Howard, for being here. It boggles my imagination why the Federalism and States' Rights committee is hearing abortion legislation, but that's the way it is. Elections have their consequences. My question to you is that we hear so often about people who do not support a woman's right to choose and to have her own healthcare choices in life, that they be informed, that they watch videos, that they watch sonograms, that they be told about risk regarding abortions, and some of this is pretty invasive. In this case, it seems to me that if a woman has taken 485 [sic] and we have these non-FDA approved procedures, to reverse that – there is a time gap between taking 485 [sic] and that procedure – and in that time gap, I am assuming – none of us are doctors up here, but we're talking

CHRIST000008

about the use of drugs or legislating the use of drugs – that there is a risk and the woman ought to be told about all possible risks to that fetus between 485 [sic] and this. And the point of the risk of the fetus is that the woman is under the impression, the hope – perhaps falsely – which makes it cruel, that that may be reversed and she may have a healthy child at full birth. And if there is a risk to a healthy child at birth – don't you think Mr. Howard that that woman ought to be given all the information pertinent to the consequences of taking this non-FDA approved drug for her health and for her fetus' health.

Brian Howard: Women need to know all of the medical evidence that there is related to any procedure that they are considering – any process, any medication. While Planned Parenthood disagreed with the degree to which the legislature chose to micro-manage the counseling and informed consent process in earlier legislation, we have always held to the standard that women need to know all of the risks, benefits and alternatives related to, in this case, medication abortion. What Dr. Sawyer acknowledged was, there is no medical evidence published by mainstream authorities that support this process. There's been no opinion issued by the FDA about this process. If and when, at such time there is such medical evidence, we'd be happy to talk about it because we're driven by medical evidence. And I think the distinction is that people can travel to other locals to get experimental medication. The difference here is that we're writing this into state law. We're writing an assertion that is not medically based into state law.

Rep. Townsend: If the FDA came out and banned the use of progesterone as a means to restore as a pregnancy, post abortion pill, would you be satisfied with that? If the FDA came out and said that this procedure that we're wanting to tell the patient about was banned, would you be comfortable with that and pleased because they came out with that decision and you would say that it should not be used.

Brian Howard: I think our interest would be in any statement that the FDA would make

Rep. Townsend: So would you have an interest in an FDA-banned medication to induce labor?

Brian Howard: I'm not sure what you're referencing. ... Our concern is not limited to the FDA. It's the fact of there being no medical evidence...

Rep. Townsend: [discussed cytotec and fact that it's not FDA approved but that it is used to induce labor – only after the woman is told of the health risks.] Would you not afford women the same right, and again – progesterone is not a drug. I can go down to Whole Foods or Sprout's and pick up a progesterone cream for $30 and have a month's supply of that if I choose. It's not a regulated substance. But nonetheless, say it was – as we use cytotec to induce labor, outside of the FDA's approval because it's approved by enough obstetricians that it's considered standard practice now. Would you not afford a woman who may want to know, and asks the question, "is there something I can do?" wouldn't she have the right then to make that decision. Just like she makes the decision to risk her child's life and her own taking cytotec to induce that labor, should she not be afforded that same right to know and take that risk for her child and for herself to take, I don't want to call inert, but basically a female hormone if it could potentially save the life of the child? Should she not have that right as a human being. As a sovereign human being to make a decision for herself and her baby. She has the choice to make the abortion. She has that sovereign right, according to law now, to choose to have an

CHRIST000009

abortion. Should she also not have that right to choose to help the child live should she change her mind?

Brian Howard: I'm assuming, being unfamiliar with the situation that you're describing, that the common use is based on thousands, hundreds of thousands, millions of medical cases. That evidence does not exist in this case.

Rep. Townsend: Would you oppose when that practice began in its early stages of using cytotec, would you have opposed it at that point?

Brian Howard: I don't know if my opinion is relevant on that matter

Rep. Campbell: Walk me through, I'm really trying to figure out who you're concerned about here. We know that you say, at least I understand, that this is a non-approved FAA [sic] drug, progesterone after the woman has taken RU-486. And then this non-authorized or non-approved FDA drug is used that may, in your opinion, that may save or may not save the child. So who is your concern for there? Is it for the health of the mother? At that point, what is your concern? I know the justification for this concern, but I'm just trying to understand who you're concerned about.

Brian Howard: This may come as a surprise, but Planned Parenthood is concerned about the health and well-being of women and of the pregnancies and the babies they ultimately have. The concern that I was describing is that we're taking the focus that the legislature has previously placed on the counseling process and sending the confusing message that you don't actually need to be resolved about the decision you're making today because somewhere down the line you can reverse it and that there is no medical evidence to support that. Until there is, our interest is in ensuring that women are resolved in the decision that they're making.

Rep. Campbell: I'm just an average guy here. What do you mean by that "women are resolved in the decision they're making"? So what you're looking out for is basically the health of the women, isn't that right... – or not? Break that down for me. That's the issue.

Brian Howard: It is not a good day for Planned Parenthood when a woman pursues a course of treatment that she actually remains conflicted about. We actually send women home who are presenting for abortion healthcare because our counselors have concluded that they are not resolved. They're conflicted. They desire to continue the pregnancy but they – and at the same time they have doubts. And we send them home with recommendations about how to – *resources* about how to continue their thinking, how to think this through with a spouse, clergy member, family in general, that-

Rep. Mitchell: To that point, I'm curious, you mention that. Do you have any statistics, do you guys keep statistics on how many women are sent home because they're undecided? I mean, you must keep that. Do you have those numbers for us?

Brian Howard: We collect a ream of data. I would be happy to find out if we can present that information to you. ... If we have it, we will share it.

Rep. Thorpe: Have there ever been abortions performed at Planned Parenthood where the mother was conflicted and regretted the decision afterwards?

Brian Howard: About 13,000 women a year in Arizona receive abortion healthcare. I cannot speak to their peace of mind, the peace of mind of every woman once they've had an abortion.

Rep. Thorpe: I'm not asking if you can speak to each and every one. I'm just asking a generalized question. Do you think that there's a chance that there have been – you mentioned counseling and things like that – do you think there's a chance that women have been conflicted by their decision and have regretted the decision afterwards?

Brian Howard: Our goal is to walk the patient through that process –

Rep. Thorpe: I'm looking for an answer. I think this is a yes or no answer. Do you think that there are situations where women who have gone to Planned Parenthood, received counseling, that there are times when they have been conflicted, gotten the abortion, and then regretted the choice afterwards? That's my question. Yes or no?

Brian Howard: Madame chair, Mr. Thorpe. It is possible.

Rep. Thorpe: *[discussed taxpayer funding of abortion]*

Rep. Mitchell: *[discussed the aspect of why Planned Parenthood stated that there were "extremist legislators" and that this abortion issue was "distracting from the real issues of school funding, the environment, etc."]*

Brian Howard: The point that I was trying to make in that statement is that by our count, this is the 28th piece of legislation, regulating abortion healthcare that's been introduced since 2009. What we've seen for the past 3 years since reporting standards changed in this state is that there's zero impact on the number of women seeking and needing abortion healthcare. I don't think any of us believe that women are best off experiencing an unintended pregnancy and only then having to figure out what to do about it. They're best off if they can prevent the unintended pregnancy in the first place. I would hope that at some point you, our elected officials, would want to talk about prevention which has been demonstrated in places like Colorado in a report that was just released last year. That you can reduce unintended pregnancy if you will focus on prevention and reducing unintended pregnancy results in a reduction of abortion.

Rep. Wheeler: [went on about "extremist legislators"] This is extreme legislation in which we are experimenting with un-FDA approved drugs on women...

Rep. Townsend:  Point of order – this isn't a drug we're talking about, this is progesterone.

Rep. Wheeler: Okay – progesterone.

Rep. Rios: *[discussed physician's information being made available to the public through the provision requiring physicians' to submit documentation of their admitting privileges.]*

CHRIST000011

Rep. Rios: I just wanted to acknowledge something I had time to Google as well and just wanted to make a statement that the American Congress of Obstetricians and Gynecologists have indicated "there is really no clear evidence that this works (this reversal). They have concerns that there's no oversight of this procedure by any institutional review board or any ethical review committee." And they also comment that "in the rare situation where a woman takes this mifepristone and then changes her mind, it may very well be that doing nothing and just waiting to see what happens would be just as effective as doing the course of progesterone treatment." Again, this speaks to the fact that this is a non-FDA approved use, this is in fact experimental, and there is no ethical review committee overseeing this experimentation. And thank you Mr. Howard. I appreciate you very much being here today.

*Video Time: 1:00:42*

Rep. Campbell: Speaking against the bill Ilana Addis.

Dr. Addis: My name is Ilana Addis. I am an OBGYN. I am here representing the Arizona section of the American College of Obstetricians and Gynecologists. I'm the chair of the Arizona section. I represent close to 600 obstetricians and gynecologists in Arizona and a much larger group of people across the United States.

I'm going to be reading my comments. To begin with, about the bill and then I'd like to address the amendment. This will be brief.

*[Comments about the two other provisions in the bill]*

I would like to move onto speaking about the amendment that was introduced. What I would like to say, and then I'd be happy to answer your questions is that as physicians, we like to practice medicine that is evidence based. And unfortunately, the protocol that has been suggested for reversing a medication abortion has no evidence to support it. In fact, after mifepristone, otherwise known as RU-486, there's a chance without doing anything that it will fail in up to 50% of the times. So what I'm saying is that within the 48 hours after you take the mifepristone and before you take the misoprostol, the mifepristone just will not work and 50% of the times, the pregnancy will go on to be a normal term pregnancy. So in the research that I have read, that I believe is being quoted here, the various progesterone protocols that are being used to supposedly reverse medication abortion are working about as well as placebo.

Additionally, in the research that I've done on the so-called medication abortion reversal, what I have seen is that there are many, many case reports. Now case reports are the very, very, early beginnings to developing a research question. However, they are not research. They're just reports of specific cases.

I welcome your questions on the science behind this amendment.

Rep. Townsend: Do you agree with the current president of Planned Parenthood that you only stick to FDA-approved medications?

Dr. Addis: No. As has been mentioned previously, it is – the FDA is an organization that approves medications. As physicians we will frequently use medications off-label. However, in using medications

CHRIST000012

off-label, we counsel our patients that it is an off-label use. Such as using misoprostol, or cytotec, to induce labor.

Rep. Townsend: If you are okay with using cytotec to induce an abortion and you give your patients advanced notice and you fully inform them of the fact that it might be 50%, or that the RU-486, might work 50% of the time and you inform them of that – that it may or may not work. I'm curious to know too if you inform them that misoprostol is not FDA approved, if that's part of your informed consent. And if these things may not work, you're okay with informing them and allowing them to make that decision. Would you not be okay then to inform them that a simple hormone may in fact reverse the process and may or may not work?

Dr. Addis: I don't mean to correct you on some of your statements, however I want to sort of parse out the – I believe there were three separate things that you asked me. What I had mentioned before your question was using misoprostol to induce labor at 39 or beyond weeks.

Rep. Townsend: No. I'm sorry. I meant misoprostol to, it's my understanding that – from what you've told us, and I could be wrong – is that you give the RU-486 and then a few days later you give them misoprostol, right?

Dr. Addis: Right. In fact, the FDA-approved regimen for the mifepristone/misoprostol medication abortion is mifepristone and then 48 hours later, the misoprostol.

Rep. Townsend: And they're FDA approved?

Dr. Addis: Correct. They're an FDA-approved regimen.

Rep. Finchem: You mentioned "medically necessary". Can you define medically necessary for me?

Dr. Addis: Do you mean in the realm of women's healthcare?

Rep. Finchem: Well you said that abortion often times is medically necessary.

Dr. Addis: There are any number of reasons that a woman might need to terminate her pregnancy. It could be for health reasons. In cases of lethal anomalies to the fetus, or in cases that it might cause psychological harm to the woman.

Rep. Finchem: Madame chair, Ms. Addis…

Dr. Addis: Dr. Addis

Rep. Finchem: I'm sorry – That is not then "choice" that is actually "medical necessity," correct?

Dr. Addis: Now, the – a dilation and curettage, which is the way that we do pregnancy termination is a medical procedure. And "medically necessary," yes. You're correct. It's not a choice.

Rep. Finchem: So because it's medically necessary, it's not a choice. That's where I was going with that. Correct?

CHRIST000013

Dr. Addis: Yes.

Rep. Finchem: So as I understand it, this is about administering a naturally occurring human hormone, in order to potentially counteract the effects of these two medications, is that correct?

Dr. Addis: That is what this amendment states, yes.

Rep. Finchem: I want to make sure we're tracking here. So there are, I think we owe it to women, I mean just in looking here briefly – 78 pages of stories of women who regretted basically doing this. Are you familiar with Prop 303?

Dr. Addis: I might be, but not by the number.

Rep. Finchem: Prop 303 was Arizona's Right to Try. That passed 1, 111, 850 to 304, 971. The reason I bring that up is that I believe that we may have already answered the question about whether or not somebody has the right to try something that is already an FDA approved medication for a reason that may be off-label. And that is, in this particular case, people quite often talk about cancer. If we were to apply that same logic to this, if we say that well it's probably not going to do any harm but it's more than likely placebo affect. I guess I don't understand what your objection is to this.

Dr. Addis: Respectfully, I'd like to correct you on a few of your comments. Progesterone is, in fact, a medication. Though it is a hormone that's made in the body, the progesterone that women take is the medication that is made in a lab. I've heard a few times that progesterone is not a drug, progesterone is not a medication, it's a hormone. A hormone – when given to someone – is a medication. Now, if it is compounded in a pharmacy, or it's approved by the FDA, or you get it from boiling up a bunch of yams, it's still a medication if somebody is taking it to do something for them.

You are actually speaking to an issue that is close to my heart – well that has nothing to do with what we're speaking to right here so I won't go into it – but when giving progesterone to a woman, there is always, of course, risks involved. Progesterone can do any number of things when given in high or low doses and the side effects of progesterone are not necessarily minor. So to give a medication to someone without the knowledge – without it having any research to support it – and without the knowledge that it is effective in what it's being given for, I would not support. And, I apologize, neither would our college. We believe strongly in evidence based medicine.

Rep. Finchem: I have just one ending question, I guess it's more of a comment. Based on what you're saying then, it troubles me that this medication is an over-the-counter medication.

Dr. Addis: Yes, it troubles me as well.

Rep. Finchem: And maybe it should be a controlled substance, but maybe that's something more for the healthcare realm, the healthcare committee to take up. Thank you for your comments.

Rep. Rios: I just had a question to you as a physician, do you think that requiring physicians to make this untested approach part of their informed consent, do you think that it could encourage women to go

ahead with a medical abortion because, even if they had doubts, because they're now thinking I can reverse this.

Dr. Addis: I think it would be unfortunate for that reason and any number of other reasons. Giving a woman information that she could possibly reverse this procedure, without any medical evidence behind it, would – I can't really speak to what would happen, but I would imagine that there would be women who would have in mind that they'll just take their first pill and then have 48 hours to decide on it. And rather than making the decision and considering their options before taking the first pill.

Rep. Townsend: To that point. It sounds to me that what you're imagining this informed consent going out is, when you inform them that this is an option to them that this is the end of the information. How hard would it be to say "this is an option that has not gone through clinical trials but is available to you should you decide." Would that be beyond the scope of what you could put on a website?

Dr. Addis: I'm here from the American Congress of OBGYNs so I'm not entirely sure. I specifically would like to speak to the evidence behind the medicine, I don't have much to do with the informed consent.

Rep. Townsend: Have you ever been affiliated with Planned Parenthood?

Dr. Addis: In the very distant past, yes.

Rep. Townsend: As what?

Dr. Addis: I uh, as a board member.

Rep. Mitchell: If this drug did go through FDA approval and it still, like many drugs it would only work a certain percentage of the time, would you then have a problem with that drug? Because the woman is still going to have the indecision that she took the first steps, and then she thought, well maybe I can reverse this with this – but it's been FDA approved, say – she would still have that indecision. She would still leave confused. She would still have options, perhaps, even with the percentage attached to it after the fact. Would you be okay with that, if the FDA did approve it? It seems like the argument is...

Dr. Addis: So, of course, I would be happy to consent to an FDA approved option for medication abortion reversal. However, this medication, if it in fact only has a 50% effectiveness rate, which is what I'm seeing in the data, would never make it through the FDA.

Rep. Mitchell: The argument that we're hearing is that women leave confused, and they ought to be counseled beforehand, and make this decision firmly one way or the other, obviously prior to making the initial decision, but if this was FDA approved and it went through clinical trials, and there are certainly FDA approved drugs that are not working all the time. There are a lot of mitigating circumstances, so that woman would still have an option, so it seems to negate the argument that I'm hearing today that was put forward by Mr. Howard and yourself that it would leave a woman confused and giving her the "cruel" intentions of knowing that maybe she could change her mind the next day, to quote Mr. Wheeler. So I don't know – if it had an FDA approval, all those things would remain the same

CHRIST000015

– it just has an FDA-approval stamp on it. So I don't understand the argument I guess. Maybe you can clarify it.

Dr. Addis: I'm not sure that I could clarify it much more than I already have. I'm sorry that you don't understand.

Rep. Townsend: I think we're done, we're going to move onto the next person.

Rep. Wheeler: Dr. Addis, this is a life or death bill, it's very important. I would like to ask Dr. Addis a question. Thank you for being here. It's important that the public hear your point of view which represents that of the majority of Arizonans. I want to clarify something that was said about Prop 303, it's a measure in Arizona that will allow investigational drugs, biological products, and external devices to be made available to eligible, terminally ill patients. So obviously, again – it's doesn't have any sense to what we're talking about here. So the patient is the expectant mother, and it's not applicable.

But what I want to say to you is thank you for saying that you were a member of Planned Parenthood. I'm proud to support Planned Parenthood. It reminds me of the questions that were asked in the 1950's: are you or have you ever been a member of Planned Parenthood? If I were, I'd proudly say yes.

Rep. Finchem: Point of order, speak to the bill

Rep. Wheeler: Is this the first time you've spoken before a legislative committee?

Dr. Addis: Can't you tell! I'm incredibly nervous.

Rep. Wheeler: I hope you go back to your community and let them know what is going on here because it's important that they know what's going on.

*Gaveled to recess*

**Start of Video 2**

Rep. Townsend: *[discussed rules of decorum for the committee]*

*Video Time: 4:00*

Rep. Campbell: Next person wishing to speak is Ms. Tory Anderson from the Secular Coalition of Arizona…. You'll be given two minutes.

Tory Anderson: My name is Tory Anderson. I'm here speaking on behalf of the Secular Coalition for AZ. For those of you not familiar with our organization, we represent a statewide constituency base of theists and non-theists alike who value the separation of church and state and I'm here today on behalf of my constituency in opposition to SB 1318 and to ask you to vote no on this bill.

There are complicated moral and ethical questions involved in women's health issues and access to healthcare for both theists and non-theists alike. However, the particular influence of sectarian, religious

CHRIST000016

beliefs on government policy regarding women, suggests a government endorsement of particular religious beliefs to the exclusion of minority and non-theist views.

In the landmark case, *Roe vs. Wade*, the U.S. Supreme Court recognized that the U.S. Constitution protects a woman's right to make her own medical decisions including her decision to have an abortion. In a pluralistic society valuing religious and moral freedom, healthcare should not be dictated or compromised by personal sectarian religious beliefs of those in office.

This bill is part of a nationwide effort to limit women's access to abortion based on these personal beliefs. The decision to have an abortion is a personal and private decision that should be left between a woman, her personal faith, and her doctor.

Laws and regulations or healthcare and access to that healthcare should be based on scientifically sound medical research and driven by a compelling government interest, not sectarian religious beliefs.

Rep. Rios: Thank you for reminding us of the importance of the separation of church and state.

*Video Time: 6:40*

Alessandra Soler: My name is Alessandra Soler, I am the executive director at the ACLU of Arizona. We believe that everyone has the right to make informed decisions free from government interference about when and whether to become parents. We're opposed to this bill for three reasons.

One, we believe that it interferes with the private medical decisions by taking away insurance coverage for abortion. Two, we believe the bill threatens the privacy rights of abortion providers and puts them at greater risk of harassment and violence. And three, we believe that the bill compels healthcare professionals to engage in speech that is not rooted in evidence based medicine.

As we all know, many things can happen in a pregnancy and insurance coverage for abortions allows every woman to get the healthcare services that she needs. No woman plans to have an abortion for any reason and in difficult situations, medical decisions should be made by a woman, her family, and her doctor – not politicians. Caring for pregnant women means making sure that they have all of the care that they need and that they address all of the medical possibilities during pregnancy, whether that applies to carrying that pregnancy to term or making decisions with her doctor to end the pregnancy.

*[Comments on other two provisions of the bill]*

Finally, with regard to the amendment, there is no evidence that women accessing medication abortions seek to reverse the process after taking their first medication. And we believe the efforts to encourage women to reverse the medical abortions are rooted solely in the desire to control their reproductive choices and interfere with these decisions and not rooted in evidence-based practices or research.

And finally, the piece that compels doctors to engage in speech we believe violates not only the doctor's free speech rights, but the oath that they take to not do any harm to their patients.

*Video Time: 10:10*

CHRIST000017

Rep. Steele: I just wanted to say, regarding the amendment that I don't think that the amendment is based on science. It's not even based on junk science. There is no science around this particular approach. I don't think at this point we have enough information to make a real clear decision about the amendment, so for that reason, I would be against the amendment.

*[Comments on other two provisions of the bill]*

Rep. Rios: *[questions regarding other two provisions of the bill]*

Rep. Townsend: Tell us your opinion on why medical abortion is healthcare?

Rep. Steele: *[Personal story of how she was molested as a child for years. He had many victims and one of the other victims ended up in the hospital due to an illegal abortion.]*

Rep. Velasquez: Do you think this bill may deter some OBGYNs from coming to practice in Arizona?

Rep. Steele: *[comments regarding other two provisions of the bill.]*

*Video Time: 19:15*

Christine Accurso: Good morning. My name is Christine Accurso and I'm here representing myself today.

I'm the executive director of First Way Pregnancy Center in Phoenix and for over 43 years we have served women in Maricopa County with pregnancy services. We serve on average about 400 women every month. Some women are abortion minded and some are not. I'm here to testify today that in my experience, women who have full knowledge and plentiful information available on each option of their pregnancy make choices that they are comfortable with and can live the rest of their lives with.

I'm in favor of this bill, and specifically the amendment, because the more information a woman has while she is deciding on what path to choose for her life and the life of her child, the more at ease she seems to be at moving forward with her choice. Women have the right to know the truth and it shouldn't be hidden from them.

I was a little bit surprised today to hear that many people don't know how women do regret their abortion decisions. I thought many people knew that, I was a little surprised to hear it. I'd be happy to introduce you to many people, both women and men, who have regretted that decision.

A little bit specifically to the abortion pill reversal, it hasn't been stated today, but I do know the doctor who is organizing the physicians nationwide, there's over 400 doctors, Dr. George Delgado in Southern California, in San Diego. They have 86 live births, 61 still currently pregnant. And so the reason that there isn't a case study yet is because they have to get to 200. Of course, he can speak better to that than I can, but those are the facts.

I have two personal relationships with women who have done abortion pill reversal. They're very happy and excited to have daughters. They made a decision to change their mind. They called this number in San Diego, referred them to local physicians and those physicians gave them the abortion pill reversal.

And they are very happy for that choice and so I'm privileged to know them and so I know from personal experience that it works.

*Video Time: 21:45*

Cathi Herrod: Good morning, my name is Cathi Herrod. I am president of Center for Arizona Policy. I also am a licensed attorney. I will attempt to briefly and succinctly respond to some of the points that were brought up today.

*[Comments about why the bill was in the Federalism and States' Rights committee]*

*[Comments about exceptions in the bill regarding insurance coverage]*

*[Comments about constitutionality of the insurance coverage provision]*

On the abortion pill reversal, you've heard plenty of testimony on that. Let me just emphasize, there's no question that some women do take the pill and then they want to reverse it. You heard that testimony today. The doctor would be the one responsible for informing the woman whether there are any future risks, that type of thing.

You know, the whole point about the abortion regulation that the Arizona Legislature and the Governor have passed, the 28 provisions that were referred to has been to give women an informed choice. To give them options, to know what their options are. These regulations have actually resulted in a decrease in the number of abortions in Arizona and surely, we should all be able to agree that the decrease in the number of abortions is a good thing for our state.

*[Comments about admitting privileges provision of the bill]*

On the RU-486, I would also – there's been a lot about progesterone and all of that, I'm not a doctor – I'm an attorney. But this is my understanding. When RU-486 was approved, it was approved under a special designation, sub-part H in the FDA – how they do medication, that requires post-marketing restrictions to protect the patient's health and safety. So RU-486 was approved under a specific FDA protocol. Progesterone is approved under normal FDA process. So progesterone is treated like aspirin or any other medication that is approved for use, so there is a distinction that hasn't really been brought up.

I also want to correct – and this depends on how you date a pregnancy – but the FDA protocol specifies that the RU-486 is supposed to be within the first 7 weeks of pregnancy. Planned Parenthood in other testimony has indicated that they are doing it through the first 9 weeks. So just to clarify that.

This bill will not prohibit one abortion, it will not prevent one woman from getting an abortion and that's important to emphasize. It's also not based on a religious belief. That people of all faith and no faith believe that abortion should be regulated, that the mother's health and safety should be provided for, and even that preborn children have a right to life, liberty, and the pursuit of happiness. So to say that this is based on a religious or sectarian belief simply is not accurate and I think many of us know

CHRIST000019

people who would support this bill, who do support this bill, and it has nothing to do with their personal beliefs.

Rep. Campbell: *[question regarding doctor's admitting privilege and concerns about the safety of the doctor]*

Rep. Wheeler: Is the procedure described in this amendment endorsed by either the ACOG, the American Congress of Obstetricians and Gynecologists, or the AMA?

Cathi Herrod: You've heard testimony obviously from someone from the American College of Obstetricians and Gynecologists. I do not know – obviously you've seen a position taken against the bill – this provision – today. I can tell you that you heard expert testimony from a board certified obstetrician, Dr. Sawyer, who absolutely, has the evidence, the example of a 12-week pre-born child in utero who is growing, healthy, has a heartbeat after having taken the abortion pill. So as long as there's some evidence that this *may* afford a woman who wants to reverse the effects of taking the abortion pill, that surely we would want the woman to be aware of that.

I would also emphasize that just because someone is a member of the – you know, when you say how many people, how many doctors, are members of ACOG – that that doesn't necessarily mean that they all agree with the positions being taken. I'm an attorney. I don't agree with every position taken by the State Bar of Arizona to say the least. So I think when we start throwing out, whether it's ARMA, or who approves of this, or who believes in it, well that's a stretch to say because they're not speaking for all of their members.

Rep. Wheeler: So the answer is no. Neither the ACOG nor the AMA have endorsed this and they do take positions on issues. Thank you.

Rep. Rios: *[questions regarding other two provisions of the bill]*

**Vote on Amendment**

Rep. Rios: Thank you. I have a number of concerns with this bill. One is that, this is a procedure that has not been FDA approved. There are no studies, medical studies that prove that this is effective or safe. This has not been endorsed by a professional organization of OBGYN physicians. I have concerns about doing studies on pregnant women. I think the very first physician indicated quote "It's not ethical to do clinical studies on pregnant women." And he is in fact in support of this bill.

I have concerns about singling out abortion providers as the only physicians that have to register their information at the Department of Health Services, along with daycare centers. That's apples and oranges. I find that a little embarrassing personally when legislators want their information held private from the public but we're not willing to ensure the safety of physicians that we know have been murdered because of the procedures they offer.

I'm concerned about women being given a false sense of hope that "you know I'm not really sure what I want to do but I'm going to start this RU-486 because I've now been informed by my physician because

CHRIST000020

he was required in his informed consent to tell me that, you know what, there might be a reversible procedure". And what happens to those women that then decide okay I want to reverse it, and it doesn't work? That's unfair.

I'm appreciative of the fact that there's an exception for rape and incest. I'm very concerned about having a young child, an adult woman have to go in front of whomever and be re-victimized to tell their tale of incest or rape. It's none of our business. Madam Chairman, for those and so many other reasons, I vote no.

*Skipping to Minute 41:00*

### Vote on the Bill as Amended

Rep. Rios: I would like my previous comments that I made on the first round put into the record for this vote and I vote no.

Rep. Thorpe: Aye

Rep. Velasquez: I feel that a woman's decision about her pregnancy and the option to abort should be a decision that's between her and her doctor. I have two daughters and I think that if they were to come to me, I would refer them back to the doctor because, you know, I can't make that decision. But government should not have a say in what a woman can and cannot do with their body, so I vote no.

Rep. Wheeler: There are a lot of concerns. Rep. Rios eloquently described every concern that I have. I want to reemphasize the troubling aspect of public records requests where the names and addresses of doctors would be released to the public. I think that is shameful.

And I also want to register my deep concern that in this procedure, not a single mainstream medical organization, including the American Congress of Obstetricians and Gynecologists, nor the Arizona Medical Association have endorsed or approved of this procedure and with that I vote no.

Rep. Campbell: I'm not God. This is very difficult and I understand the emotional problems and try to understand this issue. But I support the right of the taxpayers not to fund abortions. I think that that's a legitimate concern. But I'm not for prohibiting abortions – until they overturn the *Roe vs. Wade* – it's legal. So I support the legal process – I may not agree with it, but I do support it. SO I don't have any issues with the trying to save the pregnancy with a unapproved FDA medication. That's not the real issue for me.

The issue for me is – because I'm just a human being – it has to do with the safety aspects. I would never condone anybody taking the law into their own hands and going after an abortion provider. As much as I disagree with it, or you disagree with it, that should never happen. I do have real concerns about this publication of names if that were to happen. So I support this bill 95% but that's a key issue for me, it really is. So I'm going to vote yes on this bill, but that had better come before – that needs to be really put on the line about this. Because I'm not in favor of allowing anybody's name and address – just as I would not allow any police officer's name and address go after an authorized shooting. We've had that

CHRIST000021

bill before us. So I'm protecting the police officers and their safety and their family's safety as much as I am these abortion providers. I don't agree with it, but I'm not – that has to be worked out. So with that, I vote aye.

Rep. Finchem: We had a little discussion about Prop 303 and whether it applies here, it doesn't apply here and whether or not it affects the right of the mother to try. But the mother actually is the final arbiter of whether or not the child will have a "terminally ill event" or not. So I think it's wholly appropriate that we hold it up to that light and I appreciate the idea. I understand the Hippocratic oath – above all else, do no harm. But I think there are sufficient questions here that would cause me to believe that my vote needs to be aye. And with that I'll cast an aye vote.

Rep. Townsend: I vote aye.

Rep. Townsend: Members, with 5 ayes and 3 no's, you've passed SB 1318.

CHRIST000022

# 3/16 House Rules Transcript
SB 1318

http://azleg.granicus.com/MediaPlayer.php?view_id=22&clip_id=15626
Start: 7:10

**Mr. Flemming**: SB 1318 is the Abortion Healthcare Exchange Licensure measure as amended in the FSR Committee on March 11 it also had another provision that has to do with the issue of informed consent amending Title 36.21.53. And as with most discussions we have had with abortion bills there is always very interesting issues constitutionally that are presented by these.

I would just like to say that the first section of the bill amends a part of involving Arizona state's election to opt out of coverage for healthcare for insurance plans that are offered through healthcare exchange under the affordable care act. And I did actually go through and once again find the place buried in the affordable care act where there really was the exemption that this could happen. So I understand that I really do believe that is constitutional.

The Second part of the bill is an abortion clinic licensure part and what that does it basically talks about requiring upon renewal of a license of abortion clinic that additional documentation be required regarding the availability of physicians to have admitting privileges that is required by another section of law already and I don't think that creates a problem at least one that creates sufficient weight to create a constitutional problem.

Let me just back up and say that the constitutional analysis and tests will be driven by the analysis from the Planned Parenthood vs. Casey decision from the Supreme Court basically involving whether or not the test of whether there is an undue burden of placing a substantial obstacle in the path of a woman who is seeking an abortion of an non-viable fetus and that is the test so it's a balancing test. But the changes that are proposed here in section 2 don't jump off the page seeming to me as causing a serious issue.

With regard to the committee amendment I just want to comment. By way of comment, these are the changes of 36-2153 the informed consent provision and what this does is in addition to the existing informed consent requirements that the law already has in place in Section 36-2153 it also adds in the other things that a woman seeking abortion would need to be informed about is the new language of whether it may be possible to reverse the effects of a medication abortion if the woman changes her mind and that the time is of the essence.

And some things that are related to that, we know from reading a couple cases including one I mentioned already and researching further form a 9th circuit case called the Tucson Women's Clinic case that certain kinds of information may be appropriate in that kind of information prior to the time an abortion procedure can

CHRIST000023

be undertaken. The test is whether it is truthful and non-misleading and as I stand here I do not know whether the information that I've read to you from the language is truthful or non-misleading. I don't know if it is or not. I mean that's a question for the medial basis on a case by case basis. I just want to point out that there may see some question about and that may be the source of some litigation perhaps going forward. But frequently there is litigation in these measures that involve abortion regulations.

**Rep. Hale**: I think you stated the test for constitutionality of abortion rules and it seems to me like if I'm not mistaking the legislation we are looking at or any new regulation cannot impose any undue burden on a woman seeking an abortion. It seems to me that the bill is prohibiting a woman from purchasing an insurance policy through the exchange. Is that a correct statement? Is that what the bill is doing?

**Mr. Flemming**: One part of the bill does deal with the issue of the healthcare exchange coverage. And what I had said that when I looked back at the federal law under the affordable care act I did find he place hat said that in creating the structure under the affordable care act for the exchanges to be created and that plans be offered through exchanges that it does have a provision that allows states to opt out if they do not wish to have that kind of coverage for exchange policies in that state.

**Rep. Hale**: In the event that the state opts out. A purchase through the Exchange would not be available to women. So where do they go and what is the cost there?

**Mr. Flemming**: If I may answer just by backing up a little bit further. There are exceptions it's not ALL abortion coverage. It's abortion coverage that it's not necessary to save the life or avert a substantial and irreversible impairment of a major bodily function, I think the health of the mother and also new language when the pregnancy is the result of rape or incest. So I think the coverage could include those kinds of circumstances but that the opt out is to opt out of all other coverage. To answer your question about the increased cost certainly there could be an increase cost, it seems to me that there could be an increased cost for an individual seeking to avail herself to these kinds of medical services if it's not covered in insurance. So I think that undue burden analysis will be the test that's used. And I think at some point if you have such an overwhelming burden, it has to be a substantial burden, that's the test they use. It has to be substantial enough. And where exactly that is when you're drawing the line is that line in how much is too much I cannot say but a court is going to be looking at that and that could be an issue as an illegal challenge.

**Rep. Hale**: The cost that is going to be associated with this procedure, in the event that there is no insurance coverage, to me seems to be, will probably be prohibitive. Cause that's what the Affordable Care Act is trying to reduce the cost of medical procedures so it seems to me that the cost without insurance will be such a burden

CHRIST000024

on a woman that is trying to get this procedure done that it will be undue burden, that seems to be the case that you're telling me.

**Mr. Flemming**: I guess I should just say that there's a whole bunch of cases and reasoning that just because there is a fundamental right in this situation involving an abortion access right doesn't mean there has to be some type of federal funding or other funding to offset the cost of that so that a persona can avail o f that right. I can't give you the page and line of the case I'm thinking of but I know it's discussed in a couple of these abortion related health care cases where the court has concluded that I believe I'm right in saying that even though the right may exist for a person it doesn't have to be affirmatively provided in the terms of paying for it.

**Rep. Hale**: Kind of makes sense. That leads me to the next question, which has to deal with the informed consent.  Now as I understood in your presentation the test there is rational basis. Correct me if I'm wrong.

**Mr. Flemming**: I think that before you can get to the part of the test that involves the balancing and considering of burdens and undue burdens. I mean certainly think that the offset, rational basis has to be the beginning point before you trigger the next step. There cannot be an irrational reason or an absurd reason for wanting to accomplish a certain policy. So yes, that has to be accomplished first and then I believe the court will apply a balancing test if they decided there was a rational reason for doing that.  But the deference the courts tend to give is very widely given to the policy makers in determining if there is rational reason. Basically any rational reason that might support the creation of a policy that is fairly closely related the mechanism that's used to implement it is typically found to be a sufficient rational basis.

**Rep. Hale**: What about in the event that there's no scientific basis for it, no medical basis for it. Then would you say there is no rational basis that exists?

**Mr. Flemming**: Permit me to answer it this way: if a court found that then they would probably strike down the provision. So I think the answer to your question is yes, if a court did find that on a challenge there really wasn't scientific evidence that supported whatever the mechanical policy procedure concluded then it's possible that the court could conclude that there is no rational basis and therefore strike down the measure, or that part of the measure.

**Rep. Hale**: With your answer, I take it that means that we pass the bill and are setting up for some sort of litigation and cost related there too.

**Mr. Flemming**: Like I mentioned previously, it wouldn't surprise me if there was litigation because there typically is in these abortion related measures, not always, but often.  And yes there is cost associated with it.

CHRIST000025

**Rep. Montenegro**: I just wanted to address the concerns at least from my understanding. There are 23 other states that have prohibited abortion coverage. 17 of those specifically prohibit the separate writer and there has been no constitutional questions or issues raised there. And also that women are still able to, or free to get private insurance. The courts are clear that he right to abortion doesn't include forcing taxpayers or having taxpayers subsidize or having to pay for it. I believe that, It is my understanding that the courts have upheld that Arizona has informed consent law so this additional info imposes no constitutional issues at least to my understanding.  I just wanted to make sure we read that for record.

**Rep. Thorpe**: in testimony in Federalism that was noted, that as far as taxpayer funds would not be used for abortion services. The other piece of this, the consent piece we had medical testimony during the committee and it as talking about the reversal of the Morning After abortion pill. And that doctors are starting to recognize that it can be reversed if it's caught early enough and what we basically are wanting organizations like Planned Parenthood to do is to make sure when they are counseling a person who is thinking about using that product that that would be included in the counseling session that there is a possibility that the effects of the pill could be reversed.

**Rep. Valesquez**- I do have major concerns with this bill. It sounds like this bill would prohibit women from obtaining healthcare insurance through the Exchange that would allow her to obtain an abortion. This contemptuous bill will just impede on a woman's right to choose so with that I vote no.

Hale/Velsquez—no

**Arizona House of Representatives**

**Fifty-second Legislature - First Regular Session**

**House Majority (Republican) Caucus**

Tuesday, March 17, 2015

Video: http://azleg.granicus.com/MediaPlayer.php?view_id=22&clip_id=15652

*Start time: 44:50*

Analyst: As amended by the Federalism and States' Rights committee, SB 1318 prohibits any healthcare plan offered through any healthcare exchange operating in this state from providing health coverage for abortions. It provides exceptions for pregnancies which are a result of rape or incest. It also requires documentations from abortion clinics on licensure or renewal with applications regarding admitting privileges be submitted to the director of the Arizona Department of Health Services. It adds to the 24 hour period prior to an abortion procedure that the performing physicians of a medical abortion inform the patient that it may be possible to reverse the effects of the medical abortion if she so changes her mind, it also requires that the information on reversing and assistance with reversing the effects of the medical abortion be available on ADHS's website.  Happy to answer questions.

Rep. Borrelli: Just for clarification, this is to ensure that the doctor gives more notification and making sure that the patient is fully aware of the options that they have?

Analyst: Currently in statute there is a list of things that physicians are required to inform a patient of within 24 hours of a procedure – an abortion procedure – being performed. And this is going to add that they have the possibility of reversing the effects of a medical abortion. Because of the way that the medical abortion is administered, there is about a 48 hour window, where – if they wanted to change their mind, they could.

It was testified in committee that this is a new idea and procedure so there was some conflict about whether it was FDA approved or not.

Rep. Borrelli: Thank you. So in other words, the women are not even fully aware of the choices that they have by the doctor?

Rep. Livingston: The doctors are not currently required to tell them that if they take an abortion pill, there may be an option to reverse it. This tells the doctors that they have to at least mention that to the ladies and give the disclosure information out. That's the main purpose of that part of the bill.

Rep. Cobb (context = she's a dentist): A couple of comments to that. The pill is progesterone which is a hormone. And the anti – and the counteraction of that is more of the – it's anti – it's the same thing. It's just giving you high doses of it. Right now it doesn't have a basis for it yet, it hasn't been out there long enough. So they haven't put it on there but it is progesterone which is a regular hormone that we use on other things. Not me, because I'm not an OB/GYN. And I don't use it in the mouth.

CHRIST000027

But, so far there isn't an evidence base and I think that's why it hasn't been put on to the website yet.

Also, Mr. Whip, is there an amendment that's coming as far as protection for the physicians' personal addresses? I thought I saw an email on that.

Rep. Livingston: Yes. There will be an amendment on this. *[discussed the admitting privilges provision of the bill]*

Rep. Townsend: Just for clarification on what RU-486 is. It's not actually progesterone; it's a synthetic steroid that blocks progesterone. Progesterone is what sustains the pregnancy until the placenta's developed and created by the corpus luteum and so the idea with RU-486 is to block the effect of that progesterone, which then makes the body think that it's not pregnant, and she has her normal monthly cycle and the baby is lost. So what this does is basically adding that progesterone back and simulating what the corpus luteum would be doing and to sustain that pregnancy long enough so that it can then go forward. That's essentially how this works.

The antidote, the key to this is a basic hormone that's available over the counter. It's not a prescription. It's not a drug to be studied. You can go down to Whole Foods and Sprout's and buy a thing of it for $30 and women take it for various reasons – so it's not a controlled substance. It's a simple female hormone that has the potential of reversing the effects of RU-486.

Rep. Livingston: In the same token, we are also recommending that ladies always talk about these issues with their doctors and get professional advice on these things.

Rep. Cobb: To that point, she's correct. When I was talking about the "reversal" it was the progesterone. High doses of progesterone.


*End time: 50:25*

3-23 House Floor Session COW #2

http://azleg.granicus.com/MediaPlayer.php?view_id=22&clip_id=15761

**Rep. Stevens**: Clerk will read the next bill on the calendar along with committee recommendations

**Clerk**: Senate Bill 1318... (fast talking)... Mr. Chairman

**Rep. Stevens**: Chair recognizes Representative Townsend.

**Rep. Townsend**: Thank you, Mr. Chair. I move that when the Committee of the Whole rises to report it recommends that Senate Bill 1318 be adopted.

**Clerk**: (fast talking)

**Rep. Stevens**: Chair recognizes Representative Townsend to move her committee amendment.

**Rep. Townsend**: Thank you, Mr. Chair. I recommend that when the Committee of the Whole, excuse me, I move that when the Committee of the Whole ri um rises to report the FSR amendment be adopted.

**Rep. Stevens**: Thank you. The Steele floor amendment will not be offered and the Cobb floor amendment will not be offered. So the Chair recognizes Representative Mitchell to move his floor amendment. Feedback. Ms. Cobb, just a minute. Any further discussion on the committee amendment? The Chair recognizes Representative Cobb.

**Rep. Cobb**: Mr. Chairman, I rise in opposition to this amendment. May I speak?

**Rep. Stevens**: The floor is yours.

**Rep. Cobb**: I understand that Representative Townsend has put in a lot of work and has done a lot of research on the RU-486, and um she also knows about the reversal product that is out there for RU-486. But high doses of anything is uh not necessarily a good thing, and one of the things that uh Representative Townsend that was brought out in committee also was talking uh about how the progesterone levels is something that you buy over the counter. Well there's many things that we can buy over the counter. There's vitamins that we could buy over the counter. If you have a high, too high of a dose of a Vitamin A you end up with kidney failure and you die. If you have too uh too strong of a high dose of Vitamin D, you end up with uh liver failure, and if you have too strong of a dose of Vitamin E you end up with hemorrhaging. So everything in moderation is what we should be using. The problem with this um protocol that is out there is that it's nonevidence-based medicine. It's only been out for a short period of time and the studies are not out yet on this, and what we don't know is what we don't know. I strongly oppose putting something in statute that is a nonevidence-based medicine. And uh I feel like that we have we're ping ponging a fetuses with taking progesterone away from him with the Far U, RU-486 and then you're adding a uh a high dose of progesterone back into them and we don't know what the what the precautions or what's going to happen in the future. The OBGYNs right now are on the line for about 21 years after that child is born, and granted we may be able to save children um and I

CHRIST000029

hope that we can in the future, but I want it to be on medication that has already gone through studies and we know that it's going to be effective without giving them ad-adverse reactions in the future. ACOG came out over the weekend which is the American Congress of OBGYN and spoke against this also, this amendment, and um since then we have seen lots of the OBGYN um population come out against it also. I also have received emails, text messages from the Tea Party um which is an OBGYN in my district that says please do not support this amendment. So with that I just would would urge this House to not sup-put something in statute that we don't have as good medicine at this point. Thank you.

**Rep. Stevens**: Thank you. The Chair recognizes Representative Townsend.

**Rep. Townsend**: Thank you, Mr. Chair. Will Representative Cobb stand for two questions?

**Rep. Stevens**: Representative  Cobb, will you stand for two questions? She does stand.

**Rep. Townsend**: Thank you uh, Mr. Chair, and Representative Cobb, um can you tell me what the protocol is, the accepted protocol uh for physicians when a woman has uh a first trimester pregnancy at risk of an a spontaneous abortion? What is the protocol to help preserve that pregnancy?

**Rep. Stevens**: Representative Cobb

**Rep. Cobb**: The protocol is um using 10 milligrams of of progesterone.

**Rep. Stevens**: Representative Townsend

**Rep. Townsend**: Thank you, Mr. Chair, and so the use of progesterone then is used, and you're sure that it's only 10 milligrams?

**Rep. Cobb**: 10 milligrams is what they average—

**Rep. Stevens**: Representative Cobb

**Rep. Cobb**: Excuse me, Mr. Chairman. Um 10 milligrams is what the average should be at that point and it kind of depends on what what the physician wants to to prescribe at that point. Again I think that we're right now we are getting in between the doctor-patient relationship. And and putting it into statute that this is available makes it sound like it's already had all the evidence and all this all the background already available.

**Rep. Stevens**: Representative Townsend

**Rep. Townsend**: Thank you, Mr. Chair. So you do agree uh, Representative Cobb, that the use of progesterone, and it sounds like you're not sure of the exact dosage is standard protocol for the preservation of an early pregnancy.

**Rep. Stevens**: Representative Cobb

**Rep. Cobb**: Yes it is.

CHRIST000030

**Rep. Townsend**: Thank you. Mr. Chair,

**Rep. Stevens**: Miss Townsend

**Rep. Townsend**: A second question for Representative Cobb you agreed to, um can you tell me uh the ACOG, they came out this weekend in opposition to this, can you tell me who the president of ACOG um I don't remember her name but she came and spoke. Can you tell us if she has any prior uh affiliation with Planned Parenthood?

**Rep. Stevens**: Representative Cobb

**Rep. Townsend**: Which which might, excuse me, Mr. Chair, which might uh have an impact on her decision to put that statement out?

**Rep. Stevens**: Representative Cobb

**Rep. Cobb**: No, Representative Townsend, I don't know any affiliation.

**Rep. Townsend**: Thank you, Mr. Chair. I would just like the members to know that this statement coming from ACOG saying that they are opposed to this issue came from a physician who was uh testified in committee that—

**Rep. Stevens**: Just a minute. We still have. You're doing closing remarks. We'll come back to you on that. We still got four members on the board. You got any more questions?

**Rep. Townsend**: Yes, thank you, Mr. Chair. Uh Representative Cobb, did you know that the ACOG president was just I believe it was in 2013 I was told that she was president of Planned Parenthood. Did you know that?

**Rep. Stevens**: Representative Cobb

**Rep. Cobb**: No, ma'am, I didn't.

**Rep. Townsend**: Thank you, Mr. Chair, and Representative Cobb, would you think that having been recent president of Pr Planned Parenthood might have an impact on the decision making on whether or not to support this procedure?

**Rep. Stevens**: Representative Cobb

**Rep. Cobb**: Mr. Chair, I don't yield to any more than two questions, and that's what she told me she was going to so.

**Rep. Stevens**: Ms. Townsend, she no longer yields.

**Rep. Townsend**: I yield.

**Rep. Stevens**: Chair recognizes Representative Friese.

CHRIST000031

**Rep. Friese**: Uh thank you, Mr. Chair, I'd just like to make a comment.

**Rep. Stevens**: It's all yours.

**Rep. Friese**: Thank you. Uh I I I rise uh to uh express opposition to this amendment, and I want to uh express my opposition um because uh I'm an academic uh uh physician, meaning I have a master's degree in clinical sciences, and I know how to perform a clinical study. What I I've scrolled through some of the data on the use of progesterone to uh it basically it's a competitive uh inhibitor to the drug that's being used to endorse induce the abortion. So um you know I understand how the physicians can use it. I understand that there is some logic behind it. However, the evidence doesn't support that it works well enough to force us to mandate that we, you know, interfere with the doctor-patient relationship, and um give, what I think, would be false hope to this woman who is making a very difficult decision. And what I'm referring to is the percentages I've seen reported is this this this procedure this rescue procedure if you will has been provided to 220 some uh women with about 120 some uh pregnancy pregnancies proceeding to term. That's about 50 some percent. You can flip a coin, and have that same result in any scientific study. That that that's chance alone, chance alone giving you those same results. So I think we have to take a look at this as not substantiated, as fringe medicine, and be very careful about the weight that putting this in statute puts on this uh on these findings. These are case series. There is no randomization. There is not even a cohort or observational study here. There's no statistical mathematics being applied. We can't tell if there is a real difference between these two groups or that chance alone is resulting in the dis differences that we're seeing. So, that's the comment I just wanted to make, and uh I just would like people to pay close attention to that as they vote. Thank you.

**Rep. Stevens**: Thank you. Chair recognizes Representative Boyer

**Rep. Boyer**: Thank you, Mr. Chair, a comment

**Rep. Stevens**: It's all yours.

**Rep. Boyer**: Thank you, Mr. Chairman. Members, I rise in support of the Townsend amendment. I just wanted to point out that while we're waiting for case studies, there is evidence of this working, and that's 80 live births, 80 children who are alive today because of abortion reversal. And there's nothing in this legislation that prevents an abortion. I don't see why it's so difficult to have a woman be fully informed on what her options are, so I guess I'm bemused why we cannot support this. Um I I do support the Townsend amendment to 1318. Thank you.

**Rep. Stevens**: Thank you. Chair recognizes Representative Petersen.

**Rep. Petersen**: Thank you, Mr. Chair. I rise um in support of Senate Bill 1318 and I want to see if Representative Cobb would yield to a question.

**Rep. Stevens**: Representative Cobb, will you yield to a question.

**Rep. Cobb**: Yes I will

CHRIST000032

**Rep. Stevens**: Mr. Petersen

**Rep. Petersen**: Representative Cobb, I just want to make sure I understand this procedure. I wasn't in the committee of course. Um so if this reversal procedure is not does not take place, what will happen to the baby?

**Rep. Stevens**: Representative Cobb

**Rep. Cobb**: What happens is the Far RU-486 blocks the progesterone. So they have within 24 to 48 hours for the progesterone to be put back into their system and possibly they could have a chance of it being a reversal, and so what it does is just gives them high doses of progesterone. If it doesn't happen, the abortion continues on, as the woman had decided. Now I I'm with you, Representative Petersen. I like this bill. I don't like this amendment.

**Rep. Petersen**: K

**Rep. Stevens**: Mr. Petersen

**Rep. Petersen**: Um and then again I missed the committee hearing. So my second question goes to, uh I think I understand your answer to the first question. Second question is to the success stories, that have we heard maybe the number of success stories and have we heard success stories? Uh I guess I'll ask two questions. Have we heard success stories? Number one. And then, have you heard of any deformities or so forth from with that with those?

**Rep. Stevens**: Were you asking Representative Cobb? Representative Cobb

**Rep. Cobb**: Mr. Chairman, Representative Petersen, I have heard through the emails recently of the success stories. Uh we have not done enough studies to know if there's any birth defects yet. We haven't done any studies. That's what the problem is here is there's no studies to know. ??? babies. That's a prime example of what has happened in the past of things that we didn't know about so you know you just don't know what you don't know, and that's my concern.

**Rep. Stevens**: Representative Petersen

**Rep. Petersen**: So then one one follow up question to that would be if the parents were aware of the risk, cause I think you're, it sounds like some of the concern is there may be deformities or something to the ba child. Uh if the parent was notified of those possible risks is that ma does that put you in support of the bill or would you still be in opposition to it?

**Rep. Stevens**: Representative Cobb

**Rep. Cobb**: Mr. Chairman, Representative Petersen, at this time we don't know that so I can't be in support of it, but if in the future we did have evidence-based, we did do studies, we did find out that there is absolutely no risk with with this, not absolutely but very minimal risk, then I would definitely be in support of that. But at this point, we're putting in statute something that has not even been studied yet. Thank you.

CHRIST000033

**Rep. Petersen**: Thank you for yielding to those questions.

**Rep. Stevens**: Mr. Petersen

**Rep. Petersen**: I have the utmost respect for Representative Cobb. Uh Mr. Chair I just want to say I support

**Rep. Stevens**: Are these closing remarks?

**Rep. Petersen**: Yes, If I could provide closing comments, Mr. Chair,

**Rep. Stevens**: You got it

**Rep. Petersen**: Thank you. Uh I just want to say, Mr. Chair, from from what I understand here uh it seems pretty clear what we will have is a child will have a chance to live if this passes. If this does not pass uh then there then death is certainty. And as far as the um risks, my wife and I when we had our first when we were expecting with our first child, we have five children, um we were asked, "Do you want to do these studies to see if your child has problems or issues?" and and we declined and said that you know we're, we don't care how this child comes; we are taking this child. And uh we will love them and take care of them and provide for them and and take them the way that God sent them to us, so I think there are also parents who also have that change of mind that they're going to feel the same way that even if there is a risk, at least there's a possibility of life. And uh so, Mr. Chair, I support life and I support Senate Bill 1318 and respectfully request uh my fellow colleagues to support as well. Thank you.

**Rep. Stevens**: Thank you. Chair recognizes Rep. Farnsworth.

**Rep. Farnsworth**: Mr. Chairman, I rise uh in support of this amendment. Um Mr. Chairman, I've heard a number of things. A lot of it I think is off the off the scope and topic of this particular amendment. Um this is pure and simple a disclosure. That's all. If you look at the current statute, we have delineated a number of issues that we believe is important for full disclosure to a patient 24 hours before a an abortion is performed. This would be included in that simply to give a a patient the information they need as they weight their options dealing with abortion. This does not require an abortion. It does not stop an abortion. It does not require the doctor to give any medical um any kind of medical help, any kind of anything that has to do with with with actual medical assistance, except for disclosure of information. That's it. So, I hear what's being said in debated, but that has nothing to do with this bill. If the doctor discloses that this option is available, then I would assume the doctor practicing within the good scope of practice would give all the information and say there may not be clinical studies yet that that that it only works 50 percent of the time. I disagree with my colleague who says this is just a 50-50 chance. I don't believe that's accurate. That would be accurate if you're rolling the dice, but in this case according to World Health Organization, 95 percent of women who receive this in the first nine weeks uh have actually have aborted the fetus. So to have a 50 percent survival rate by taking the reversal would would mean you've reversed over 50 percent. So, I disagree with him on that issue. But that isn't even what this is about. This is about disclosing to a potential patient all of the options that they have regarding a procedure that they have selected. If they choose to ignore the information, they ignore it.

CHRIST000034

But what happens if it hasn't been disclosed and they they they go in and and take this RU-46 and then they have second thoughts for whatever reason and they want to reverse it? They don't have the information. They can't even make an informed consent or decision. And in my opinion, this doesn't interfere with the doctor-patient privilege or the practice of medicine. It doesn't interfere at all. It actually encourages a greater scope and breadth of participation by giving more information to the patient. I think every one of us agree that disclosure is very important. That's all this does, members. It does not dictate any kind of practice of medicine. It is simply disclosure. And for that reason I rise in support of this amendment. Thank you.

**Rep. Stevens**: Thank you. Chair recognizes Representative Olson.

**Rep. Olson**: Thank you, Mr. Chair. I rise in support of the uh Federalism and States' Rights Committee Amendment to Senate Bill 1318 for many of the same reasons just articulated by Representative Farnsworth. And I wholeheartedly support this bill and frankly I was surprised to hear comments on this floor that that giving a 50 percent chance of survival to a a child who is yet to be born is something not worth pursuing, that that's just a simple chance, a mere coin flip. Well, I would like to have that chance if I were that preborn child, not yet to have his first breath or her first breath of life. That is a chance worth pursuing. This is an important bill. There are already 80 children alive today who have gone undergone this reversal of this of this abortion proceeding, or this abortion procedure. So there is a chance, and as was mentioned, this is a mere disclosure to to the patient. This is to ensure that a patient is not given bad information. We've actually heard of of circumstances where that that this could prevent someone who takes the first dose and regrets it and wants to change their mind and goes to Planned Parenthood or some other abortion provider and asks, "Can this be undone?" And this prevents them from being given false information because certainly there is a chance even if it is a small chance, even if it's less than 50 percent. What this says is that you have to tell them that there may be a chance, and that has been demonstrated. More than the number of people in this room today are alive today because this abortion procedure was reversed. 80 children, 60 pregnancies currently exist because this abortion procedure was reversed. This is a mere disclosure telling a mother that she has the opportunity if she so chooses to reverse this procedure. I rise in support of the committee amendment to Senate Bill 1318.

**Rep. Stevens**: Thank you. Chair recognizes Representative Townsend. Do you have are you going to ask for a question?

**Rep. Townsend**: Mr. Chair, I wanted to ask, uh Representative Farnsworth a question but he's left the floor. Can I pass til he returns?

**Rep. Stevens**: All right. Chair recognizes Representative Cobb.

**Rep. Cobb**: Mr. Chairman, can I make final closing statements?

**Rep. Stevens**: You've already made your closing comments. You can ask anybody a question.

**Rep. Cobb**: Okay, thank you.

CHRIST000035

**Rep. Stevens**: Any other discussion? Would Ms. Townsend like closing comments?

**Rep. Townsend**: Thank you, Mr. Chair. I still I would like to ask Representative Farnsworth a question if that's possible.

**Rep. Stevens**: You haven't started so you can you can ask if he would like to yield. Mr. Farnsworth, do you yield to a question?

**Rep. Farnsworth**: Mr. Chairman, I yield.

**Rep. Stevens**: Ms. Townsend, he does.

**Rep. Townsend**: Thank you, Mr. Chair, and Representative Farnsworth, are you aware that there has been at least one patient who requested information from a local Planned Parenthood as to whether or not they could reverse the abortion pill, RU-486?

**Rep. Stevens**: Mr. Farnsworth

**Rep. Farnsworth**: Mr. Chairman, and Representative Townsend, I am now.

**Rep. Townsend**: Okay, thank you, Mr. Chair. And Representative Farnsworth,

**Rep. Stevens**: Ms. Townsend

**Rep. Townsend**: Do you think it would be uh ethical and honest to advise that patient that yes there is a procedure that may reverse the procedure RU-486 whether or not it has had full scientific study? Uh don't you think that a full disclosure and uh truthfulness and ethical practice would dictate that you would disclose that information rather than telling that patient no?

**Rep. Stevens**: Mr. Farnsworth

**Rep. Farnsworth**: Mr. Chairman, Representative Townsend, I would think so if a patient asks specifically if there was something that could help her reverse her decision and uh and offset the effects of RU-486 I would think that that would be within the ethics of the profession as long as, again, it's full disclosure. Disclose that this is a relatively new product. Disclose that it it may or may not work. I mean give the full disclosure. I'm not suggesting for a second that a doctor only give a piece of disclosure, and what it is that I would want to say. Give the full disclosure and let the patient decide. We do that with experimental drugs all the time. There's a disclosure. There's an experimental drug. Sometimes they can get them into a program. Sometimes they can't. It may work with what they have. Sometimes it doesn't. But nobody, I don't think anybody would cringe if this had something to deal with like cancer or another disease we all believe we want to fight. Disclosure that there may be options even though they aren't necessarily mainstream yet, I think is a a a tremendous and positive piece of the treatment. I think we had something here at the legislature that we referred to the ballot that did something like that with experimental drugs. We allow people to make decisions on experimental drugs if they are terminal. So I do believe it. Disclose all the information. Disclose the literature. Disclose lack of literature. But I believe the disclosure certainly falls within the scope of ethical practice.

**Rep. Stevens**: Ms. Townsend

**Rep. Townsend**: Thank you, Mr. Chair, and Representative Farnsworth, would you agree then, and it sounds like you do, that if a woman legally has the right to take the life of her child, that she ought to also have the right to know that she is able to save that should she change her mind?

**Rep. Stevens**: Mr. Farnsworth

**Rep. Farnsworth**: Mr. Chairman, Representative Townsend, yes, I believe that again it all goes back to the disclosure and what that what that mother decides certainly is going to be within the scope of practice. But I excuse me I for the life of me can't understand why we're uplo opposed to disclosing that there is something out there that might work along with all the relevant data and let the mother at that point decide if that's a decision she wants to make.

**Rep. Stevens**: Ms. Townsend

**Rep. Townsend**: Thank you, Representative Farnsworth, and Mr. Chair, I'd like to make closing comments.

**Rep. Stevens**: Oh wait we got other people on the board. We'll get back to you. We have other people on the board for questions. Chair recognizes Representative Cobb.

**Rep. Cobb**: Mr. Chairman, would Representative Farnsworth yield to a question?

**Rep. Stevens**: Mr. Farnsworth, it's your day

**Rep. Farnsworth**: Mr. Chairman, I yield

**Rep. Stevens**: Ms. Cobb he does.

**Rep. Cobb**: Mr. Chairman, Mr. Farnsworth, is there anywhere in this amendment that it says that this is a nonevidence-based treatment?

**Rep. Stevens**: Mr. Farnsworth

**Rep. Farnsworth**: Uh Mr. Chairman and Representative Cobb, um no there's not, and I would be a misnomer anyway because there is evidence. It hasn't necessarily gone through the protocols that you want, but there's obviously evidence. Whatever limited evidence there is exists.

**Rep. Stevens**: Ms. Cobb

**Rep. Cobb**: Mr. Chairman, Mr. Farnsworth, what I am talking about with medical evidence, does it say anywhere in here that this has any studies, that this is experimental?

**Rep. Stevens**: Mr. Farnsworth

**Rep. Farnsworth**: Mr. Chairman, Representative Cobb, it does not. I would believe that that would be up to the doctor to disclose, as I've stated several times now on this floor that I believe that that is relevant

CHRIST000037

information, that the doctor would disclose under the scope of this particular bill, which would be statute that would require disclosure. So, there is absolutely no way we can fill the the statutes with every piece of information that has to be disclosed but there are good practices for disclosure, there's and there's the code of ethics. All those things control, so I think that that would be upon the individual doctor to make sure that they disclose the information to be in compliance with this statute.

**Rep. Stevens**: Representative Cobb

**Rep. Cobb**: Mr. Chairman, Representative Farnsworth, would you think that this would also allow a young girl to look at this and say that, "my decision isn't really final," that "I might have a few days to change my mind and this could be what I would do."?

**Rep. Stevens**: Mr. Farnsworth

**Rep. Farnsworth**: Mr. Chairman, Representative Cobb, from my perspective on this kind of right to life perch that I sit on, uh I would certainly hope that she would realize that her decision isn't final because there are a lot of girls that go in and they make the decision and then they wish that it hadn't been final. So I think if your question is, is it going to promote more abortions? I don't believe so. I believe that somebody who is inclined to get an abortion isn't going to change her mind and get an abortion because they might be able to reverse it later. I don't believe that. But I do believe that those who make a who make a decision to have an abortion and regret it will have an opportunity to potentially reverse it.

**Rep. Stevens**: Representative Cobb

**Rep. Cobb**: Mr. Farnsworth, Chair Mr. Chairman, you just refuted exactly what you just said a few minutes ago. Isn't it it isn't it true you're saying it's it's not a permanent thing and now you're saying you it's okay that they can change their mind? I would think that they're taking months to to do this. Wouldn't you think that they could would not change their mind at after two days?

**Rep. Stevens**: Mr. Farnsworth

**Rep. Farnsworth**: Mr. Chairman, Representative Cobb, if you if they have taken months to do this then the RU-486 probably won't be that effective, but um that that's I guess semantics. Uh the answer is no, I didn't refute my own statement. My statement is the 24 hours before they have an abortion, there are disclosure requirements already in the law. This adds to that the disclosure that there might be a way to reverse it. Once they have entered into an abortion clinic, I don't think at that point that they are opposed to having an abortion. I think what they need is the information that says if you do this and it and you change your mind, this may work. If the disclosure is accurate, I don't think that there's a doctor out there that's going to say this is 100 percent full proof. And the decision to have an abortion is still going to rest heavily upon that woman's mind. This I think, though, captures those that regret it after they take an RU-486 pill and say, "You know what? That was a huge mistake," of which I know several who have talked to me. Um so that's what I believe. I don't think it's going to push anybody into an abortion. I do think it could possibly allow them to to change their mind and reverse it.

**Rep. Cobb**: Thank you, Mr. Chairman.

CHRIST000038

**Rep. Stevens**: Chair recognizes Representative Lawrence

**Rep. Lawrence**: Mr. Chairman, would Representative Cobb please rise for a question?

**Rep. Stevens**: Ms. Cobb, will you yield to a question?

**Rep. Cobb**: Yes, Mr. Chairman, I will.

**Rep. Stevens**: Mr. Lawrence, she yields.

**Rep. Lawrence**: Thank you, Mr. Chairman. Representative Cobb, have you any evidence, even anecdotally, that this procedure has been harmful?

**Rep. Stevens**: Ms. Cobb

**Rep. Cobb**: Mr. Chairman, Mr. Lawrence, that's my issue, that we don't have evidence. So that is the problem right there. We didn't have evidence on other medications that we've given and have bad outcomes. Once we have the evidence, I think this is a viable option for all if if it works and you're not having the and we do have the evidence behind it, it would be a good option. But at this point we don't. So I do believe this is getting in between the doctor-patient relationship at this point. They still can can offer this to their patients, just not in statute.

**Rep. Stevens**: Representative Lawrence

**Rep. Lawrence**: Mr. Chairman, Representative Townsend, would you rise for a question?

**Rep. Stevens**: Representative Townsend, will you yield to a question?

**Rep. Townsend**: I will yield.

**Rep. Stevens**: Mr. Lawrence, she yields

**Rep. Lawrence**: Have you any evidence anecdotally even anecdotally of harm brought about by this procedure?

**Rep. Stevens**: Ms. Townsend

**Rep. Townsend**: Mr. Chair, no I do not.

**Rep. Stevens**: Mr. Lawrence

**Rep. Lawrence**: Mr. Chair, I would be in favor of this amendment and the bill. Thank you, sir.

**Rep. Stevens**: Thank you. Members, any further discussion? Ms. Townsend, would you like closing remarks?

**Rep. Townsend**: Thank you, Mr. Chair, and I appreciate all the folks who stood up in favor of this bill today. I think that this is something that is uh as Representative Farnsworth has said, a right for women

CHRIST000039

to know, a right to try. The citizens of this state voted last year for those who were facing terminal illness that they ought to have the right to try with medication that is not yet FDA approved because that's their sovereign uh person that they are trying to save, and much the same, this child is also a sovereign person inside the mother with whom she has decided to try and save. Members, I remind you that there are at least two groups, Silent No More and I believe it's Rachel's Vineyard, with many women signed up who do regret their abortion and wish that there was something they could do to to have reversed that, and who suffer for years upon end uh post-abortion. And the regret oftentimes uh can be emotionally crippling. Members, this is a very simple amendment. This is not mandating that a physician perform this. This is just saying that you have to be truthful in your disclosure, that if a woman asks if there's a possibility to reverse this, if I've changed my mind, is there a possibility that I can reverse this? The answer must be yes and that it should be disclosed on their website on the DHS, and so, members, I support this amendment. That's why I offered it, and I ask you to vote yes.

**Rep. Stevens**: Thank you. Members, the question before you is the adoption of the FSR committee amendment to Senate Bill 1318 be adopted. All those in favor vote aye

Aye

**Rep. Stevens**: All those opposed vote nay.

Nay

**Rep. Stevens**: Appears the ayes have it do have it so ordered. Chair recognizes Representative Mitchell to move his floor amendment


**APR discussion breaks at 35:35**

**APR picks up again later at 38:48**


**Rep. Brophy McGee**: Thank you, Mr. Chairman. Ms. Townsend, would the doctors uh by being compelled to provide the information in the Townsend amendment be subject to medical malpractice or a lawsuit uh for uh medical malpractice by being compelled to provide this information? Would they be exposed to medical malpractice lawsuits?

**Rep. Stevens**: Ms. Townsend

**Rep. Townsend**: Thank you, Mr. Chair, and Representative Brophy McGee, it is not my opinion that they would be exposed to medical malpractice because they are not practicing medicine by informing them that these procedures have happened and are available.

**Rep. Stevens**: Ms. Brophy McGee

CHRIST000040

**Rep. Brophy McG**ee: Uh thank you, Mr. Chairman. Ms. Townsend, I was asking uh not for your opinion but for an answer. Respectfully, would the doctors be by being compelled to provide this information as contained in the Townsend amendment then be open to medical malpractice litigation?

**Rep. Stevens**: Ms. Townsend

**Rep. Townsend**: Thank you, Mr. Chair. Again, as my legal opinion, I am not the one eh behind the gavel making that decision, that they would not be compelled and be held medically liable.

**Rep. Stevens**: Ms. Brophy McGee

**Rep. Brophy McGee**: Uh thank you, Mr. Chairman, and Ms. Townsend uh what uh has there been any money or uh appropriations set aside for any legal expenses associated with the enactment of this legislation?

**Rep. Stevens**: Ms. Townsend

**Rep. Townsend**: Thank you, Mr. Chair. I would ask the second question if there's been any appropriations for the other provisions that uh for disclosure uh it's my understanding that there is not. But I would also ask uh a question in return is there money set aside for the others?

**Rep. Stevens**: Well, Ms. Ms. McGee has the Ms. Brophy McGee has the floor—

**Rep. Townsend**: Thank you

**Rep. Stevens**: for questions. Ms. Brophy McGee, the answer is no.

**Rep. Brophy McGee**: Thank you, Mr. Chairman. Ms. Townsend, I'm trying to determine based on the fact that um Arizona has been very uh forward moving in enacting uh legislation which uh strictly limits abortions uh but we've also been very active in the courts and expended hundreds of thousands of dollars defending our legislation and at the same time not being able to enact it. So what I'm trying to figure out in terms of my vote on this legislation because I agree no public funds should go uh for uh any abortion other than rape and incest. I I'm trying to figure out if this bill is going to be injuncted if it becomes law and then will once again will start a pathway to the court, or will it be simply enacted and enforced?

**Rep. Townsend**: Mr. Chair

**Rep. Stevens**: Ms. Townsend

**Rep. Townsend**: And Representative Brophy McGee, I preface my answer with the fact that no matter how much it costs in court that the protection of life you cannot put a price tag on. And I think the state of Arizona has and will continue to put aside money for that purpose. Secondly, it's my understanding that out of all the court's cases that have been uh brought that we have defended only two have been uh overturned.

**Rep. Stevens**: Ms. Brophy McGee

CHRIST000041

**Rep. Brophy McGee**: And thank you, Mr. Chairman. Ms. Townsend, I am well aware of haha the fact that defending life should not have a price tag on it, but I would also comment that our resources are finite, and to the extent that the Supreme Court has upheld abortion as a legal um medical practice we are operating within those confines, and that to move beyond those confines subjects us to uh legal fees um and a failure to enact legislation uh restricting abortions. So respectfully that was not a question. Mr. Chair, I realized I'm commenting. Those are my final comments.


**APR discussion breaks at 42:55**

**APR picks up again later at 45:50**


**Rep. Mesnard**: …And finally, I I understand what one of my colleagues was was bringing up earlier as far as uh you know is there enough scientific information. Is it evidence-based and that sort of thing. I I think that we all acknowledge that this is has only newly been tried, but what we do know is that at least in some cases, 80 that we know of and 60 that are ongoing, it has worked. This does not say it will work. It does not say you should do it. All it does is list in all the disclosures that it may be possible, and then it doesn't go anywhere beyond that as far as you know there were concerns about medical malpractice. There's nothing in here about a doctor doing anything. Nothing at least to me that would elicit some sort of you know malpractice uh claim against the individual. All it is is a long list of of things we're out now up to letter "I" with this. And if you scroll through all the others, whatever fears you might have about medical malpractice could apply to any number of things and yet we don't see that bearing out. So I I think I think that some of the concerns at least brought up especially about that issue there I I I don't agree. I don't see it the same way. I think that there isn't any harm in saying that it might be possible um it doesn't say that it is possible. I'm sure there will be people studying this issue for the coming years. I certainly hope that they will. Um but I can certainly imagine that someone makes a major decision like this and then right afterwards feels regret. Uh we all know whether you're on the prolife or prochoice side of the issue that this is an emotional issue. And so we can certainly I can certainly see that happening, and I think a person knowing that it might be possible, not that it is necessarily, but that it might be possible time is of the essence and here's some information if you want to explore this on your own. I I don't see the harm in that. Um we don't prescribe anything about what must be said uh the process for that to take place, if they have to do this, anything other than saying it may be possible. Time is of the essence. So, Mr. Chairman, I rise in support of Senate Bill 1318.

**Rep. Stevens**: Thank you, Chair recognizes Representative Friese.

**Rep. Friese**: Thank you, Mr. Chair, I'd just like to make a comment on the bill as amended.

**Rep. Stevens**: Please proceed.

**Rep. Friese**: Thank you uh I certainly am opposed uh in opposition to this bill, and I just wanted to highlight a couple of things. Uh Mr. Mesnard just referred again to the scientific studies that we were

CHRIST000042

debating during the debate on the amendment, and um uh what what I'm trying to ih ih communicate is that there is a certain scientific rigor that one must adhere to in order for your results to any conclusions or for any weight to be given to the conclusions to that study. And a series of patients that were just given this treatment in no scientifically based, randomized way, or protocoloized way, or uh in a way that was under uh the degree of scientific rigor that one must um impart in order to make valid conclusions. In the absence of those things, I think that we're running a risk of informing people of an outcome that is inf that may in fact be unlikely. Just because we have 80, 60, or 50 percent, or whatever people that may have had this medical abortion reversed, wi in the absence of the medical rigor that should be applied when you're doing a study, one can introduce bias into the results. And when you introduce bias into results, the conclusions are invalid. So that's the reason for the uh uh a design, a clinical studies design, and there's several of them. There's many different ways to do uh uh a clinical study, a randomized control trial being the most expensive, the most time intensive, and the best tool, giving you the best results. But not every study needs that design. You could do a study design that is cohort design in a very you know in trying to ask yourself is is smoking associated with cancer? We never did a randomized control study on that, but we very we feel very comfortable. We know that association is very strong. So I just want to highlight the scientific rigor point. Just because the numbers look good, when you think, oh my gosh 50% 57% that is really meaningless in the absence of the scientific rigor that must accompany a clinical study. I also want to highlight that I do believe people will be hurt by this legislation. Who will b e hurt? Women that need access to reproductive healthcare services. Right? No one is being held harmless here. There has to be.. Abortion services are legal here in this country and we need to protect that access. Thank you.

**Rep. Norgaard**: Will Rep Townsend yield to a question?

**Rep. Townsend**: I do yield.

**Rep. Norgaard** Rep Townsend, your language makes it clear that women will be told the abortion pill MAY be reversible. That isn't a guarantee, is that correct?

**Rep. Tonswend**: That is correct.

**Rep. Cobb:** There is on the progesterone package itself there are warnings on that that contraindicate a pregnant woman to be taking it because of possible defects in the fetus. It also says that by taking it they may have cleft palette or heart defects. These are actual things on the package of progesterone. So putting it in high doses of progesterone could possibly lead to these things. And that is where my problem lies at, not necessarily that this will give somebody a chance. But just because we don't know the causes or what could happen after the medication has been given. I don't argue that they have a chance now of being able to save a child. That part of it is there I realize that. What I'm saying is that this part of it should not be put in statute. And with putting it in statute and by putting it on the website what we are insinuating is that we do have the background science for this. And that's what it's insinuating. It doesn't say anywhere that there isn't background science on this. It just says that they have to be aware of this and their doctor has to consult with them on this. But it does not give the

CHRIST000043

indication that this is not evidence-based medicine and that is my argument on this part of the amendment that goes to this bill. Thank you.

**Montenegro**: I rise in support of SB 1318 as amended. I have heard a few things as well that id' like to add my comments to on this floor. And let me start by saying that this bill as amended does not stop a woman from an elective abortion if that is what she chooses. However what we are saying here that if a woman has a choice to receive an abortion she should have the choice to reverse it as well. And we want to ensure that we do everything being that this is so sensitive to the woman's health and being that this is so sensitive to the life of the child that all options are available I also want to mention that they said that this is going to impact people from having a coverage. And that is inaccurate there is no impact on the number of available private health insurance options because of this bill or as a result of this bill. The bill ensures that taxpayers are not footing the bill or are not funding elective abortions. And to this I have currently every 41 out of every 199 plans on Arizona's healthcare exchange offer elective abortions considering that nearly 90% of those on the exchange receive a federal subsidy its' clear that taxpayer dollars are flowing into the abortion industry. It isn't anything new as well because there are 23 other states that have prohibited abortion coverage in their plans available through the exchange. This is, doing so is explicitly permitting that the ACA or the Obamacare or however you want to label it or as is permitted by the ACA or Obamacare as permitted. There is one thing I wan to bring up as well. And that is earlier today the issue of rape and incest was brought up and I think it is very clear and important that the rape and incest exemption that is here in 1318, SB 1318, mirrors the rape and incest exception that is found in the federal Hyde Amendment that has been a part of the federal law since 1976. So with that Mr. Chairman I rise in support I think it is important for us to do everything possible to afford the best information, the best information to flow to such sensitive decisions being made that have to do with the life of the mother and the life of that child. And we should do everything possible so that child has every avenue and opportunity to have as mentioned earlier today that first breath of air.

**Mr. Thorpe**: Mr. Chairman I rise in support of this bill as amended. In 2014 voters overwhelming approved Proposition 303, which is the right to try. And this bill is v very much in line with that but it actually doesn't go quite as far as that. The voters proved that they like this idea of right to try. But what happens with this bill. The provision we are arguing about is nothing more than disclosure. We are giving information. So then if the mother chooses to act, what is the mother have to do? The mother has to seek out a licensed doctor to actually do the procedure. The mother isn't going to go the local drugstore to pick something up. That's not available to the mother. The mother will then seek out a professional in the healthcare industry here in Arizona. The doctor will have to choose whether they will provide that medication according to the reversing this abortion pill. So we are talking about disclosure here. We are talking about information here. Are we really going to blindside a mother and not provide all the information they might require when making very difficult life choice. It's amazing we are arguing over disclosure, we are arguing of words, we are arguing of information. And Mr. Chairman I support this bill whole-heartedly.

**Rep. Townsend**: Members, thank you again for your discussion. This topic deserves to be looked at. And you know what else these women deserve to know the truth about whether or not they can or cannot reverse the RU 486 I cannot imagine any other area of healthcare any other medial practice that would

CHRIST000044

withhold life saving information from their patient whether there are FDA approved or not. Whether they can tell them there are procedures they can go and get elsewhere to try and save a life. We are sovereign human beings and so are these babies and if a mother asks the question, "Is it possible to reverse this abortion, to reverse this RU486 that I took and have changed my mind now," members I cannot imagine that anybody would support lying to that patient. I also want to remind us that our voters overwhelmingly and have consistently said they do not want their taxpayer money going to fund abortions. We have promised that, we have worked towards that and that's what this bill does it closing the loophole making sure that your money that came out of your check this last time will not go to fund an abortion. That's what this bill does. Members, I ask you for your support. I support this bill as amended thank you Mr. Chair.

CHRIST000045

## 3/26 Senate Floor Transcript
SB 1318
http://azleg.granicus.com/MediaPlayer.php?view_id=22&clip_id=15815

Video Time: 7:10

**Smith:** So, I won't get into the fact that we've murdered about 60 million children since Roe v. Wade. I will just stick to those that can agree or disagree about abortion this simple fact whether you are in favor or against it, I think the public is pretty clear that the taxpayers shouldn't pay for it. And I think that's the underlying motive and agenda that this bill 1318 is doing because through creative accounting, gimmicks, whatever you want to to call it, our Exchange, our federally run Exchange basically lets that happen because that extra separate abortion waiver is somewhere around $1 but yet we subsidize it to about $155 per person. And before people start saying well yeah Arizona shouldn't be doing this, I think the current number right now is that 17 other states are doing this. And so at the end of the day we will try the best that we can, I will, to keep politics out of this discussion, we will just talk taxpayer rights in this bill and I think it is made abundantly clear time and again across this nation that the taxpayers should not be paying for abortions and that's what this bill does; it removes that gimmick it removes that accounting creativity that is in Obamacare. It's a great bill. Proud to vote for it. I vote yes.

**Cajero Bedford**: I rise in strong opposition to SB 1318 this legislation would prohibit any insurance plan on a healthcare Exchange in Arizona with limited exceptions from covering abortions. And as was just stated by my colleague from district 11, some state that rationale for this prohibition is that taxpayers are paying for elective abortions with tax credits and subsidies made available through the Affordable Care Act. However according AZ Republic Fact Check on March 16 of this year the facts do not support this claim. Currently there are 41 of the 199 exchange plans available in Arizona on the federal exchange offer elective abortion coverage. Federal law clearly prohibits insurance companies from using public funding for abortions except in cases of rape, incest, or when the life of mother is threatened. As required by the federal care act and enforced by agencies insurance companies must not only collect separate payments to cover abortion services but also segregate these funds from accounts that accept public monies. So based on these facts the Arizona republic article concluded and I quote that there is no evidence that tax payer funds have been illegally used to cover abortions in Arizona. In the end Senate Bill 1318 is just another example of Center for Arizona Policy legislation designed to interfere with a woman's private health care decisions. To me this is insulting to women. This is a decision that should be made between a woman, her family, if the man is still around, and her doctor. With that, I vote no.

**Hobbs**: I am not happy with the underlying bill I made that clear on third read when this bill left this chamber. I said I think it's a stretch to say that subsidies that purchase insurance plans go directly towards paying for abortions. I think the

article that Senator from district 3 just referred to underscores that idea. And there were some things in the bill that were fixed here and I was happy that we added the amendment that protected victims of rape and incest. I'm happy that in the house they added an amendment that would protect physicians' personal information from the public record so that they would be less likely to be targets of hateful action toward them. However I am very highly concerned as many of us here in this chamber that should be about an amendment that was added in the house that basically when you boil it down I think requires medical professionals to commit medical malpractice. The amendment that was added requires abortion providers to tell patients about a possible procedure that can possibly reverse a medication abortion that's not completed. This is junk science. It is quack medicine. It is not evidence based in the least. There is absolutely no evidence anywhere in any peer-reviewed journal that supports this as a valid medical procedure. And what there is is a doctor out there selling this procedure or not selling it I don't know if he's making any financial gain off of it but touting this procedure and what he does is takes women who have started a medication abortion and have not taken the second medication and fills them full with progesterone. Which is again there is no evidence to back this up as a valid procedure. So now we are requiring medical professionals who are serving their patients to give this information to their patients. Progesterone is not safe to give during pregnancy. You can Google that and find that yourself. There are risks to the fetus, including multiple birth defects cases of cleft palette, cleft lip, hypospadias, which if you are a guy I wouldn't Google that because it's really ugly and uncomfortable looking, ventricular septal defect, a heart defect, patent ductus arteriosus which is another heart defect and other congenital heart defects. So this is what you are subjecting fetuses too, these possible birth defects, from giving progesterone to women who are pregnant which is not safe to give them while they are pregnant if you refer them, if you tell them that this procedure is available. There was a doctor I believe who testified; I'm going to retract that because I'm not positive he testified, but some OBGYNs have said that if you don't take the second pill of the abortion of the medication abortion that you have a chance that you will carry the pregnancy to term anyway, it's not complete  unless you take both drugs. So now we are inserting this extra thing in there that's not valid there's no evidence to back it up and subjects pregnant women and their fetuses to harm. I think that is wrong. I think it's medical malpractice and I don't think we should be inserting that into state statute, which is what this bill now does as amended in the house. I also think that it is highly insulting that we continue to put layer up layer upon layer upon layer on women who are going to get this procedure. It is insulting to think that women who are considering getting abortion have not already thought through all of the consequences and all of the implications that this will have on their life and have taken this decision lightly and have not considered all these implications and so now they have gone through this process they jumped through all the hurdles they've had to jump through, they gotten the ultrasound they waited 24 hours and whatever else we've put in their way and now we have to tell them because it's in statue and it's not medically founded in anyway whatsoever that by the way if you decide that  you want change your mind you can go to this

CHRIST000047

quack doctor and get this quack procedure that can reverse your abortion maybe. I think it's wrong and I oppose this bill and I vote no.

**Lesko**: You know normally when we are ahead on votes I don't talk but there is such falsities that have been claimed that I feel compelled to get up and speak. I know any time we talk about pro life or non-pro life issues that people are very passionate and they have certain beliefs. This bill is about not allowing taxpayer money to be used for abortions. And as I stated before the first time we voted on this I have constituents that are both prolife and non-prolife but a vast majority of them do not believe taxpayer money should be subsidized for it. Now senator, I'm sorry I don't know the district numbers so I hope it's ok to say Senator Bedford and Senator Hobbs

--Yeah, you really need to say their districts so that'd be 24 and 3.

--Senators from 24 and district 3 said there is no proof that taxpayer money is being used for this. But quite frankly 41 and 199 plans on Arizona's healthcare exchange offer elective abortion coverage. Considering that's 75% of those on the exchange in Arizona receive a federal subsidy it is clear to me that taxpayer dollars are flowing into the abortion issue. You know these type of exemptions on taxpayer funding is explicitly permitted by the affordable care act and none of the laws that have been put forward in other states and there have been 23 other states that have prohibited abortion coverage in plans available on exchange and none of those laws have been challenged in court. I want to address also this issue of calling a doctor a quack doctor. I really think that goes over the top. There was testimony from a doctor who is board certified and has delivered more than 10,000 babies worldwide. I certainly would not consider this person a quack doctor if that's what the senator was referring too. And he testified in the house committee and was referenced a portion of this bill requires women seeking abortion to be informed and only informed that there is a possibility of reversing the effects of the abortion pill after taking the first pill of the regimen. And in testimony in the house Dr. Allan Sawyer who is a certified OBGYN said the abortion pill RU486 is a potent antagonist of progesterone and cortisol the anti progestinal effects of RU486 will result in fetal death, as progesterone is essential to fetal growth and survival, administration of supplemental progesterone to women who have taken RU486 and can overcome the effects of RU486 and effectively stop the abortion from occurring. Natural micronized progesterone supplementation has been used for years in obstetrics, gynecology, and infertility care. The safety of progesterone supplementation during pregnancy has been well established and this is used routinely. So I just say some of these comments that have been said I just totally disagree with and with that I vote aye.

**Ward**: Ok, I just want to address the progesterone issue because progesterone has been used for years and years and years. It's given in pregnancy especially in women who have had multiple miscarriages in order to facilitate the pregnancy, to

CHRIST000048

enhance the pregnancy and allow it to continue to go on. And all of the things that could happen to the poor little baby in utero by this medication, what's worse? The people who support abortion want to kill those little babies! So I mean I think a cleft palette or even hypospadias is preferable to killing the little baby. So with that, I just want to talk a little bit about Dr. Sawyer, himself, and tell a little bit the story from his testimony before House Federalism and States Rights Committee. So this is in Dr. Sawyer's own words, just last month a young woman walked in to the Glendale Planned Parenthood office, 10 weeks pregnant grieving over the recent loss of her father, thinking her first pregnancy was conceived at an unfortunate time she was given RU486 to cause a medication abortion. Within hours she regretted her decision and the next morning she went back to Planned Parenthood in that office on UG and begged them to have them reverse the effects of the pill she was told by Planned Parenthood staff that she had to complete the process or else she would have complications and get an infection. While she was still standing in that clinic waiting room she googled "abortion pill reversal" on her cell phone where she connected to a national call center that pairs women in the midst of a medication abortion with physicians who are willing to help save the lives of their unborn babies. Within 45 minutes she was in Dr. Sawyer's office, my office, where I showed her on ultrasound her 10 week fetus with a heartbeat and moving inside her womb. Dr. Sawyer started her on a protocol of high dose progesterone to undue the lethal affects of the anti-progesterone medication RU486 because she used all her available money to pay for her abortion at Planned Parenthood and she didn't have enough money to pay for the progesterone. Dr. Sawyer personally paid for her medication at the local pharmacy. She's now past her 1st trimester and the baby is out of danger and doing well and she has a due date in September. So members, Senate Bill 1318 respects women to make an informed decision when presented with all the relevant information. The bill simply says that women must be informed that it may be possible to reverse the effects of a medication abortion if the woman changes her mind, but time is of the essence.  I don't think it's a controversial step to take, I'm not saying hey, as a doctor you should never do this.  I think it respects women to make an informed decision and it gives them a chance to avoid deep regret later. So I hope you will please join me in supporting 1318 and with that I vote Aye.

Final Vote: 18-11-1

CHRIST000049

abortion; health care exchange; licensure

*FSR 3/11*
*DPA*

COVER SHEET

*Rules 3/16*
*C+P*

S.B. 1318
(Reference to Senate engrossed bill)

*cow 3/17 ret,*
*ret,*

Introduced by
Senators Barto, Allen, Burges, Kavanagh, Lesko, Shooter;
Representatives Allen J, Boyer, Kern, Montenegro, Olson, Petersen, Townsend;
Senators Dial, Farnsworth D, Griffin, Miranda, Pierce, Ward, Worsley, Yee;
Representatives Bowers, Finchem, Gray, Leach, Livingston, Mesnard, Shope

*3/17 ret*

*3/23 DPA*

Engrossed as amended

*3/23*   PASSED AS AMENDED

*3/16*   RETAINED ON
THE CALENDAR

*3/17*   RETAINED ON
THE CALENDAR

CHRIST000050

Senate Engrossed

State of Arizona
Senate
Fifty-second Legislature
First Regular Session
2015

# SENATE BILL 1318

AN ACT

AMENDING SECTIONS 20-121 AND 36-449.02, ARIZONA REVISED STATUTES; RELATING TO
ABORTION.

(TEXT OF BILL BEGINS ON NEXT PAGE)

- i -

CHRIST000051

S.B. 1318

1   Be it enacted by the Legislature of the State of Arizona:
2       Section 1.  Section 20-121, Arizona Revised Statutes, is amended to
3   read:
4       20-121.  Health care exchange: abortion coverage: prohibition:
5                exceptions
6       A.  Consistent with the provisions of the patient protection and
7   affordable care act (P.L. 111-148), any qualified health insurance policy,
8   contract or plan offered through any ~~state~~ health care exchange ~~established~~
9   OPERATING in this state shall not provide coverage for abortions ~~unless the~~
10  ~~coverage is offered as a separate optional rider for which an additional~~
11  ~~insurance premium is charged~~.
12      B.  Subsection A OF THIS SECTION does not apply to coverage for any
13  abortion ~~that is necessary to either~~:
14      1.  THAT IS NECESSARY TO save the life of the woman having the
15  abortion.
16      2.  THAT IS NECESSARY TO avert substantial and irreversible impairment
17  of a major bodily function of the woman having the abortion.
18      3.  WHEN THE PREGNANCY IS THE RESULT OF RAPE OR INCEST.
19      Sec. 2.  Section 36-449.02, Arizona Revised Statutes, is amended to
20  read:
21      36-449.02.  Abortion clinics: licensure requirements: rules:
22              inspections: standing to intervene: legal counsel
23      A.  Beginning on April 1, 2000, an abortion clinic shall meet the same
24  licensure requirements as prescribed in article 2 of this chapter for health
25  care institutions.  ON INITIAL LICENSURE AND ANY SUBSEQUENT RENEWAL, AN
26  ABORTION CLINIC SHALL SUBMIT TO THE DIRECTOR ALL DOCUMENTATION REQUIRED BY
27  THIS ARTICLE, INCLUDING VERIFICATION THAT THE CLINIC'S PHYSICIANS WHO ARE
28  REQUIRED TO BE AVAILABLE HAVE ADMITTING PRIVILEGES AT A HEALTH CARE
29  INSTITUTION AS REQUIRED BY SECTION 36-449.03, SUBSECTION C, PARAGRAPH 3.
30      B.  An abortion clinic that holds an unclassified health care facility
31  license issued before August 6, 1999 may retain that classification until
32  April 1, 2000 subject to compliance with all laws that relate to unclassified
33  health care facilities.
34      C.  Beginning on April 1, 2000, abortion clinics shall comply with
35  department requirements for abortion clinics and department rules that govern
36  abortion clinics.
37      D.  If the director determines that there is reasonable cause to
38  believe an abortion clinic is not adhering to the licensing requirements of
39  this article or any other law or rule concerning abortion, the director and
40  any duly designated employee or agent of the director, including county
41  health representatives and county or municipal fire inspectors, consistent
42  with standard medical practices, may enter on and into the premises of the
43  abortion clinic that is licensed or required to be licensed pursuant to this
44  article during regular business hours of the abortion clinic to determine

- 1 -

S.B. 1318

1   compliance with this article, rules adopted pursuant to this article, local
2   fire ordinances or rules and any other law or rule relating to abortion.
3       E.   An application for licensure pursuant to this article constitutes
4   permission for, and complete acquiescence in, an entry or inspection of the
5   premises during the pendency of the application and, if licensed, during the
6   term of the license.
7       F.   If an inspection conducted pursuant to this section reveals that an
8   abortion clinic is not adhering to the licensing requirements prescribed
9   pursuant to this article or any other law or rule concerning abortion, the
10  director may take action authorized by this article.
11      G.   An abortion clinic whose license has been suspended or revoked
12  pursuant to this article or section 36-424 is subject to inspection on
13  application for relicensure or reinstatement of the license.
14      H.   In any proceeding in which the constitutionality, legality or
15  application of this section is challenged, the attorney general or any county
16  or city attorney who wishes to defend the law has the right to intervene as a
17  party and is deemed to have proper standing in the matter. The only
18  objection that may be raised to a motion to intervene as of right pursuant to
19  this subsection is that the proposed intervenor does not have a good faith
20  intention to defend the law. Any party or proposed intervenor may raise this
21  objection. Notwithstanding section 41-192, the department may employ legal
22  counsel and make an expenditure or incur an indebtedness for legal services
23  for the purposes of defending this section.



- 2 -

CHRIST000053

"Sec. 3.  Section 36-2153, Arizona Revised Statutes, is amended to read:

36-2153.  Informed consent; requirements; information; website; signs; violation; civil relief; statute of limitations

A.  An abortion shall not be performed or induced without the voluntary and informed consent of the woman on whom the abortion is to be performed or induced.  Except in the case of a medical emergency and in addition to the other requirements of this chapter, consent to an abortion is voluntary and informed only if all of the following are true:

1.  At least twenty-four hours before the abortion, the physician who is to perform the abortion or the referring physician has informed the woman, orally and in person, of:

(a)  The name of the physician who will perform the abortion.

(b)  The nature of the proposed procedure or treatment.

(c)  The immediate and long-term medical risks associated with the procedure that a reasonable patient would consider material to the decision of whether or not to undergo the abortion.

(d)  Alternatives to the procedure or treatment that a reasonable patient would consider material to the decision of whether or not to undergo the abortion.

(e)  The probable gestational age of the unborn child at the time the abortion is to be performed.

(f)  The probable anatomical and physiological characteristics of the unborn child at the time the abortion is to be performed.

#1

CHRIST000054

(g)  The medical risks associated with carrying the child to term.

2.  At least twenty-four hours before the abortion, the physician who is to perform the abortion, the referring physician or a qualified physician, physician assistant, nurse, psychologist or licensed behavioral health professional to whom the responsibility has been delegated by either physician has informed the woman, orally and in person, that:

(a)  Medical assistance benefits may be available for prenatal care, childbirth and neonatal care.

(b)  The father of the unborn child is liable to assist in the support of the child, even if he has offered to pay for the abortion.  In the case of rape or incest, this information may be omitted.

(c)  Public and private agencies and services are available to assist the woman during her pregnancy and after the birth of her child if she chooses not to have an abortion, whether she chooses to keep the child or place the child for adoption.

(d)  It is unlawful for any person to coerce a woman to undergo an abortion.

(e)  The woman is free to withhold or withdraw her consent to the abortion at any time without affecting her right to future care or treatment and without the loss of any state or federally funded benefits to which she might otherwise be entitled.

(f)  The department of health services maintains a website that describes the unborn child and lists the agencies that offer alternatives to abortion.

(g)  The woman has a right to review the website and that a printed copy of the materials on the website will be provided to her free of charge if she chooses to review these materials.

(h)  IT MAY BE POSSIBLE TO REVERSE THE EFFECTS OF A MEDICATION ABORTION IF THE WOMAN CHANGES HER MIND BUT THAT TIME IS OF THE ESSENCE.

(i)  INFORMATION ON AND ASSISTANCE WITH REVERSING THE EFFECTS OF A MEDICATION ABORTION IS AVAILABLE ON THE DEPARTMENT OF HEALTH SERVICES' WEBSITE.

-2-

CHRIST000055

3.  The information in paragraphs 1 and 2 of this subsection is provided to the woman individually and in a private room to protect her privacy and to ensure that the information focuses on her individual circumstances and that she has adequate opportunity to ask questions.

4.  The woman certifies in writing before the abortion that the information required to be provided pursuant to paragraphs 1 and 2 of this subsection has been provided.

B.  If a medical emergency compels the performance of an abortion, the physician shall inform the woman, before the abortion if possible, of the medical indications supporting the physician's judgment that an abortion is necessary to avert the woman's death or to avert substantial and irreversible impairment of a major bodily function.

C.  The department of health services shall establish ~~a website within ninety days after the effective date of this amendment to this section~~ and shall annually update ~~the~~ A website. ~~The website must include~~ THAT INCLUDES a link to a printable version of all materials listed on the website.  The materials must be written in an easily understood manner and printed in a typeface that is large enough to be clearly legible.  The website must include all of the following materials:

1.  Information that is organized geographically by location and that is designed to inform the woman about public and private agencies and services that are available to assist a woman through pregnancy, at childbirth and while her child is dependent, including adoption agencies. The materials shall include a comprehensive list of the agencies, a description of the services they offer and the manner in which these agencies may be contacted, including the agencies' telephone numbers and website addresses.

2.  Information on the availability of medical assistance benefits for prenatal care, childbirth and neonatal care.

3.  A statement that it is unlawful for any person to coerce a woman to undergo an abortion.

-3-

CHRIST000056

4.  A statement that any physician who performs an abortion on a woman without obtaining the woman's voluntary and informed consent or without affording her a private medical consultation may be liable to the woman for damages in a civil action.

5.  A statement that the father of a child is liable to assist in the support of that child, even if the father has offered to pay for an abortion, and that the law allows adoptive parents to pay costs of prenatal care, childbirth and neonatal care.

6.  Information that is designed to inform the woman of the probable anatomical and physiological characteristics of the unborn child at two-week gestational increments from fertilization to full term, including pictures or drawings representing the development of unborn children at two-week gestational increments and any relevant information on the possibility of the unborn child's survival. The pictures or drawings must contain the dimensions of the unborn child and must be realistic and appropriate for each stage of pregnancy. The information provided pursuant to this paragraph must be objective, nonjudgmental and designed to convey only accurate scientific information about the unborn child at the various gestational ages.

7.  Objective information that describes the methods of abortion procedures commonly employed, the medical risks commonly associated with each procedure, the possible detrimental psychological effects of abortion and the medical risks commonly associated with carrying a child to term.

8.  INFORMATION ON THE POTENTIAL ABILITY OF QUALIFIED MEDICAL PROFESSIONALS TO REVERSE A MEDICATION ABORTION, INCLUDING INFORMATION DIRECTING WOMEN WHERE TO OBTAIN FURTHER INFORMATION AND ASSISTANCE IN LOCATING A MEDICAL PROFESSIONAL WHO CAN AID IN THE REVERSAL OF A MEDICATION ABORTION.

D.  An individual who is not a physician shall not perform a surgical abortion.

E.  A person shall not write or communicate a prescription for a drug or drugs to induce an abortion or require or obtain payment for a service provided to a patient who has inquired about an abortion or scheduled an

-4-

CHRIST000057

abortion until the expiration of the twenty-four-hour reflection period required by subsection A of this section.

F. A person shall not intimidate or coerce in any way any person to obtain an abortion. A parent, a guardian or any other person shall not coerce a minor to obtain an abortion. If a minor is denied financial support by the minor's parents, guardians or custodian due to the minor's refusal to have an abortion performed, the minor is deemed emancipated for the purposes of eligibility for public assistance benefits, except that the emancipated minor may not use these benefits to obtain an abortion.

G. An abortion clinic as defined in section 36-449.01 shall conspicuously post signs that are visible to all who enter the abortion clinic, that are clearly readable and that state it is unlawful for any person to force a woman to have an abortion and a woman who is being forced to have an abortion has the right to contact any local or state law enforcement or social service agency to receive protection from any actual or threatened physical, emotional or psychological abuse. The signs shall be posted in the waiting room, consultation rooms and procedure rooms.

H. A person shall not require a woman to obtain an abortion as a provision in a contract or as a condition of employment.

I. A physician who knowingly violates this section commits an act of unprofessional conduct and is subject to license suspension or revocation pursuant to title 32, chapter 13 or 17.

J. In addition to other remedies available under the common or statutory law of this state, any of the following may file a civil action to obtain appropriate relief for a violation of this section:

1. A woman on whom an abortion has been performed without her informed consent as required by this section.

2. The father of the unborn child if married to the mother at the time she received the abortion, unless the pregnancy resulted from the plaintiff's criminal conduct.

-5-

CHRIST000058

3. The maternal grandparents of the unborn child if the mother was not at least eighteen years of age at the time of the abortion, unless the pregnancy resulted from the plaintiff's criminal conduct.

K. A civil action filed pursuant to subsection J of this section shall be brought in the superior court in the county in which the woman on whom the abortion was performed resides and may be based on a claim that failure to obtain informed consent was a result of simple negligence, gross negligence, wantonness, wilfulness, intention or any other legal standard of care. Relief pursuant to subsection J of this section includes the following:

1. Money damages for all psychological, emotional and physical injuries resulting from the violation of this section.

2. Statutory damages in an amount equal to five thousand dollars or three times the cost of the abortion, whichever is greater.

3. Reasonable attorney fees and costs.

L. A civil action brought pursuant to this section must be initiated within six years after the violation occurred."

CHRIST000059

House Engrossed Senate Bill

**FILED**
**MICHELE REAGAN**
**SECRETARY OF STATE**

State of Arizona
Senate
Fifty-second Legislature
First Regular Session
2015                        CHAPTER 87

# SENATE BILL 1318

AN ACT

AMENDING SECTIONS 20-121, 36-404, 36-449.02 AND 36-2153, ARIZONA REVISED
STATUTES; RELATING TO ABORTION.

(TEXT OF BILL BEGINS ON NEXT PAGE)

CHRIST000060

S.B. 1318

Be it enacted by the Legislature of the State of Arizona:

1    Section 1.  Section 20-121, Arizona Revised Statutes, is amended to
2    read:
3    20-121.  Health care exchange; abortion coverage; prohibition;
4    exceptions
5    A.  Consistent with the provisions of the patient protection and

Section 1.  Section 20-121, Arizona Revised Statutes, is amended to read:

**20-121.  Health care exchange; abortion coverage; prohibition; exceptions**

A.  Consistent with the provisions of the patient protection and affordable care act (P.L. 111-148), any qualified health insurance policy, contract or plan offered through any ~~state~~ health care exchange ~~established~~ OPERATING in this state shall not provide coverage for abortions ~~unless the coverage is offered as a separate optional rider for which an additional insurance premium is charged~~.

B.  Subsection A OF THIS SECTION does not apply to coverage for any abortion ~~that is necessary to either~~:

1.  THAT IS NECESSARY TO save the life of the woman having the abortion.

2.  THAT IS NECESSARY TO avert substantial and irreversible impairment of a major bodily function of the woman having the abortion.

3.  WHEN THE PREGNANCY IS THE RESULT OF RAPE OR INCEST.

Sec. 2.  Section 36-404, Arizona Revised Statutes, is amended to read:

**36-404.  Limitation of disclosure of information**

A.  Information received and records kept by the department for the purpose of administering this chapter are available to the public except:

1.  Information obtained for purposes of articles 4 and 5 of this chapter.

2.  Personally identifiable medical information or any information from which a patient or the patient's family might be identified.

3.  Sources of information that cause the department to believe that an inspection of an institution is needed to determine the extent of compliance with this chapter and rules adopted pursuant to this chapter.

4.  PERSONALLY IDENTIFIABLE INFORMATION OF A PHYSICIAN THAT IS RECEIVED AND ANY RECORDS KEPT REGARDING THE PHYSICIAN'S ADMITTING PRIVILEGES PURSUANT TO SECTION 36-449.02.

B.  The department may release information listed under subsection A OF THIS SECTION to an officer of the court pursuant to a court order, a department or agency of this state or the federal government, a law enforcement agency or a county medical examiner if the release of this information is necessary and pertinent to an investigation or proceeding unless the release of this information is prohibited by federal or state law. The recipient shall maintain patient and source name confidentiality.

Sec. 3.  Section 36-449.02, Arizona Revised Statutes, is amended to read:

**36-449.02.  Abortion clinics; licensure requirements; rules; inspections; standing to intervene; legal counsel**

A.  Beginning on April 1, 2000, an abortion clinic shall meet the same licensure requirements as prescribed in article 2 of this chapter for health

CHRIST000061

S.B. 1318

1   care institutions.  ON INITIAL LICENSURE AND ANY SUBSEQUENT RENEWAL, AN
2   ABORTION CLINIC SHALL SUBMIT TO THE DIRECTOR ALL DOCUMENTATION REQUIRED BY
3   THIS ARTICLE, INCLUDING VERIFICATION THAT THE CLINIC'S PHYSICIANS WHO ARE
4   REQUIRED TO BE AVAILABLE HAVE ADMITTING PRIVILEGES AT A HEALTH CARE
5   INSTITUTION AS REQUIRED BY SECTION 36-449.03, SUBSECTION C, PARAGRAPH 3.
6        B.  An abortion clinic that holds an unclassified health care facility
7   license issued before August 6, 1999 may retain that classification until
8   April 1, 2000 subject to compliance with all laws that relate to unclassified
9   health care facilities.
10       C.  Beginning on April 1, 2000, abortion clinics shall comply with
11  department requirements for abortion clinics and department rules that govern
12  abortion clinics.
13       D.  If the director determines that there is reasonable cause to
14  believe an abortion clinic is not adhering to the licensing requirements of
15  this article or any other law or rule concerning abortion, the director and
16  any duly designated employee or agent of the director, including county
17  health representatives and county or municipal fire inspectors, consistent
18  with standard medical practices, may enter on and into the premises of the
19  abortion clinic that is licensed or required to be licensed pursuant to this
20  article during regular business hours of the abortion clinic to determine
21  compliance with this article, rules adopted pursuant to this article, local
22  fire ordinances or rules and any other law or rule relating to abortion.
23       E.  An application for licensure pursuant to this article constitutes
24  permission for, and complete acquiescence in, an entry or inspection of the
25  premises during the pendency of the application and, if licensed, during the
26  term of the license.
27       F.  If an inspection conducted pursuant to this section reveals that an
28  abortion clinic is not adhering to the licensing requirements prescribed
29  pursuant to this article or any other law or rule concerning abortion, the
30  director may take action authorized by this article.
31       G.  An abortion clinic whose license has been suspended or revoked
32  pursuant to this article or section 36-424 is subject to inspection on
33  application for relicensure or reinstatement of the license.
34       H.  In any proceeding in which the constitutionality, legality or
35  application of this section is challenged, the attorney general or any county
36  or city attorney who wishes to defend the law has the right to intervene as a
37  party and is deemed to have proper standing in the matter.  The only
38  objection that may be raised to a motion to intervene as of right pursuant to
39  this subsection is that the proposed intervenor does not have a good faith
40  intention to defend the law.  Any party or proposed intervenor may raise this
41  objection.  Notwithstanding section 41-192, the department may employ legal
42  counsel and make an expenditure or incur an indebtedness for legal services
43  for the purposes of defending this section.

CHRIST000062

S.B. 1318

| | |
|---|---|
| 1 | Sec. 4.   Section 36-2153, Arizona Revised Statutes, is amended to read: |
| 2 | 36-2153.   <u>Informed consent; requirements; information; website;</u> |
| 3 | <u>signs; violation; civil relief; statute of</u> |
| 4 | <u>limitations</u> |

5   A.   An abortion shall not be performed or induced without the voluntary
6   and informed consent of the woman on whom the abortion is to be performed or
7   induced.   Except in the case of a medical emergency and in addition to the
8   other requirements of this chapter, consent to an abortion is voluntary and
9   informed only if all of the following are true:
10   1.   At least twenty-four hours before the abortion, the physician who
11   is to perform the abortion or the referring physician has informed the woman,
12   orally and in person, of:
13   (a)   The name of the physician who will perform the abortion.
14   (b)   The nature of the proposed procedure or treatment.
15   (c)   The immediate and long-term medical risks associated with the
16   procedure that a reasonable patient would consider material to the decision
17   of whether or not to undergo the abortion.
18   (d)   Alternatives to the procedure or treatment that a reasonable
19   patient would consider material to the decision of whether or not to undergo
20   the abortion.
21   (e)   The probable gestational age of the unborn child at the time the
22   abortion is to be performed.
23   (f)   The probable anatomical and physiological characteristics of the
24   unborn child at the time the abortion is to be performed.
25   (g)   The medical risks associated with carrying the child to term.
26   2.   At least twenty-four hours before the abortion, the physician who
27   is to perform the abortion, the referring physician or a qualified physician,
28   physician assistant, nurse, psychologist or licensed behavioral health
29   professional to whom the responsibility has been delegated by either
30   physician has informed the woman, orally and in person, that:
31   (a)   Medical assistance benefits may be available for prenatal care,
32   childbirth and neonatal care.
33   (b)   The father of the unborn child is liable to assist in the support
34   of the child, even if he has offered to pay for the abortion.   In the case of
35   rape or incest, this information may be omitted.
36   (c)   Public and private agencies and services are available to assist
37   the woman during her pregnancy and after the birth of her child if she
38   chooses not to have an abortion, whether she chooses to keep the child or
39   place the child for adoption.
40   (d)   It is unlawful for any person to coerce a woman to undergo an
41   abortion.
42   (e)   The woman is free to withhold or withdraw her consent to the
43   abortion at any time without affecting her right to future care or treatment
44   and without the loss of any state or federally funded benefits to which she
45   might otherwise be entitled.

- 3 -

CHRIST000063

S.B. 1318

1        (f)  The  department  of  health  services  maintains  a  website  that
2   describes the unborn child and lists the agencies that offer alternatives to
3   abortion.
4        (g)  The woman has a right to review the website and that a printed
5   copy of the materials on the website will be provided to her free of charge
6   if she chooses to review these materials.
7        (h)  IT MAY BE POSSIBLE TO REVERSE THE EFFECTS OF A MEDICATION ABORTION
8   IF THE WOMAN CHANGES HER MIND BUT THAT TIME IS OF THE ESSENCE.
9        (i)  INFORMATION ON AND ASSISTANCE WITH REVERSING THE EFFECTS OF A
10  MEDICATION ABORTION IS AVAILABLE ON THE DEPARTMENT OF HEALTH SERVICES'
11  WEBSITE.
12       3.  The  information  in  paragraphs  1  and  2  of  this  subsection  is
13  provided to the woman individually and in a private room to protect her
14  privacy  and  to  ensure  that  the  information  focuses  on  her  individual
15  circumstances and that she has adequate opportunity to ask questions.
16       4.  The  woman  certifies  in  writing  before  the  abortion  that  the
17  information required to be provided pursuant to paragraphs 1 and 2 of this
18  subsection has been provided.
19       B.  If a medical emergency compels the performance of an abortion, the
20  physician shall inform the woman, before the abortion if possible, of the
21  medical indications supporting the physician's judgment that an abortion is
22  necessary to avert the woman's death or to avert substantial and irreversible
23  impairment of a major bodily function.
24       C.  The department of health services shall establish a-website-within
25  ninety-days-after-the-effective-date-of-this-amendment-to-this-section and
26  shall annually update the A website. -The-website-must-include THAT INCLUDES
27  a link to a printable version of all materials listed on the website.  The
28  materials must be written in an easily understood manner and printed in a
29  typeface that is large enough to be clearly legible.  The website must
30  include all of the following materials:
31       1.  Information that is organized geographically by location and that
32  is designed to inform the woman about public and private agencies and
33  services that are available to assist a woman through pregnancy, at
34  childbirth and while her child is dependent, including adoption agencies.
35  The materials shall include a comprehensive list of the agencies, a
36  description of the services they offer and the manner in which these agencies
37  may be contacted, including the agencies' telephone numbers and website
38  addresses.
39       2.  Information on the availability of medical assistance benefits for
40  prenatal care, childbirth and neonatal care.
41       3.  A statement that it is unlawful for any person to coerce a woman to
42  undergo an abortion.
43       4.  .A statement that any physician who performs an abortion on a woman
44  without obtaining the woman's voluntary and informed consent or without

- 4 -

CHRIST000064

S.B. 1318

1  affording her a private medical consultation may be liable to the woman for
2  damages in a civil action.
3      5.  A statement that the father of a child is liable to assist in the
4  support of that child, even if the father has offered to pay for an abortion,
5  and that the law allows adoptive parents to pay costs of prenatal care,
6  childbirth and neonatal care.
7      6.  Information that is designed to inform the woman of the probable
8  anatomical and physiological characteristics of the unborn child at two-week
9  gestational increments from fertilization to full term, including pictures or
10 drawings representing the development of unborn children at two-week
11 gestational increments and any relevant information on the possibility of the
12 unborn child's survival.  The pictures or drawings must contain the
13 dimensions of the unborn child and must be realistic and appropriate for each
14 stage of pregnancy.  The information provided pursuant to this paragraph must
15 be objective, nonjudgmental and designed to convey only accurate scientific
16 information about the unborn child at the various gestational ages.
17     7.  Objective information that describes the methods of abortion
18 procedures commonly employed, the medical risks commonly associated with each
19 procedure, the possible detrimental psychological effects of abortion and the
20 medical risks commonly associated with carrying a child to term.
21     8.  INFORMATION ON THE POTENTIAL ABILITY OF QUALIFIED MEDICAL
22 PROFESSIONALS TO REVERSE A MEDICATION ABORTION, INCLUDING INFORMATION
23 DIRECTING WOMEN WHERE TO OBTAIN FURTHER INFORMATION AND ASSISTANCE IN
24 LOCATING A MEDICAL PROFESSIONAL WHO CAN AID IN THE REVERSAL OF A MEDICATION
25 ABORTION.
26     D.  An individual who is not a physician shall not perform a surgical
27 abortion.
28     E.  A person shall not write or communicate a prescription for a drug
29 or drugs to induce an abortion or require or obtain payment for a service
30 provided to a patient who has inquired about an abortion or scheduled an
31 abortion until the expiration of the twenty-four-hour reflection period
32 required by subsection A of this section.
33     F.  A person shall not intimidate or coerce in any way any person to
34 obtain an abortion.  A parent, a guardian or any other person shall not
35 coerce a minor to obtain an abortion.  If a minor is denied financial support
36 by the minor's parents, guardians or custodian due to the minor's refusal to
37 have an abortion performed, the minor is deemed emancipated for the purposes
38 of eligibility for public assistance benefits, except that the emancipated
39 minor may not use these benefits to obtain an abortion.
40     G.  An abortion clinic as defined in section 36-449.01 shall
41 conspicuously post signs that are visible to all who enter the abortion
42 clinic, that are clearly readable and that state it is unlawful for any
43 person to force a woman to have an abortion and a woman who is being forced
44 to have an abortion has the right to contact any local or state law
45 enforcement or social service agency to receive protection from any actual or

CHRIST000065

S.B. 1318

```
1  threatened physical, emotional or psychological abuse.  The signs shall be
2  posted in the waiting room, consultation rooms and procedure rooms.
3      H.  A person shall not require a woman to obtain an abortion as a
4  provision in a contract or as a condition of employment.
5      I.  A physician who knowingly violates this section commits an act of
6  unprofessional conduct and is subject to license suspension or revocation
7  pursuant to title 32, chapter 13 or 17.
8      J.  In addition to other remedies available under the common or
9  statutory law of this state, any of the following may file a civil action to
10 obtain appropriate relief for a violation of this section:
11     1.  A woman on whom an abortion has been performed without her informed
12 consent as required by this section.
13     2.  The father of the unborn child if married to the mother at the time
14 she received the abortion, unless the pregnancy resulted from the plaintiff's
15 criminal conduct.
16     3.  The maternal grandparents of the unborn child if the mother was not
17 at least eighteen years of age at the time of the abortion, unless the
18 pregnancy resulted from the plaintiff's criminal conduct.
19     K.  A civil action filed pursuant to subsection J of this section shall
20 be brought in the superior court in the county in which the woman on whom the
21 abortion was performed resides and may be based on a claim that failure to
22 obtain informed consent was a result of simple negligence, gross negligence,
23 wantonness, wilfulness, intention or any other legal standard of care.
24 Relief pursuant to subsection J of this section includes the following:
25     1.  Money damages for all psychological, emotional and physical
26 injuries resulting from the violation of this section.
27     2.  Statutory damages in an amount equal to five thousand dollars or
28 three times the cost of the abortion, whichever is greater.
29     3.  Reasonable attorney fees and costs.
30     L.  A civil action brought pursuant to this section must be initiated
31 within six years after the violation occurred.
```

APPROVED BY THE GOVERNOR MARCH 30, 2015.

FILED IN THE OFFICE OF THE SECRETARY OF STATE MARCH 31, 2015.

- 6 -

CHRIST000066