IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Planned Parenthood Arizona, Inc., et al.,

               Plaintiffs,

vs.

Mark Brnovich, et al.,

               Defendants.

No.  CV-15-01022-PHX-SPL

**ORDER**

At issue are Motions to Dismiss filed by Defendants Mark Brnovich, Cara Christ, M.D., Patricia E. McSorley, Richard T. Perry, James Gillard, Jodi A. Bain, Marc D. Berg, Donna Brister, R. Screven Farmer, Gary R. Figge, Robert E. Fromm, Paul S. Gerding, Lois Krahn, Edward G. Paul, and Wanda J. Salter. (Docs. 40, 41, 44, 46.) Plaintiffs Planned Parenthood Arizona, Inc., Desert Star Family Planning, LLC, Eric Reuss, Paul A. Isaacson, and DeShawn Taylor, have also filed a Motion for Leave to Amend the Complaint (Doc. 81), which Defendants oppose. The motions are fully briefed, and will be addressed jointly as follows.

## I.    Background

### A.    Arizona Informed Consent Law

Arizona law requires that an abortion shall not be performed or induced without the voluntary and informed consent of the woman seeking the procedure, certified in writing. Ariz. Rev. Stat. § 36-2153(A)(4). With exception to instances involving a medical emergency, consent is voluntary and informed only if, at least twenty-four hours

before an abortion, the woman has been informed orally and in person, individually and in private, of two categories of information. Ariz. Rev. Stat. § 36-2153(A)(1)-(3).[1]

First, the woman must be informed by the physician who is to perform the abortion, or the referring physician, of:

(a) The name of the physician who will perform the abortion.

(b) The nature of the proposed procedure or treatment.

(c) The immediate and long-term medical risks associated with the procedure that a reasonable patient would consider material to the decision of whether or not to undergo the abortion.

(d) Alternatives to the procedure or treatment that a reasonable patient would consider material to the decision of whether or not to undergo the abortion.

(e) The probable gestational age of the unborn child at the time the abortion is to be performed.

(f) The probable anatomical and physiological characteristics of the unborn child at the time the abortion is to be performed.

(g) The medical risks associated with carrying the child to term.

Ariz. Rev. Stat. § 36-2153(A)(1).

Second, the woman must be informed by the physician who is to perform the abortion, a qualified physician, physician assistant, nurse, psychologist, or licensed behavioral health professional delegated with authority by the physician, that:

(a) Medical assistance benefits may be available for prenatal care, childbirth and neonatal care.

(b) The father of the unborn child is liable to assist in the support of the child, even if he has offered to pay for the abortion. In the case of rape or incest, this information may be omitted.

---

[1]     Voluntary and informed consent requires satisfaction of these two requirements, contained at Ariz. Rev. Stat. § 36-2153(A)(1) and (2), and satisfaction of the additional requirements contained in Title 36, Chapter 20, Article 1 of the Arizona Revised Statutes. *See* Ariz. Rev. Stat. § 36-2156 (consent to an abortion is informed if, within 24-hours before the abortion is to be performed or induced, the woman is given an opportunity to view the active ultrasound image and hear the fetal heartbeat); § 36-2158 (consent to an abortion is informed if the woman has certain received information where a lethal and non-lethal fetal condition has been diagnosed).

(c) Public and private agencies and services are available to assist the woman during her pregnancy and after the birth of her child if she chooses not to have an abortion, whether she chooses to keep the child or place the child for adoption.

(d) It is unlawful for any person to coerce a woman to undergo an abortion.

(e) The woman is free to withhold or withdraw her consent to the abortion at any time without affecting her right to future care or treatment and without the loss of any state or federally funded benefits to which she might otherwise be entitled.

(f) The department of health services maintains a website that describes the unborn child and lists the agencies that offer alternatives to abortion.

(g) The woman has a right to review the website and that a printed copy of the materials on the website will be provided to her free of charge if she chooses to review these materials.

Ariz. Rev. Stat. § 36-2153(A)(2).[2] The Arizona Department of Health Services ("ADHS") must establish and "annually update a website that includes a link to a printable version of all materials listed [in the informed consent statute] on the website." Ariz. Rev. Stat. § 36-2153(C).

In 2015, the Arizona legislature passed Senate Bill 1318, a set of statutory amendments regulating abortion that was signed in to law by the Governor on March 30, 2015. Ariz. Legis. Serv. Ch. 87 (S.B. 1318) (2015). The requirements for obtaining a patient's informed consent was amended to include that a woman must also be informed that:

(h) It may be possible to reverse the effects of a medication abortion if the woman changes her mind but that time is of the essence.

(i) Information on and assistance with reversing the effects of a medication abortion is available on the department of health services' website.

---

[2]     Ariz. Rev. Stat. § 36-2153(A) first went into effect in 2009. Ariz. Legis. Serv. Ch. 172 (H.B. 2564 § 4) (2009). Prior challenges to the constitutionality of this statute have been brought, but are not relevant to the issues before the Court. *See Tucson Women's Center v. Arizona Medical Board,* No. CV-09-01909-PHX-DGC (D. Ariz. Mar. 8, 2010) (dismissed in its entirely without prejudice); *Planned Parenthood Arizona, Inc. v. American Ass'n of Pro-Life Obstetricians & Gynecologists,* 257 P.3d 181, 195 (Ariz Ct. App. 2011) (finding the requirement that certain information "be provided in person and by a physician" was constitutional).

S.B. 1318 § 4 (codified at Ariz. Rev. Stat. § 36-2153(A)(2)(h) and (i)). Further, ADHS must include on their website:

> Information on the potential ability of qualified medical professionals to reverse a medication abortion, including information directing women where to obtain further information and assistance in locating a medical professional who can aid in the reversal of a medication abortion.

S.B. 1318 § 4 (codified at Ariz. Rev. Stat. § 36-2153(C)(8)).

### B.    Plaintiffs' Challenge to the Act

Plaintiffs commenced the instant action challenging the amended provisions codified at Ariz. Rev. Stat. § 36-2153(A)(2)(h) and (i), otherwise referred to by the parties and this Court as "the Act."[3] (Doc. 1.) Plaintiffs claim that the Act violates physicians' rights under the First Amendment, and the rights of patients seeking abortions under the Fourteenth Amendment. (Docs. 1 ¶ 57, 59; 81-1 ¶ 61, 63.)[4] Plaintiffs seek injunctive and declaratory relief, asking that enforcement of the Act be permanently enjoined, and the Act be declared unconstitutional.

Plaintiffs include two health care facilities and three physicians. Planned Parenthood Arizona, Inc. is a nonprofit corporation that provides reproductive, sexual health, and abortion services. It provides both surgical and medication abortions at four of its health centers, which are licensed by ADHS. It employs obstetricians and gynecologists licensed to practice medicine by the Arizona Medical Board. Planned Parenthood sues on behalf of itself, its patients, and its physicians. (Docs. 1 ¶ 7; 81-1 ¶ 7.) Desert Star Family Planning, LLC, is a private physician practice that provides comprehensive family planning and health services, including abortion services, and is licensed by ADHS. It employs board-certified obstetricians and gynecologists. Desert Star sues on behalf of itself, its physicians, and its patients. (Docs. 1 ¶ 10; 81-1 ¶ 10.) Plaintiffs Eric Reuss, M.D., M.P.H., Paul A. Isaacson, M.D., and DeShawn Taylor, M.D.

---

[3]    Plaintiffs did not challenge Ariz. Rev Stat. § 36-2153(C)(8).

[4]    Because the Court addresses Plaintiffs' request for leave to amend simultaneously with Defendants' challenges, it cites to both the original complaint (Doc. 1) and the proposed amended complaint (Doc. 81-1).

("Physician-Plaintiffs"), are board-certified obstetricians and gynecologists that perform abortions and are licensed to practice medicine in Arizona. They sue on their own behalf and on behalf of patients. (Docs. 1 ¶¶ 8, 9, 10; 81-1 ¶¶ 8, 9, 10.)

On the basis of their alleged statutory authority to enforce the Act, Plaintiffs sue the members of the Arizona Medical Board, the Executive Director of the Arizona Medical Board, the Arizona Attorney General, and the Director of ADHS.[5] (Doc. 1 ¶¶ 11-14; 81-1 ¶¶ 11-14.)

Before the Act was to take effect on July 3, 2015, pursuant to the stipulation of the parties, the Court entered a temporary restraining order enjoining enforcement of the Act (Doc. 32). Also on request of the parties, the temporary restraining order was lifted and the Court entered an order of preliminary injunction (Doc. 107) enjoining enforcement of the Act pending final judgment on the merits.

## II.     Present Issues in Dispute

Defendants have each individually moved to dismiss some or all of the claims brought against them on the basis that they are improper parties to this action. (Docs. 40, 41, 44, 46.) Defendants also challenge Plaintiffs' standing. (*See* Docs. 87 at 5 n.2; 60 at 31-33; 73.)[6]

First, Defendants move to dismiss on the basis that Plaintiffs "have failed to properly assert any claims under 42 U.S.C. § 1983." (Docs. 41 at 3; 44 at 3; 46 at 3.) A plaintiff may bring a cause of action under 42 U.S.C. § 1983 to seek redress for the deprivation of a right protected by the Constitution or laws of the United States caused by a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v.*

---

[5]     Plaintiffs further sued the members of the Arizona Board of Osteopathic Examiners in Medicine and Surgery and the Executive Director of the Osteopathic Board, Jenna Jones. Those parties have been dismissed by stipulation. (Doc. 111.)

[6]     Finding the challenges to standing are either duplicative or overlapping with issues presented in the pending motions, as a matter of judicial efficiency and uniformity, the Court resolves them here.

*Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979)). Defendants argue that Plaintiffs fail to sufficiently state a § 1983 claim because they do not set forth the statutory elements and "make reference to 42 U.S.C. § 1983 only once." (Docs. 41 at 7; 44 at 8; 46 at 8.) This argument is flatly rejected. Plaintiffs allege that they bring a cause of action under 42 U.S.C. § 1983 for declaratory relief declaring the Act unconstitutional, and for prospective injunctive relief restraining Defendants, and their employees, agents, and successors in office from enforcing the Act, which, unless enjoined, will violate their First and Fourteenth Amendment rights. (Docs. 1 ¶¶ 1-4 and § VI; 81-1 ¶¶ 1-4 and § VI.) Nothing more is required. *See Johnson v. City of Shelby, Miss.*, 574 U.S. ___, 135 S. Ct. 346, 347 (2014).[7]

Second, Defendants argue that Plaintiffs fail to state a claim under § 1983 because they do not sufficiently allege facts showing Defendants' personal participation. This argument, while having some surface appeal, misses the mark. True, a state official sued in his or her official capacity for injunctive relief is "a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10 (1989) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985)). However, a plaintiff seeking prospective injunctive relief against a state official "is not required to allege a named official's personal involvement in the acts or omissions constituting the alleged constitutional violation." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013). "Rather, a plaintiff need only identify the law [] challenged as a constitutional violation and name the official within the entity who can appropriately respond to injunctive relief." *Id*. Plaintiffs have done just that. (*See* Docs. 1 ¶¶ 1, 11-14; 81-1 ¶¶ 1, 11-14.)

Defendants nonetheless press that, as a matter of law, they do not have authority to

---

[7]      *See also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (in determining whether the Eleventh Amendment bars a suit from the onset, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" (citation omitted)).

enforce the Act and therefore are improperly named parties that should be dismissed. Whether Defendants, acting in their official capacities as state officials, are "proper defendants," is "really the common denominator of two separate inquiries: first, there is the requisite causal connection between their responsibilities and any injury that the plaintiffs might suffer, such that relief against the defendants would provide redress [i.e., Article III standing], and second, whether [] jurisdiction over the defendants is proper under the doctrine of *Ex parte Young,* 209 U.S. 123 (1908), which requires 'some connection' between a named state officer and enforcement of a challenged state law." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004) (citations omitted). *See also Culinary Workers Union, Local 226 v. Del Papa*, 200 F.3d 614 (9th Cir. 1999) (discussing that attorney general's authority to enforce the challenged state statute was a question of traceability); *National Audubon Society, Inc. v. Davis*, 307 F.3d 835, 846 (9th Cir. 2002) ("whether a named state official has direct authority and practical ability to enforce the challenged statute" is a question of whether a plaintiff is "circumventing the Eleventh Amendment under *Ex parte Young* simply by suing *any* state executive official"). These questions, along with Defendants' remaining challenges to Plaintiffs' standing, will therefore be addressed in turn below.

## III.   Legal Standards

### A.   Article III Standing

Article III federal courts are limited to deciding "cases" and "controversies." U.S. Const. art. III, § 2; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). "Article III standing" is among one of the components that enforces the "case-or-controversy requirement." *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 597-98 (2007). The doctrine of standing encompasses both constitutional requirements and prudential considerations. *See Valley Forge Christian Coll.*, 454 U.S. at 471; *Sahni v. American Diversified Partners*, 83 F.3d 1054, 1057 (9th Cir. 1996). The plaintiff bears the burden of establishing the existence of a justiciable case or controversy, and "'must demonstrate standing for each claim he

seeks to press' and 'for each form of relief' that is sought." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

The "irreducible constitutional minimum of standing" is comprised of three elements. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). First, "the plaintiff must have suffered an injury in fact - an invasion of a legally protected interest." *Id.* "An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent,' not 'conjectural' or 'hypothetical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. __, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan,* 504 U.S. at 560). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. ___, 133 S. Ct. 1138, 1150 n.5 (2013)). Where a plaintiff will sustain "a direct injury as a result of the statute's operation," *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979), and there is a responsive threat of state action, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law," *Driehaus*, 134 S. Ct. at 2342. Under these circumstances, where a plaintiff brings a pre-enforcement challenge, he "satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Driehaus*, 134 S. Ct. at 2342 (quoting *Babbitt,* 442 U.S. at 298). *See also Libertarian Party of Los Angeles County v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013); *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010).[8]

---

[8] "The constitutional component of ripeness overlaps with the 'injury in fact' analysis for Article III standing. Whether framed as an issue of standing or ripeness, the inquiry is largely the same: whether the issues presented are 'definite and concrete, not hypothetical or abstract.'" *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) (citations omitted). *See also LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154 (9th Cir. 2000) ("'the maturity of such disputes for resolution before a prosecution begins is decided on a case-by-case basis, by considering the likelihood that the complainant will disobey the law, the certainty that such disobedience will take a particular form, any present injury occasioned by the threat of prosecution, and the likelihood that a prosecution will actually ensue.'" (quoting *Blanchette v. Conn. Gen. Ins. Corp.*, 419 U.S. 102, 143 n.29 (1974))).

Second, for Article III standing, "there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly... traceable to the challenged action of the defendant, and not... the result of the independent action of some third party not before the court." *Lujan,* 504 U.S. at 560. *See also Salmon Spawning & Recovery Alliance v. Gutierrez,* 545 F.3d 1220, 1227 (9th Cir. 2008). The "line of causation" between a defendant's actions and a plaintiff's alleged harm must be more than "attenuated." *Allen v. Wright,* 468 U.S. 737, 757 (1984). "A causal chain does not fail simply because it has several 'links,' provided those links are 'not hypothetical or tenuous' and remain 'plausib[le].'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (quoting *Nat'l Audubon Soc.,* 307 F.3d at 849). Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan,* 504 U.S. at 561. *See also Cantrell v. City of Long Beach,* 241 F.3d 674, 679 (9th Cir. 2001); *United States v. City of Arcata*, 629 F.3d 986, 989 (9th Cir. 2010).

The prudential limitations on federal court jurisdiction dictate that: (1) a party must ordinarily assert its own legal rights and interests, and not those of others; (2) the harm asserted must not be a mere "generalized grievance" (i.e. "abstract questions of wide public significance"); and (3) the interest claimed must fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Valley Forge Christian Coll.*, 454 U.S. at 474-75; *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1122 (9th Cir. 2009).

**B.**     ***Ex parte Young* and Eleventh Amendment Immunity**

Under the Eleventh Amendment to the Constitution of the United States, a State may not be sued in federal court without its consent. *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Eleventh Amendment immunity extends to state departments, agencies, boards, and commissions, and to state employees acting in their official capacity because a suit against them is regarded as a suit against the State itself. *Will*, 491 U.S. at 71. An exception to this rule exists under *Ex parte Young*, *supra*, which permits a state official to be sued under § 1983 in his or her official capacity for

prospective declaratory or injunctive relief for an alleged violation of federal law. *Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013); *Jackson v. Hayakawa*, 682 F.2d 1344, 1351 (9th Cir. 1982). "[I]n a suit to enjoin the enforcement of an act alleged to be unconstitutional," the state officer "must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex Parte Young*, 209 U.S. at 157. "[T]hat connection 'must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit.'" *Coalition to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (quoting *L.A. Cnty. Bar Ass'n v. Eu,* 979 F.2d 697, 704 (9th Cir. 1992)).

### C.    Rule 12(b)(1)

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, an action may be dismissed for lack of jurisdiction.[9] A Rule 12(b)(1) motion can either be "facial," attacking a pleading on its face and accepting all allegations as true, or "factual," contesting the truth of some or all of the pleading's allegations as they relate to jurisdiction. *Wolfe v. Strankman,* 392 F.3d 358, 362 (9th Cir. 2004). In considering a facial challenge to jurisdiction, as here, the Court determines whether the allegations in the complaint are insufficient on their face to demonstrate the existence of jurisdiction, and dismissal is appropriate only where the plaintiff fails to allege an element necessary for subject matter jurisdiction. *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir. 2004). The material factual allegations of the complaint are presumed to be true and construed in favor of the complaining party. *Maya,* 658 F.3d at 1068.

---

[9]    Because "Article III standing is a species of subject matter jurisdiction[,]" *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1227 (9th Cir. 2011), it is properly raised in a Rule 12(b)(1) motion to dismiss[,]" *Chandler v. State Farm Mut. Auto. Ins. Co.,* 598 F.3d 1115, 1122 (9th Cir. 2010), not in a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted, *White v. Lee,* 227 F.3d 1214, 1242 (9th Cir. 2000). Likewise, "[a]lthough sovereign immunity is only quasi-jurisdictional in nature, Rule 12(b)(1) is still a proper vehicle for invoking sovereign immunity from suit." *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015). *See also Maya*, 658 F.3d at 1068.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.   Discussion

### A.   Foreground[10]

In *Planned Parenthood of Southeastern Pennsylvania v. Casey,* the Supreme Court held that a woman has a fundamental liberty interest, protected by the due process clause of the Fourteenth Amendment, "to choose to have an abortion before viability and to obtain it without undue interference from the State." 505 U.S. 833, 846 (1992) (plurality opinion of Justices O'Connor, Kennedy, and Souter),[11] reaffirming in part *Roe v. Wade*, 410 U.S. 113 (1973). *Casey* observed that states also have two legitimate interests that may justify regulation of abortion: an interest in promoting potential life and an interest in protecting the health of the woman. 505 U.S. at 878. *Casey* then "struck a balance," *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007), creating an "undue burden" framework to reconcile "the State's interest with the woman's constitutionally protected liberty," *Casey,* 505 U.S. at 876.

Under this approach, *Casey* held that the State may promote its interest in respecting potential life through measures designed to inform a woman's decision and to persuade her to choose childbirth over abortion. 505 U.S. at 878. By example, the Supreme Court held that a State may enact legislation which requires that a woman be provided with "information about the nature of the procedure, the attendant health risks and those of childbirth, and the probable gestational age of the fetus," *id.* at 881, and "be informed of the availability of information relating to fetal development and the assistance available should she decide to carry the pregnancy to full term," *id.* at 883. However, the State regulation may not impose an unconstitutional "undue burden" on a woman's liberty interests, by having "the purpose or effect of placing a substantial

---

[10]     As the Court does not reach the merits, it presents the following for context. *See Catholic League for Religious and Civil Rights v. City and County of San Francisco*, 624 F.3d 1043, 1049 (9th Cir. 2010) (the "standing analysis, which prevents a claim from being adjudicated for lack of jurisdiction," is not to be confused with or disguised as the "merits analysis, which determines whether a claim is one for which relief can be granted if factually true"); *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal").

[11]     This summary refers only to the opinion enunciated by the plurality in *Casey*.

obstacle" in a woman's path in deciding whether to terminate her pregnancy prior to fetal viability. *Casey*, 505 U.S. at 877. The information conveyed or made available to a woman must be "truthful and not misleading." *Casey*, 505 U.S. at 881. "[T]he means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it," *id.* at 877, and "a state measure designed to persuade her to choose childbirth over abortion" must be "reasonably related to that goal," *id.* at 878. *See also Gonzales,* 550 U.S. at 158 ("Where it has a rational basis to act… the State may use its regulatory power to… promote respect for life, including life of the unborn"). A State may also permissibly enact legislation requiring a physician to convey to a woman, and provide her with material containing information mandated by the State "as part of obtaining her consent to an abortion." *Casey,* 505 U.S. at 884.[12] However, that requirement must not interfere with the private doctor-patient relationship such that it imposes a substantial obstacle on a woman seeking an abortion. *Id.*

In *Wooley v. Maynard*, the Supreme Court held that the First Amendment protects "the right of freedom of thought," which "includes both the right to speak freely and the right to refrain from speaking at all." 430 U.S. 705, 714 (1977). Citing to *Wooley, Casey* observed a physician's First Amendment "right[] not to speak… as part of the practice of medicine." 505 U.S. at 884. The Supreme Court noted that the right is "subject to reasonable licensing and regulation by the State."[13] *Casey*, 505 U.S. at 884 (comparatively citing *Whalen v. Roe*, 429 U.S. 589, 603 (1977) (holding State legislation was a reasonable exercise of its broad police powers in regulating the administration of drugs by health professionals where "the decision to prescribe, or to use, is left entirely to the physician and the patient.")).

---

[12]     *Casey* noted as a preliminary matter, that the Pennsylvania "statute [did] not prevent the physician from exercising his or her medical judgment." *Casey,* 505 U.S. at 884.

[13]     The parties dispute whether the undue standard espoused by *Casey* applies to Plaintiffs' First Amendment claim. The Court in no manner decides that question or alludes to its answer here.

**B.     Article III Injury-In-Fact**

The Act requires that prior to performing or inducing an abortion, physicians must inform every patient that "i[t] may be possible to reverse the effects of a medication abortion," and of the availability of "[i]nformation on and assistance with reversing the effects of a medication abortion." Ariz. Rev. Stat. § 36-2153(A)(2)(h) and (i). The Act requires physicians to convey, and every patient seeking an abortion to receive from the physician as a part of the informed consent process, the state-mandated message orally and in person, in a private medical setting. § 36-2153(A)(3).

Plaintiffs have alleged a sufficiently concrete and imminent injury to physicians and patients arising from the operation of the Act, and that Plaintiffs are the appropriate parties to challenge it based on an assertion of physicians' and patients' constitutional rights.

**(1)     Physicians**

Physician-Plaintiffs "have alleged 'an intention to engage in a course of conduct arguably affected with a constitutional interest'" under the First Amendment that is "'proscribed by [the] statute' they wish to challenge." *Driehaus*, 134 S. Ct. at 2344 (quoting *Babbitt*, 442 U.S. at 298). *See Wooley, supra; Casey, supra*. Plaintiffs allege that the Act compels physicians to deliver a state-mandated message which is against their best medical judgment, contrary to the accepted standard of care, and is one "that they would not otherwise tell their patients." (Docs. 1 ¶¶ 46-57; 81-1 ¶¶ 49-61.)

Physician-Plaintiffs have alleged a credible threat of enforcement of the Act. The informed consent statute provides that a physician who knowingly fails to comply with its provisions, which includes the Act, is guilty of unprofessional conduct and is subject to license suspension or revocation. Ariz. Rev. Stat. § 36-2153(I).[14] *See Driehaus*, 134 S. Ct. at 2345 ("administrative action, like arrest or prosecution, may give rise to harm

---

[14]     A physician is also subject to a private cause of action brought in state superior court by a "woman on whom an abortion has been performed without her informed consent as required by" the Act, by the woman's spouse, or the parents of a woman under the age of 18. § 36-2153(J) and (K).

13

sufficient to justify pre-enforcement review"); *Doe v. Bolton,* 410 U.S. 179, 188 (1973) (finding standing where physicians asserted "a sufficiently direct threat of personal detriment" for performing an abortion that did not meet statutory conditions); *Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir. 2013) (physician had standing to challenge an abortion law that posed a direct threat of prosecution); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011) (finding standing where plaintiff "is the direct object of regulatory action"). As here, "[a] plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute." *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003). "The State has not suggested that the newly enacted law will not be enforced, and [the Court] see[s] no reason to assume otherwise." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988).[15] *Cf. Thomas v. Anchorage Equal Rights Comm'n,* 220 F.3d 1134, 1140 (9th Cir. 2000) ("When plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, they do not allege a dispute susceptible to resolution by a federal court.") (citation and quotation marks omitted).

Whether physicians perform abortions without advising their patients regarding the Act's medication abortion reversal provisions and face punishment, or unwillingly convey the state-mandated message under threat of prosecution, as alleged, their First Amendment rights are concretely and imminently affected. *See Wasden,* 376 F.3d at 916-17; *Human Life of Wash. Inc. v. Brumsickle,* 624 F.3d 990, 1000 (9th Cir. 2010) ("[W]hen a challenged statute risks chilling the exercise of First Amendment rights, the Supreme Court has dispensed with rigid standing requirements and recognized 'self-

---

[15]     Defendants' uncertainty as to whether a physician's failure to comply with the Act would qualify as a basis to seek an emergency injunction does not make the prospect of enforcement under Ariz. Rev. Stat. § 36-2153(I) any less credible or more speculative. (Doc. 46 at 7 n.3.) *See* § 32-1454(A)(2) ("An injunction shall issue forthwith to enjoin the practice of medicine by... [a] doctor of medicine whose continued practice will or well might cause irreparable damage to the public health and safety...")

censorship' as a harm that can be realized even without an actual prosecution." (citations and quotation marks omitted)); *Getman*, 328 F.3d at 1094 ("In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences."); *McCormack v. Herzog*, 788 F.3d 1017, 1027 (9th Cir. 2015) (parties "need not even claim a 'specific intent to *violate* the statute,'" they need only possess "reasonable fear a statute would be enforced against it *if* it engaged in certain conduct") (citations omitted); *Arizona Right to Life Political Action Committee v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003); *Bland v. Fessler*, 88 F.3d 729, 737 (9th Cir. 1996).

Further, contrary to Defendants' contention, Planned Parenthood and Desert Star are appropriate representatives to litigate and assert the First Amendment rights of the third-party physicians that they employ. (Doc. 87 at 5 n.2; Doc. 73.) *See Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am. v. Brock,* 477 U.S. 274, 281 (1986) ("injury to an organization's members will satisfy Article III and allow that organization to litigate in federal court on their behalf"); *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342 (1977) ("an association may have standing solely as the representative of its members"); *Colwell v. Dept. of Health and Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009); *cf. Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1101 (9th Cir. 2004) (organizational standing, in comparison to representational standing by an organization, turns on "whether the organization *itself* has suffered an injury in fact") (emphasis added). Planned Parenthood and Desert Star are "in every practical sense identical" to the physicians it employs. *Nat'l Ass'n for Advancement of Colored People (NAACP) v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 459 (1958). As previously addressed, physicians would otherwise have standing to sue in their own right. The interests they seek to protect are germane to their purpose of providing reproductive health care services. Because the parties are seeking injunctive and declaratory relief, individual participation of the physicians employed by Planned Parenthood and Desert

Star is unnecessary. *See Hunt, supra*; *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130-31 (9th Cir. 1996).

**(2)    Patients**

Plaintiffs have sufficiently alleged a concrete "invasion of [patients'] legally protected interests" under the Fourteenth Amendment to decide to have an abortion prior to fetal viability without undue government interference. *Lujan*, 504 U.S. at 560. *See Casey, supra.* Plaintiffs allege that the Act compels patients seeking an abortion to receive information from their physician that is untruthful and/or misleading, to receive and be offered information from their physician that they allege is irrelevant and not tailored to their specific medical situations, and to receive and be offered information from their physician that interferes with the informed consent process. (Docs. 1 ¶¶ 49-55, 59; 81-1 ¶¶ 52-59, 63.)

Further, because "the First Amendment has a penumbra where privacy is protected from governmental intrusion," Plaintiffs have also alleged a concrete invasion of patients' legally protected interests under the First Amendment to *receive* information concerning medical treatment from a physician exercising his or her professional medical judgment. *Griswold v. Connecticut*, 381 U.S. 479, 483 (1965); *Whalen v. Roe*, 429 U.S. 589, 600 n.25 (1977); *Lujan*, *supra. See also Conant v. Walters*, 309 F.3d 629, 643 (2002) ("It is well established that the right to hear—the right to receive information—is no less protected by the First Amendment than the right to speak."); *Hill v. Colorado*, 530 U.S. 703, 716-18 (2000);  *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) ("the right to receive ideas follows ineluctably from the sender's First Amendment right to send them… the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech"); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976) (protection under the First Amendment extends "to the communication, to its source and to its recipients both."); *Griswold*, 381 U.S. at 483 (the right of freedom of speech includes "the right to receive, the right to read and freedom of inquiry") (citation

1    omitted).[16]

2         The alleged injury to patients' Fourteenth Amendment rights is imminent because

3    "[t]he woman's exercise of her right to an abortion, whatever its dimension, is []

4    necessarily at stake" and is susceptible to "incipient mootness." *Singleton v. Wulff*, 428

5    U.S. 106, 117, 126 (1976). The danger of sustaining an injury to their First Amendment

6    rights is equally imminent; the injury is inherent in the challenged statute and likelihood

7    that the state-mandated message will be received is derivative of the likelihood that their

8    physician will speak it. *See supra.*

9         Further, as a prudential matter, Plaintiffs are the appropriate parties to challenge

10   the Act on the basis of patients' alleged constitutional rights. As recognized by the

11   parties, there is a legion of cases that have come before the Supreme Court and Ninth

12   Circuit in which both physicians and abortion facilities were permitted to litigate on

13   behalf of third-party patients to enjoin state laws restricting abortion rights. *See Griswold*,

14   381 U.S. at 481 (physicians asserted constitutional rights of patients to whom they

15   prescribed contraceptive devices); *Singleton*, 428 U.S. at 118 (recognizing that "there

16   seems little loss in terms of effective advocacy from allowing [an assertion of a woman's

17   right to an abortion] by a physician"); *Planned Parenthood of Central Missouri v.*

18   *Danforth*, 428 U.S. 52, 62 (1976); *Casey*, 505 U.S. at 845 (abortion providers challenged

19   a state statute on behalf of third-party women who seek abortion services); *McCormack*,

20   788 F.3d at 1027 ("a physician possesses standing on his own behalf and on that of his

21   patients to challenge the validity of [an] abortion statute."); *Isaacson*, 716 F.3d at 1221

22   (allowing physicians to bring challenges to abortion laws on behalf of their patients);

23   *Wasden*, 376 F.3d at 917 ("physicians and clinics performing abortions are routinely

24   recognized as having standing to bring broad facial challenges to abortion statutes.");

---

25   [16]  The Court recognizes that Plaintiffs have not advanced this alternative legal
26   theory. Because this case has yet to progress to the merits, the Court raises this question
     as one of interest that is antecedent to the issues before it. *See U.S. Nat'l Bank of Or. v.*
27   *Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993); *Kamen v. Kemper Fin. Servs.,*
     *Inc.*, 500 U.S. 90, 99 (1991). Nevertheless, the decision to pursue their claim under this
28   legal theory remains within Plaintiffs' discretion. In other words, the Court has offered a
     spoon, but will not stir the pot.

*Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 910 (9th Cir. 2014) (physicians and clinics "brought their claims on behalf of themselves, their patients, and the physicians they employ").

Physician-Plaintiffs are appropriate parties to assert the rights of patients seeking an abortion. *See Singleton*, 428 U.S. at 117 ("it is generally appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision"). The intimacy inherent to the physician-patient relationship and the necessary involvement of the physician in the abortion process makes them uniquely qualified to advocate on behalf of patients and their abortion rights. *See Singleton,* 428 U.S. at 117 (third-party standing looks to "the relationship of the litigant to the person whose right he seeks to assert"); *Isaacson*, 716 F.3d at 1221. The difficulty for women to directly vindicate their rights without compromising their privacy and the imminent mootness of their claims makes it appropriate for physicians to do so. *Singleton,* 428 U.S. at 118 (third-party standing looks to "the ability of the third party to assert his own right"); *Isaacson*, 716 F.3d at 1221. *See also Broadrick v. Oklahoma,* 413 U.S. 601, 612 (1973) ("Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."); *NAACP, supra* (allowing standing to assert First and Fourteenth Amendments rights on behalf of third parties). Physicians have a direct stake in the informed consent process as a corollary of their professional responsibilities, and in challenging the specific provision of the Act because they are vulnerable to prosecution if they do not carry out its requirements. *See Doe*, 410 U.S. at 188.

The Court observes that none of the precedents cited above examined whether abortion facilities, as entities, could assert the rights of patients, either deferring the question because other parties had standing to assert the claims at issue, or justiciability was not questioned. Undertaking that consideration, the Court sees no reason to arrive at

18

a different conclusion. Where, as here, the exercise of patients' rights is inextricably bound with the activities of their physicians, so is the provider whose operation is dependent on the existence of that relationship. In this regard, an abortion facility has a "'direct stake' in the abortion process." *McCormack*, 788 F.3d at 1028; *Am. Booksellers Ass'n*, 484 U.S. at 393 (bookseller organizations and booksellers had standing to sue based on alleged infringement of bookbuyers' First Amendment rights); *see also Eisenstadt v. Baird,* 405 U.S. 438, 445 (1972) (distributor of contraceptives who acted as "an advocate of the rights of persons to obtain contraceptives and those desirous of doing so" had third-party standing); *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 536 (1925) (enterprises permitted to litigate against interference with the freedom of patrons or customers). The ability to advocate for the interests of physicians and the patients they serve is not severed by the corporate form, nor does its entity status diminish the reasons which endorse third-party representation of women seeking an abortion. *See Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 293 (3rd Cir. 2002) ("So long as the association's members have or will suffer sufficient injury to merit standing and their members possess standing to represent the interests of third-parties, then associations can advance the third-party claims of their members without suffering injuries themselves."). Therefore, Planned Parenthood and Desert Star are also appropriate parties to assert the constitutional rights of patients.

Defendants argue that this case is distinguishable from the litany, and maintain it would be inappropriate to allow Plaintiffs to challenge the Act based on the asserted rights of patients. First, Defendants argue that unlike its predecessors that necessarily involved challenges to law regulating the right to seek or obtain an abortion, this case challenges government-regulated informed consent. (Doc. 87 at 5.) This argument is summarily rejected. *See Casey*, 505 U.S. at 884 (the "abortion right" evolves from two "general rights… the right to make family decisions and the right to physical autonomy").

Defendants next argue that this case is distinguishable because "there is no 'close

relationship' which makes it appropriate for Plaintiffs to step into the shoes of patients and assert their legal rights." (Doc. 87 at 7; *see also* Doc. 60 at 31-33.)  While a patient seeks "to obtain information concerning all available treatment options," Defendants contend that Plaintiffs are "seeking to prevent her from doing so." (Doc. 87 at 7.) Because Plaintiffs seek "to withhold information from patients which might otherwise aid such patients in making a more free and informed abortion decision," their "position and purpose in this matter are adverse to the interests and welfare of those patients." (Doc. 87 at 5-7.) This rationale is spurious and amounts to nothing but a poorly veiled attempt to litigate the merits in reverse.

### C.   Article III Traceability and *Ex parte Young* Exception

### (1)   Members of Arizona Medical Board and Executive Director

Plaintiff sues the members of the Arizona Medical Board ("Members" or "Board"),[17] and Patricia E. McSorley, the Board's Executive Director, in their official capacities. Plaintiffs allege that they have the authority to enforce the Act. (Docs. 1 ¶¶ 13-14; 81-1 ¶¶ 13-14.)

"The primary duty of the board is to protect the public from unlawful, incompetent, unqualified, impaired or unprofessional practitioners of allopathic medicine through licensure, regulation and rehabilitation of the profession" in Arizona. Ariz. Rev. Stat. § 32-1403;[18] (Docs. 1 ¶ 14; 81-1 ¶ 14). Board Members have statutory authority to initiate investigations of physician unprofessional conduct, and to discipline licensed physicians. § 32-1403(A)(2) and (5); § 32-1451(A) and (J); (Docs. 1 ¶ 14; 81-1 ¶ 14). The Executive Director, who is not a member of the Board, has the authority to "employ, evaluate, dismiss, discipline and direct professional, clerical, technical, investigative and

---

[17]     The named Board Members include: Richard T. Perry, M.D. (Board Chair), James Gillard, M.D. (Board Vice Chair), Jodi A. Bain, Marc D. Berg, M.D., Donna Brister, R. Screven Farmer, M.D., Gary R. Figge, M.D., Robert E. Fromm, M.D., Paul S. Gerding, Lois Krahn, M.D., Edward G. Paul, M.D., and Wanda J. Salter. (Docs. 1 ¶ 14; 81-1 ¶ 14.)

[18]     "Administrative agencies have no common law or inherent powers-their powers are limited by their enabling legislation." *Ariz. State Bd. of Regents ex rel. Ariz. State Univ. v. Ariz. State Pers. Bd.*, 985 P.2d 1032, 1034 (Ariz. 1999).

administrative personnel necessary to carry on the work of the board." § 32-1405(A) and (C)(1). She has authority to "[i]nitiate an investigation if evidence appears to demonstrate that a physician may be engaged in unprofessional conduct," § 32-1405(C)(12), and to review complaints alleging unprofessional conduct, § 32-1405(C)(21). (Docs. 1 ¶ 13; 81-1 ¶ 13.) She has authority to "[p]rovide assistance to the attorney general in preparing and sign and execute disciplinary orders, rehabilitative orders and notices of hearings as directed by the board," § 32-1405(C)(14), and performs "all other administrative, licensing or regulatory duties required by the board," § 32-1405(C)(28).

Board Members do not dispute that they have authority to enforce violations of the Act by Physician-Plaintiffs. Rather, the Board Members argue that Planned Parenthood and Desert Star may not bring claims against them because the Board "does not have any power or duty to administer or enforce licensure requirements for abortion clinics." (Doc. 41 at 4.) The Board's authority to sanction institutions and clinics is immaterial to whether their conduct is fairly traceable to Plaintiffs' alleged injuries, or whether they have some connection with the enforcement of the Act. Rather, as previously addressed, Planned Parenthood and Desert Star sue on the basis of the alleged injuries of third-party physicians licensed to practice medicine by the Board. This is sufficient.

Next, McSorley argues that she lacks the necessary statutory authority to enforce the Act. Instead, she contends, her duties "are largely administrative and ministerial." (Doc. 40 at 1.) She argues that although she has authority to "initiate investigations into potential unprofessional conduct under A.R.S. § 32-1405(C)(12)," and "review complaints filed under A.R.S. § 32-1451," she has no power to "discipline." (Doc. 72 at 3.) McSorley further argues that while she "can 'provide assistance to the attorney general in preparing and sign and execute disciplinary orders, rehabilitative orders and notices of hearing'… she has no ability to take any of those actions absent Board approval and direction." (Doc. 72 at 3.) Her authority to "sign orders as directed by the Board… is purely ministerial." (Doc. 40 at 2.)

Contrary to her characterization, neither the initiation of an investigation or the

review of complaints qualifies as an inconsequential step in the road to license suspension or revocation. *See Webb v. State ex rel. Ariz. Bd. of Med. Exam'rs*, 48 P.3d 505, 508 (Ariz. Ct. App. 2002) (noting that a physician has a property interest embodied in a license to practice medicine, and even in an investigation for professional censure, must be afforded with due process of law). McSorley need only have some connection with and be fairly traceable to the enforcement of the Act from which Plaintiffs' alleged injuries arise; her conduct need not be the first or final step "in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-169 (1997). *See also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. ___, 134 S. Ct. 1377, 1390 (2014) ("the proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct.").

Nor is McSorley's authority to sign and issue an order of license suspension or revocation simply paperwork. McSorley has "a powerful coercive effect on the action agency" because she is assigned with the authority to assist and give effect to the Act through her authority to carry out vital steps in the disciplinary process. *Bennett*, 520 U.S. at 169. *See also Ritland v. Ariz. State Bd. of Med. Exam'rs*, 140 P.3d 970, 972 (Ariz. Ct. App. 2006) (it is the action of the Board, not the ALJ, "that ultimately finds a person guilty of unprofessional conduct and enters disposition of the person's license." (citing Ariz. Rev. Stat. § 32-1451(M))). If Plaintiffs' alleged injuries were the result of "the independent action of some third party not before the court," those injuries would not be fairly traceable to McSorley or to the actions of the other Defendants before the Court. *Bennett*, 520 U.S. at 169. However, the nexus between her conduct and Plaintiffs' alleged injuries does not cease simply because there are others who are necessary links in the causal chain. *See Maya*, 658 F.3d at 1070 ("A causal chain does not fail simply because it has several 'links,' provided those links are 'not hypothetical or tenuous" and remain 'plausible.'") (quoting *Nat'l Audubon Soc.,* 307 F.3d at 849); *Clapper*, 133 S. Ct. at 1148 (injury cannot be the result of an "attenuated chain of possibilities").

The conduct of the Board Members and McSorley bears a sufficient causal

connection to Plaintiffs' alleged injuries arising from the Act. Their specific statutory authority to prosecute violations of the Act, along with their duty to do so, establishes that they both have the requisite "connection with the enforcement" of the Act. *See Culinary Workers Union*, 200 F.3d at 619 (citing *Okpalobi v. Foster*, 190 F.3d 337, 347 (5th Cir. 1999) (observing that Article III justiciability and Eleventh Amendment immunity present "a closely related—indeed, overlapping—inquiry"); *Harris,* 729 F.3d at 943.

### (2) Arizona Attorney General

Mark Brnovich is sued in his official capacity as the Arizona Attorney General. Plaintiffs allege that Brnovich has the authority to enforce the Act because the Attorney General is in "charge of" the Department of Law, is the "chief legal officer of the state," Ariz. Rev. Stat. § 41-192(A), and serves as "the legal advisor of the departments of this state and render such legal services as the departments require," § 41-192(A)(1). (Docs. 1 ¶ 11; 81-1 ¶ 11.)

Brnovich argues that he is not a proper party because, in his capacity as Attorney General, he is not conferred with independent authority to take disciplinary action against physicians and therefore lacks the requisite authority to enforce the Act. (Doc. 75 at 3.) He maintains that the Attorney General lacks authority to initiate license revocation or injunction proceedings against physicians (Docs. 46; 75 at 7);[19] he serves only in the "role as a legal advisor and not as a policy maker" (Doc. 75 at 7-8); and is merely "the attorney for the agency, no more," (Doc. 46 at 7 (quoting *Santa Rita Mining Co. v. Dep't of Prop. Valuation*, 530 P.2d 360, 363 (Ariz. 1975)). As above, this argument also falls short. The Attorney General's independent authority, ability to initiate proceedings, and advisory responsibilities do not circumscribe whether there is a sufficient causal

---

[19] Brnovich argues that the Attorney General lacks authority to "enforce" the Act as defined under Arizona law. (Doc. 75); *Ariz. State Land Dep't v. McFate*, 348 F.3d 912 (Ariz. 1960). While the scope of state statutory authority to administer the law is critical to whether Brnovich is a proper party, the State's common law definition of "enforce" is not. The term may often be embedded in Article III standing and Eleventh Amendment discussions, but the ability to "enforce" the law is not a static concept in application.

connection between his conduct and the alleged injuries that will arise from the Act's operation.

The Attorney General has "a powerful coercive effect on the action agency" because he is assigned with the authority to assist and give effect to the Act through his authority to prosecute it. *Bennett*, 520 U.S. at 169.  Where a licensee's right to practice medicine is implicated, such as by license revocation or suspension by the Board, a formal administrative hearing must be initiated. *See Ritland*, 140 P.3d at 972; Ariz. Rev. Stat. § 32-1451(D) and (J). The representation of an agency official in an administrative hearing to revoke or suspend a professional license is the "practice of law," and is a prosecutorial function that may only be performed by a licensed attorney. *Romley v. Arpaio*, 40 P.3d 831, 835 (Ariz. Ct. App. 2002) (citing *State Bar of Ariz. v. Ariz. Land Title & Trust Co.*, 366 P.2d 1, 14 (Ariz. 1961); Ariz. Sup. Ct. R. 31(a)(3)). With exception to instances where a conflict of interest exists, only the Attorney General may serve as counsel and prosecutor in those proceedings. *See* Ariz. Rev. Stat. § 41-1092.11(B); § 41-193(A)(2) ("Unless otherwise provided by law the department shall… when deemed necessary by the attorney general, prosecute and defend any proceeding in a state court other than the supreme court in which the state…is a party or has an interest"); § 41-192(D) ("no state agency other than the attorney general shall employ legal counsel or make an expenditure or incur an indebtedness for legal services"). If the Board wishes to pursue an action or maintain a defense that the Attorney General determines is not legally supportable or runs afoul of his constitutional obligations, he may not pursue it on the agency's behalf. *See* § 41-192(E) and (F); § 38-231(A) and (E); Ariz. Sup. Ct. R. 42, ER 3.1; Ariz. Sup. Ct. R. 41(d). Upon a finding that a physician is guilty of unprofessional conduct, the Attorney General has authority to prepare disciplinary orders. §§ 32-1405(C)(12), 1451(M).

Although he may not carry out the first or final act of discipline, Brnovich is conferred with sufficient statutory authority to prosecute physicians such that he has some connection with the enforcement of the Act, and there is a sufficient nexus between

his conduct and Plaintiffs' alleged constitutional injuries. *See Wasden*, 376 F.3d at 919; *Bennett*, 520 U.S. at 168-169. Plaintiffs' alleged injuries are not the result of "the independent action of some third party not before the court." *Id.* Nor is the Attorney General's conduct simply a single link in an "attenuated chain of possibilities." *Clapper*, 133 S. Ct. at 1148. Rather, the Attorney General's actions, when considered in tandem with the actions of the Board and its Director, form a causal chain that is both clear and plausible. *See Maya*, 658 F.3d at 1070.

### (3)   Director of Arizona Department of Health Services

Plaintiffs allege that the Arizona Department of Health Services "has authority to assess a penalty, revoke a clinic license, or take other disciplinary action against a clinic for violating the Act." (Docs. 1 ¶ 20; 81-1 ¶ 20.) Plaintiffs sue Cara Christ, M.D. in her official capacity as ADHS Director. (Docs. 1 ¶ 12; 81-1 ¶ 12.)

Christ moves to dismiss Physician-Plaintiffs' claim against her because she lacks authority to enforce the Act against them. (Doc. 44.)[20] In this instance, the Court agrees. In fact, the Court finds that Plaintiffs do not offer any allegation showing Christ has any authority to implement or prosecute violations of *the Act* – Ariz. Rev. Stat. § 36-2153(A)(2)(h) and (i).

ADHS is vested with the duty to "[p]rotect the health of the people of the state," Ariz. Rev. Stat. § 36-132(A)(1), and is responsible for licensing and regulating health care institutions, § 36-132(A)(17). "The direction, operation and control of [ADHS] are the responsibility of the director." § 36-102(B). Christ is responsible for performing "all duties necessary to carry out the functions and responsibilities of the department," § 36-136(A)(2); for "[a]dminister[ing] and enforc[ing] the laws relating to health and sanitation and the rules of [ADHS]," § 36-136(A)(4); and for "mak[ing] and amend[ing] rules necessary for the proper administration and enforcement of the laws relating to the

---

[20]     Plaintiffs respond that Court need not determine whether they have standing to sue Christ because they have demonstrated standing on other grounds. (Doc. 66 at 14-15 (citing *Wasden*, 376 F.3d at 918).) This argument is misplaced. Unlike in *Wasden*, there remains a question as to whether there is *any* nexus between Christ's authority to enforce the Act and Plaintiffs' alleged injuries.

public health," § 36-136(F), including those "relating to the abortion procedure," § 36-449.03(E).

Plaintiffs allege that Christ "has the power and duty to administer and enforce licensure requirements for healthcare institutions, including abortion clinics." (Docs. 1 ¶ 12; 81-1 ¶ 12). Plaintiffs do not, however, allege any basis which suggests health care institutions or abortion clinics, such as Planned Parenthood or Desert Star, would be penalized for violating *the Act.* By way of citation, Plaintiffs allege that Christ has authority to suspend or revoke the license of any health care institution if its owners, officers, agents or employees who violate the "chapter" (i.e., the laws governing health care institutions, including abortion clinics)[21] or the rules adopted by ADHS, Ariz. Rev. Stat. § 36-427(A); to enjoin operation of a health care institution or abortion clinic if she believes that a violation of the laws governing health care institutions and abortion clinics endanger the health, safety, or welfare of a patient, § 36-429(A)(1); to enjoin operation of a health care institution or abortion clinic that exceeds the range of services for which it is licensed, § 36-430; to penalize an abortion clinic that "is not adhering to the licensing requirements… or any other law or rule concerning abortion," § 36-449.02(F); to penalize an abortion clinic that "is not in substantial compliance" with the laws governing abortion clinics or the rules, § 36-449.03(I)(1); and to "assess a civil penalty against a person who violates" the laws governing health care institutions and abortion clinics or the rules adopted by ADHS, § 36-431.01(A). (Docs. 1 ¶¶ 12, 20; 81-1 ¶¶ 12, 20.) Yet, Plaintiffs do not point to any law or rule that requires health care institutions or abortion clinics to deliver the Act's message to patients, to ensure physician compliance with the Act, or to otherwise carry out the Act.[22] *Cf. Planned Parenthood Arizona, Inc. v. Humble*,

---

[21]     The "chapter" regulating health care institutions, including abortion clinics, is contained at Chapter 4, Title 36 of the Arizona Revised Statutes (Ariz. Rev. Stat. §§ 36-401 – 36-450.02).

[22]     Plaintiffs do not allege that Planned Parenthood or Desert Star will knowingly assist or conceal violations of the Act by their physicians. *See* Ariz. Rev. Stat. § 32-1451(A) and (B) (discussing that health care institutions and their staff must report to the Arizona Medical Board in good faith if informed of a doctor's unprofessional conduct).

753 F.3d 905 (9th Cir. 2014) (involving a challenge to a state statute and rule regulating abortion clinics that required medications used to induce abortions be administered in compliance with Food and Drug Administration's on-label regimen).

For example, under the rules adopted by ADHS, an abortion clinic director must ensure that before an abortion is performed on a patient, written consent has been signed and dated by the patient, and information has been provided to the patient "on the abortion procedure including alternatives, risks, and potential complications." Ariz. Admin. Code § R9-10-1508(E)(1)-(2) (eff. Apr, 1, 2014). This rule does not require that written consent must be obtained in the manner proscribed by the Act, or any part of the informed consent statute. *Cf.* Ariz. Rev. Stat. § 36-449.03(K) ("The rules adopted by the director pursuant to this section do not limit the ability of a physician or other health professional to advise a patient on any health issue"). Thus, while Christ has authority to penalize a health care institution or abortion clinic that fails to comply with § R9-10-1508(E), this power has no bearing on her ability to take disciplinary action against an institution or clinic for a violation of the Act.

Plaintiffs also do not allege that Christ is delegated with any authority to penalize physicians. While Plaintiffs allege that "Christ's Department" is responsible for "including information about 'the reversal of a medication abortion' on a website," (Doc. 81-1 ¶ 12), they do not show how this authority bears some connection with Christ's ability to enforce violations of *the Act*.[23] Therefore, Plaintiffs have failed to allege there is some casual connection between her conduct, her ability to enforce any violation of the Act, and Plaintiffs' alleged injuries arising from operation of the Act. Christ will

---

[23] Plaintiffs do not allege patients are harmed by the availability of or their potential voluntary exposure to information concerning medication abortion reversal that is posted on the ADHS's website. In other words, Plaintiffs' alleged injuries arise from the injection of the challenged state-mandated materials into the patient-physician discourse – not from the posting of the material on ADHS's website. Thus, Plaintiffs' allegations, as amended, do not allege a basis to sue Christ to enjoin her from maintaining the website or posting information about medication abortion reversal in accordance with Ariz. Rev. Stat. § 36-2153(C)(8).

therefore be dismissed.[24]

### D.   Redressability

Extracted from their allegations, Plaintiffs seek to enjoin enforcement of regulations requiring physicians to inform patients that it may be possible to reverse a medication abortion, to refer patients to ADHS's website that contains information concerning medication abortion reversal, and to offer and/or provide patients information related to medication abortion reversal. Stated in the alternative, Plaintiffs seek to enjoin enforcement of regulations requiring that a patient seeking an abortion be informed by her physician that it may be possible to reverse a medication abortion, be referred to ADHS's website by her physician that contains information related to medication abortion reversal, and be offered and/or provided information regarding medication abortion reversal by her physician.

Because "defendants have the power to discipline," an injunction prohibiting Defendants from enforcing violations of the Act will redress some of Plaintiffs' alleged injuries. *Wolfson*, 616 F.3d at 1056.[25] As alleged, physicians would not be compelled to deliver the Act's message under fear of punishment, and would be free to counsel patients seeking an abortion in a manner consistent with their medical judgment. *See Wolfson*, 616 F.3d at 1056-1057 ("Without a possibility of the challenged canons being enforced, those canons will no longer have a chilling effect on speech"). This relief extends to redress patients' alleged injuries. Physician-Plaintiffs allege that but-for the Act, they would not deliver its message to patients. Therefore, as alleged, a woman

---

[24]     Because the Court cannot say that it is clear that the claim against Christ could not be saved by *any* amendment, she will be dismissed without prejudice. The Court cautions that should Plaintiffs seek to reinstate Christ by amendment, any such claim must be alleged with specificity.

[25]     Declaratory relief would settle "some dispute which affects the behavior of the defendant[s] toward the plaintiff[s]." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987). Further, although a finding by the district court that the provision is unconstitutional would not be binding, it is likely that a private suit commenced in state superior court based on a violation of the Act would not be entertained. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976) ("the relevant inquiry is whether... the plaintiff has shown an injury to himself that is *likely* to be redressed by a favorable decision.").

seeking an abortion would be free to decide whether to terminate her pregnancy without the injection of a message from her physician that is false, misleading, and/or irrelevant, and be advised by her physician concerning medical treatment in a manner that is consistent with the physician's medical judgment.

Defendants argue that an injunction of the Act responsive to physicians' First Amendment claim would redress all of Plaintiffs' alleged injuries; "Plaintiffs would neither have to inform their patients of the existence of the website nor provide them with any information or documentation regarding it." (Doc. 87 at 3.) Therefore, because redress in connection with Plaintiffs' remaining claims "vis-à-vis the website" would be effectively moot, Defendants maintain Plaintiffs lack standing to assert the rights of patients. (Doc. 87 at 3.) This reasoning is flawed. The possibility that Plaintiffs would prevail on one claim and obtain relief which would redress the other has no bearing on whether there is currently a live justiciable controversy.

Plaintiffs however do acknowledge that an injunction of *the Act*, alone, would not offer complete redress for the injuries that they have alleged. They observe that "[i]ndependent of the Act," the informed consent statute requires that patients be informed by their physician of the ADHS website which contains information regarding medication abortion reversal, Ariz. Rev. Stat. § 36-2153(A)(2)(f),[26] and be offered and provided a printed copy of those materials if they choose to review them, § 36-2153(A)(2)(g). (Doc. 89 at 3.) In doing so, Plaintiffs appear to allude that they are also seeking to enjoin § 36-2153(A)(2)(f) and (g), but deflect by citing they have requested "equitable relief" which will "free Plaintiffs from those unconstitutional requirements." (Doc. 89 at 3; *see also* Docs. 1; 81-1 § VI (requesting that the Court "[g]rant such other and further relief as this Court may deem just, proper, and equitable.").) The Court agrees that, under the same reasoning above, Plaintiffs' alleged injuries could be relieved by an injunction enjoining the enforcement of § 36-2153(A)(2)(f) and (g), just as an injunction

---

[26]     The statutory provision which requires the ADHS to post information on its website "on potential ability... to reverse a medication abortion," § 36-2153(C)(8), went into effect in 2015. (*See* Doc. 81-1 ¶¶ 35-37; 82 at 2.)

against § 36-2153(A)(2)(h) and (i) could. However, given the extraordinary nature of such relief, Plaintiffs will be called to amend their demand and set forth their additional request for injunctive relief with specificity.

Nevertheless, while this issue is notable, it is not dispositive of Plaintiffs' standing. Redressability does not require that a favorable decision would relieve "*every* injury." *Larson v. Valente,* 456 U.S. 228, 243 n.15 (1982). Because the alleged injuries would be alleviated to some degree by an injunction of *the Act*, Plaintiffs have sufficiently alleged standing. *See Massachusetts v. EPA,* 549 U.S. 497, 526 (2007) (redressability is satisfied where the risk of harm "would be reduced to some extent if petitioners received the relief they seek").

**V.     Conclusion**

Plaintiffs have made a sufficient showing of Article III standing to pursue declaratory and injunctive relief for each of its claims. Finding that Plaintiffs' have failed to offer sufficient facts showing that their alleged injuries are traceable to Christ and that she possesses the necessary enforcement authority under *Ex parte Young*, she will be dismissed from this action. For the reasons above, the remaining motions to dismiss will be denied. Plaintiffs are directed to file an amended complaint consistent with this Order and in accordance with Rule 15.1 of the Local Rules of Civil Procedure. Accordingly,

**IT IS ORDERED**:

1.   That the Motions to Dismiss filed by Mark Brnovich (Doc. 46), Patricia E. McSorley (Doc. 40), and the Members of the Arizona Medical Board (Doc. 41) are **denied**;

2.   That Defendant Cara Christ's Motion to Dismiss (Doc. 44) is **granted** and she is **dismissed without prejudice** from this action;

3.   That Plaintiffs' Motion for Leave to Amend (Doc. 81) is **granted**;

4.   That Plaintiffs shall have until **April 4, 2016** to file an Amended Complaint consistent with this Order and the local rules; and

5.   That Defendants shall have **fourteen (14) days** from the date of the filing of

the Amended Complaint to file an answer.

Dated this 23rd day of March, 2016.

Honorable Steven P. Logan
United States District Judge